Mary M. Mayotte
23 South Garfield St.
Denver, CO 80209
Phone Number: 303-321-8935

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2014 DEC -8 PH 4: 58

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

MARY M. MAYOTTE, an individual;

    Plaintiff,

    vs.

US BANK NATIONAL ASSOCIATION,
AS TRUSTEE FOR STRUCTURED
ASSET INVESTMENT LOAN TRUST
MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2006-4;
WELLS FARGO BANK N.A.;
AMERICA'S SERVICING COMPANY;
and ALL PERSONS OR ENTITIES
CLAIMING ANY LEGAL OR
EQUITABLE RIGHT, TITLE, ESTATE,
LIEN OR INTEREST IN THE
PROPERTY DESCRIBED IN THIS
COMPLAINT ADVERSE TO
PLAINTIFF'S TITLE, OR ANY CLOUD
UPON PLAINTIFF'S TITLE THERETO;
DEBRA JOHNSON, PUBLIC TRUSTEE
AND DOES 1-20, Inclusive.

    Defendants.

Court Case Number: 14CV3092 CBS

**VERIFIED FIRST AMENDED COMPLAINT:**

1. DECLARATORY RELIEF [28 U.S.C.§§2201,2202]
2. NEGLIGENCE
3. QUASI CONTRACT
4. VIOLATION OF 12 U.S.C. §2605
5. VIOLATIONS OF 15 U.S.C. §1692 ET SEQ [FDCPA]
6. CANCELLATION OF INSTRUMENTS
7. QUIET TITLE
8. VIOLATION OF DUE PROCESS SAFEGUARDS
9. **INJUNCTIVE RELIEF PERTAINING TO THE FILING OF A FORCEABLE ENTRY AND DETAINER ACTION PURSUANT TO EX PARTE YOUNG**
10. ACCOUNTING
11. SANCTION FOR DUAL TRACKING
12. SET ASIDE THE PUBLIC TRUSTEE SALE
_____**FORTHWITH**_____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

I. STATEMENT OF THE CASE ................................................. 1

II. JURISDICTION, VENUE, AND PARTIES ............................ 4

III. JURY TRIAL DEMAND ..................................................... 7

IV. INTRODUCTION ............................................................... 7

V. ADDITIONAL BACKGROUND FACTS ............................. 19

VI. THE FABRICATED ASSIGNMENT OF DEED OF TRUST IS A FRAUDULENT DOCUMENT THAT CONVEYED NO LEGAL, EQUITABLE, OR PECUNIARY INTEREST, RIGHT, OR TITLE TO US BANK N.A., STRUCTURED ASSET INVESTMENT LOAN TRUST, OR WELLS FARGO BANK N.A. ............................. 20

VII. PLAINTIFF MAYOTTE'S LOAN MODIFICATION AND DEBT VALIDATION EFFORTS ......................................................... 23

VIII.  COLORADO LAW WITH RESPECT TO FORECLOSURES SUMMARY

IX. PLAINTIFF HAS SUFFERED AND CONTINUES TO SUFFER SIGNIFICANT MONETARY, LEGAL, AND EQUITABLE DAMAGES ............................. 31

X.  FIRST CAUSE OF ACTION — DECLARATORY RELIEF: TO DETERMINE STATUS OF DEFENDANTS' CLAIMS [28 U.S.C. §§ 2201, 22021  [Against All Defendants and Doe Defendants] ............................. 34

XI. SECOND CAUSE OF ACTION — NEGLIGENCE [Against All Defendants and Doe Defendants] ............................. 36

XII. THIRD CAUSE OF ACTION — QUASI CONTRACT [Against All Defendants and Doe Defendants] ............................. 37

XIII. FOURTH CAUSE OF ACTION — VIOLATION OF 12 U.S.C. § 2605 (RESPA) [As Against Wells Fargo Bank N.A., and on or more of the Doe Defendants] ............................. 38

XIV. FIFTH CAUSE OF ACTION — FOR VIOLATION OF 15 U.S.C. § 1692, ET SEQ. [Against All Defendants and Doe Defendants] ............................. 40

1

XV. <u>SIXTH CAUSE OF ACTION — CANCELLATION OF INSTRUMENTS</u>

[Against All Defendants and Doe Defendants]                                    42

XVI. SEVENTH CAUSE OF ACTION — QUIET TITLE (Cal. Civ. Proc. Code §760.010.)

[Against All Defendants and Doe Defendants]                                    43

XVII. EIGHTH CAUSE OF ACTION — VIOLATION OF 42 U.S.C. § 1983 DUE PROCESS

AND 14TH AMENDMENT CONSTITUTIONAL DUE PROCESS [Against All Defendants

and Doe Defendants]                                                            45

XIII. NINTH CAUSE OF ACTION — EX PARTE YOUNG INJUNCTION   [Against All

Defendants and Doe Defendants]                                                 46

XIX.  TENTH CAUSE OF ACTION — ACCOUNTING—REQUIRE A CORRECT CURE

STATEMENT

XX. SANCTION FOR DUAL TRACKING

XXI. SET ASIDE THE PUBLIC TRUSTEE SALE                                         48

XXII. CONCLUSION                                                               48

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# COMPLAINT

COMES NOW, Mary M. Mayotte, Pro Se, " who is unschooled in statutes and codes ["[P]ro se pleadings are held to a less strict standard than pleadings filed by lawyers and thus are construed liberally." *Alba v. Montford*, 517 F.3d 1249, 1252 (11th Cir. 2008); see also *Haines v. Kerner*, 404 U.S. 519, wherein the Supreme Court has directed that those who are unschooled in law making claims, pleadings or complaints shall have the court look to the substance of the pleadings rather than in the form], without waiver of rights or defenses, for their Verified Original Complaint against Defendants US BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR STRUCTURED ASSET INVESTMENT LOAN TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-4, (in its capacity as purported Assignee to Plaintiff Mayotte's Deed of Trust, or as a debt collector within the meaning of FDCPA) (hereinafter **"USB as Trustee"**); and AMERICA'S SERVICING COMPANY, (in its Capacity as purported Servicer to the Deed of Trust within the meaning under RESPA, or as a debt collector within the meaning of FDCPA)(hereinafter **"ASC"**) and, WELLS FARGO N.A. (as Attorney in Fact, or in its Capacity as purported Servicer to the Deed of Trust within the meaning under RESPA, or as a debt collector within the meaning of FDCPA) (hereinafter **"Wells"**), plead as follows:

## I. STATEMENT OF THE CASE

1.     Plaintiff Mayotte alleges that the Defendants are attempting to acquire title to Plaintiffs' home under the name given on certain recorded non-judicial foreclosure instruments as "US BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR STRUCTURED ASSET INVESTMENT LOAN TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-4," (hereinafter "USB as Trustee"). Plaintiff is informed and believes that is a made up name of a non-existent entity and/or a third party stranger to Plaintiff Mayotte's Note and Deed of Trust, having no ownership interest entitling them to collect payment or declare a default, or cause a default to be declared by a trustee to the Deed of Trust, or cause a default to be declared by any agent of USB as Trustee.

2.     By hiding behind the complexities of the banking (or mortgage) finance system, Defendants brazenly attempt to dupe Plaintiff (and millions of other American homeowners) into believing that they have the right to collect a debt in which USB as Trustee has no Ownership interest. In an attempt to further their fraudulent scheme and create the air of propriety surrounding their dubious debt collection and land grab efforts, Defendants have resorted to "papering the file" by fabricating an "Assignment of Deed of Trust" and "Fabricating a Notice of Trustee's Sale"; employing individuals who have no authority or personal knowledge of the facts to which they attest, and falsely representing to Plaintiff and *to the Court* that they have the right to take Plaintiff's property away. Defendants' actions are an affront to long-standing property laws, and their reliance on fabricated and forged documents undermines the integrity of the judicial system.  Through this action Plaintiff seeks to stop Defendants' fraudulent practices, discover the true holder in due course of Plaintiff Mayotte's Promissory Note ("note"), and determine the status of defendants' claims arising from their publically recorded documents.

3.     US BANK claims to be entitled as either: note holder, beneficiary, servicer, trustee, or to move under a power of sale conferred by the only recorded purportedly valid Assignment of the DOT.

4.     US BANK is either an asset backed securities trust, or a Real Estate Mortgage Investment Conduit,  "REMIC", governed under 26 U.S.C §§860(A) - 860(g), and formed under either applicable New York or Delaware trust law. USB in its role as trustee appears to have claimed to be entitled, as either: note holder, beneficiary, or person entitled to enforce an instrument, to move under a power of sale conferred only by a recorded purportedly valid Assignment of Deed of Trust, with its headquarters in New York or Delaware believed to not be licensed to do business in Colorado.

5.     Plaintiff believes US BANK is a national bank organized and controlled under the National Bank Act, a federal instrumentality and quasi-public entity, and at all times herein mentioned has its Corporate Office Headquarters at U.S. Bancorp Center, 800 Nicollet Mall, Minneapolis, MN 55402.

6.      Plaintiff is ignorant of these true names and capacities sued herein as Does 1-20, inclusive. When their true names and capacities are known, Plaintiff is informed and believes and thereon alleges each of these unknown Does as Defendants are legally responsible, negligent or in some other actionable manner, for the events and happenings hereinafter referred to and proximately thereby caused the injuries and damages to plaintiff as hereinafter alleged, or claims some right, title, estate, lien, or interest in the Property adverse to Plaintiff's title. The claims of Defendant Does 1-20 constitute a cloud on Plaintiff's title to the Property, or participated in unlawful or intentionally deceptive and fraudulent acts that resulted in injury to Plaintiff's person or Property.  Upon information and belief, Does 1-20 may claim to have become successors in interest to the subject Deed of Trust by virtue of Plaintiff's loan that may have been made a part of a securitization process wherein certain notes and residential Deeds of Trusts or Mortgages based on and executed as securities for the notes were subsequently thereon securitized by aggregating a large number of notes into a Mortgage loan pool, then selling securitized interests in that pool of mortgages to investors by way of, but not limited to, Mortgage Backed Securities, or Real Estate Mortgage Investment Conduits.

7.      These banks issued millions of predatory loans between 2001 and 2008 with the knowledge that borrowers, including Plaintiff Mayotte, would default and lose their homes, while the banks would then collect profits on insurance policies. USB and Wells have committed blatant, systematic, and inexcusable acts of fraud constituting a criminal enterprise via deceitful lending practices.  As a direct, foreseeable result of USB and Wells' illegal behavior, over a million families will lose their homes if the courts do not intervene and permit the borrowers to conduct discovery in order to determine who owns their loans.

## II. JURISDICTION, VENUE, AND PARTIES

8.      This Court has original jurisdiction over the claims in this action based on 28 U.S.C§§ 1331, 1343, 2201, 2202, 12 U.S.C §2605, 15 U.S.C.§1692(f)(6), 42 U.S.C. 1983 which confer original jurisdiction on federal district courts in suits to address the deprivation of rights secured by federal law.[1]

---

[1] The Ninth Circuit in structs that in actions brough under 28 U.S.C §2201 District courts must first determine whether there is actual controversy within its jurisdiction by analyzing the factors enumerated in *Brillhart v. Excess Ins. Co.*, 316 U.S. 491(1942). The *Brillhart* facotrs require the Court to (1) avoid needless determination of state law issues; (2) discourage litigants from filing declaratory actions as a means of forum shopping; and (3) avoid duplicative

9.     This Court also has supplemental jurisdiction over the pendant state law claims because they form a part of the same case or controversy under Article III of the United States Constitution, pursuant to 28 U.S.C. §1367.

10.    This Court also has original jurisdiction over the claims in this action based on 28 U.S.C §1332 which, confers original jurisdiction on federal district courts in suits between diverse citizens that involve an amount in controversy in excess of $75,000.00.

11.    The unlawful conduct, illegal practices, and acts complained of and alleged in this Complaint were all committed in Denver and involved real property in the Denver District of Colorado. Therefore, venue properly lies in this District, pursuant to 28 U.S.C. §1391(b).

12.    Plaintiff Mayotte is now and at all times mentioned herein, an individual residing in the County of Denver.

13.    At all times relevant to this action Plaintiff Mary Mayotte has owned real property commonly known as: 23 South Garfield, Denver, CO 80209, hereinafter ("Property") further described by APN Number 05125-13-046-046, with the following legal description:

ALL THE REAL PROPERTY, TOGETHER WITH IMPROVEMENTS IF ANY, SITUATE, IF LYING AND BEING IN THE COUNTY OF DENVER AND STATE OF COLORADO, DESCRIBED AS FOLLOWS: UNIT 38, CARRIAGE ROW AT CHERRY CREEK, CITY AND COUNTY OF DENVER, STATE OF COLORADO, ACCORDING TO THE CONDOMINIUM MAP THEREOF RECORDED ON DECEMBER 13, 1996, AT RECEPTION NO. 9600170672, AND THE DECLARATION RECORDED IN FEBRUARY 5, 1996, AT RECEPTION NO. 960015196, AND AS AMENDED IN INSTRUMENT RECORDED JUNE 26, 1996 AT RECEPTION 9600088649, AND AS AMENDED IN INSTRUMENT RECORDED DCEMBER 13,1996 UNDER RECEPTION NO. 9600170671 IN THE RECORDS OF THE CLERK AND RECORDER OF THE CITY AND COUNTY OF DENVER, COLORADO, AS AMENDED FROM TIME TO TIME.

TOGETHER WITH ALL AND SINGULAR AND HEREDITAMENTS AND APPURTENANCES THERETO BELONGING, OR IN ANYWISE APPERTAINING AND THE REVERSION AND REVERSIONS, REMAINDER AND REMAINDERS, RENTS ISSURES AND PROFITS THEREOF; AND TO ALL ESTATE, RIGHT TITLE INTEREST, CLAIM AND DEMAND WHATSOEVER OF THE GRANTOR 9S), EITHER IN LAW OR EQUITY, OF, IN AND TO THE ABOVE BARGAINED PREMISES, WITH THE HEREDITAMENTS AND THE APPURTENANCES.

litigation. *Brillhart*, 316 U.S. at 495; *see also Schafer v. Citimortgage* No. CV 11-03919, 2011 WL 2437267 (Cd Cal. June 15, 2011) as held by the Court in *Schafer*, This action does not involve the needless determination of state law issues, does not involve forum shopping, and is not duplicative litigation.

SUBJECT TO GENERAL TAXES AND ASSESSMENTS FOR THE YEAR 1999 AND SUBSEQUENT YEARS, AND SUBJECT TO THOSE EXCEPTIONS REFERRED TO IN TITLE INSURANCE COMMITMENT NO. D694298 ISSUED BY LAND TITLE GUARANTEE COMPANY.

14.   Mary Mayotte obtained ownership interest via **Grant Deed** recorded as Instrument No.: 2006033470 on 02/20/2006 in the Denver County Recorder's Office, a true and correct copy is attached hereto as **Exhibit "A"** and included herein by this reference.

15.   At all relevant times, US Bank N.A. is a National Association, having FDIC certification number 6548, is organized under the laws of the United States with its principal place of business in North Carolina.

16.   At all relevant times, Wells Fargo Bank N.A. is a National Association organized under the laws of the United States with its principal Place of Business in California.

17.   At all relevant times America's Servicing Company ("ASC"), is a wholly owned subsidiary of Wells Fargo Bank N.A., which is a National Association organized under the laws of the United States with its principal Place of Business in California.

18.   At all relevant times, New Century Mortgage Corporation ("NCM") was a corporation doing business in California, but filed bankruptcy shortly after making the subject loan.

19.   Plaintiff is ignorant of the true identity and capacity of Defendants designated as Does 1-20, but will amend the Complaint when their identities have been ascertained according to proof at the time of Trial. However, Plaintiff alleges on information and belief that each and every Doe Defendant is in some manner responsible for the acts and conduct of the other Defendants, and were, and are responsible for the injuries, damages, and harm incurred by Plaintiff.  Plaintiff further alleges on information and belief that each such designated Defendant acted, and acts, as the authorized agent, representative, and associate of the other Defendants in doing the acts alleged herein.

20.   Whenever reference is made in this Complaint to any act of any Defendant(s), that allegation shall mean that each Defendant acted individually and jointly with the other Defendants.

21.   Any allegation about acts of any corporate or other business Defendant means that the corporation or other business did the acts alleged through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or ostensible scope of their authority.

22.   At all relevant times, each Defendant committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint. Additionally, some or all of the Defendants acted as the agent of the other Defendants, and all of the Defendants acted within the scope of their agency if acting as an agent of the other.

23.   At all relevant times, each Defendant knew or realized that the other Defendants were engaging in or planned to engage in the violations of law alleged in this Complaint. Knowing or realizing that the other Defendants were engaging in or planning to engage in unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts. Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

### III.  JURY TRIAL DEMAND

24.   Plaintiff hereby demands a jury trial on all issues.

### IV. INTRODUCTION

25.   This action arises from Defendants' interference with Petitioner's due process and equal protections in the Rule 120 which was part of a broad conspiracy to deprive homeowners of due process in foreclosure proceedings in order to advance their financial interest.   The Colorado state legislature made and passed HB 1387—a procedurally defective procedure under section 1 of the 14th amendment, which is enforced in the Rule 120 foreclosure proceeding and also in violation of section 1 of the 14th amendment and which was the first overt act in a broad conspiracy to deprive homeowners of due process by defendants, US

BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR STRUCTURED ASSET

INVESTMENT LOAN TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES

2006-4 which is a federal instrumentality and quasi-public entity. *Mercantile Nat'l Bank v.*

*Langdeau* 371 U.S. 555,558,559 (1963).

26. At all times relevant herein, the defendants were state actors and their conduct was subject

to 42 U.S.C. §§ 1983, 1985, and 1988. "Private persons, jointly engaged with state officials in

the challenged action, are acting 'under color' of law for purposes of Section 1983 actions."

*Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980). *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922

(1982)

27.  In 2006, the Colorado state legislature passed HB-1387 which amended major portions of

the foreclosure statute.

28. Ordinarily "a private attorney, while participating in the trial of private state court action, is

not acting under color of state law. *Skolnick v. Martin*, 317 F.2d 855, 857 (7th Cir. 1963)

29. But attorneys Larry Castle, and Castle Stawiarski LLC, became state actors when they

involved themselves in the legislative process by drafting the legislation which amended the

foreclosure statute effectively eliminating the standard of proof needed to be provided by the

alleged lender to prove up standing to obtain an unfair advantage over homeowners in the Rule

120 and which Plaintiffs Mary M. Mayotte, found her constitutional rights were interfered

with.

30. Non-party, attorney Larry Castle, aided by his law firm, Castle Stawiarski LLC which is the

law firm that initially caused the foreclosure on Plaintiffs' home, and the public trustee on

behalf of their clients agreed to the conspiracy by drafting major portions of HB 06-1387 and

committed the first overt act which eliminated the standard of proof required of the lender to

show that the lender was the real party in interest with standing to foreclose and memorialized

the conspiracy thus ensuring that the procedurally defective statute under the 14th Amendment would serve as a continuing constitutional tort.

31. Plaintiff Mary M. Mayotte, Pro Se, has a fundamental property interest that should not be taken in such summary proceeding without clear and convincing evidence as required under the 14th Amendment. *Addington v. Texas*, 441 U.S. 418, (1979)

32. In Addington v. Texas, 441 U.S. 418, (1979) the court held:

> "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of fact finding, is to 'instruct the fact finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication."

33. The Rule 120 foreclosure is like no other summary proceeding. It has no right to appeal; no right to a jury trial; no right to counter-claim; no right to discovery; and the real party in interest defense has been muted by enactment of HB-1387 in spite of Goodwin v District Court, 779 P.2d 837 (Colo. 1989) which required the real party in interest defense be allowed.

34. Colorado Forcible Entry and Unlawful Detainer ("FED") action, although a summary proceeding like the 120 hearing, does not have the restrictions that the Rule 120 has. FED actions have a right to appeal; a right to a jury trial; a right to discovery and therefore does not deny a homeowner of the equal protection of the law when it is available to tenants in FED actions.

35. A Rule 120 Foreclosure is a summary proceeding administered by a Public Trustee who is an agent of the state. A judge's only function is to approve the foreclosure based on two issues: (a) Whether there is a default and (b) Whether the homeowner is in military service. Any other issues must be determined in a separate authorized action, known as a collateral attack on the hearing.

36. Therefore determination under Colorado Civil Procedure Rule 120, and arising from Colorado Revised Statutes §38-38-101(6) significantly affect the public interest.

37. After the order authorizing sale, the homeowner must post a bond pending the separate fair action otherwise the lender will institute eviction proceedings even though the separate fair action is pending which could reinstate the homeowner to the property.

38. The issuance by the Public Trustee's Certificate of Purchase and Confirmation Deed, which gives title to the entity that was granted an authorization to foreclose in the CRCP Rule 120 hearing, also gives that same entity the ability to evict, which removes the homeowner before a separate fair action and is a pre-deprivation, even temporarily, under the 14th Amendment. *Fuentes v. Shevin*, 407 U.S. 67, p. 85 (1972)

39. During the Mortgage Boom Era of 2002 to 2007, Wall Street investors looked to feed their insatiable and reckless greed for profit by tapping directly into the American Dream — home ownership. Mortgage lenders and investment banks aggressively lured the American people into predatory loans with teaser interest rates and into purchasing homes with inflated appraisals and under the promise that the booming real estate market would continue to boom. Wall Street took the soon to be toxic loans and bundled them into "Mortgage Backed Securities" through a process known as "Securitization." These "securities" were then sold to investors in the form of certificates, whereby the investors became the "Certificate-holders" of the securities that were to be fed by the toxic loans.

40. Knowing that the predatory loans would soon default and turn into toxic assets, Wall Street placed their bets accordingly and bought exotic insurance products in the form of Credit Default Swaps.[2] Thus, when the Mortgage Boom turned into a Mortgage Meltdown, which it

---

[2] In 1995, JPMorgan created the Credit Default Swap (CDS). Essentially, a CDS is a form of insurance intended to protect the buyer of the policy in case the borrower defaults on the loan. If the borrower defaults, the buyer of the CDS receives a lame payout for the cash value of the defaulted loan. The main difference between a traditional insurance policy and a CDS is that anyone can Purchase a CDS, even those who have no direct "insurable interest" in the lender. CDSs were instrumental during the housing bubble because once the banks ran out of creditworthy borrowers, they had to turn to uncreditworthy "subprime" borrowers. To avoid losses from default, the banks moved these risky mortgages off their books by bundling them into "securities" and selling them to investors. To induce investors to buy, these securities, the securities were then "insured" with credit default swaps. CDSs allowed investors to bet against the average American to default on their mortgage with little

did, Wall Street would stand to make even more profit when the mortgage insurance paid them out for their "losses."

41. However, in their rush to "securitize" the predatory loans, Wall Street failed to actually follow its own rules and regulations, creating the instant situation where the securities are not actually backed by any mortgages at all. Under the standard model, the promissory notes were supposed to be sold and transferred into a trust pool ("Securitized Trust") that holds the promissory notes as collateral on the securities bought by investors ("Certificate-holders"). These "true sales" allow the original lenders to move the notes off their books, eliminating the need to maintain capital-adequacy reserves against default. The purpose of securitizing collateral debt obligations was to provide a large supply of money to lenders for originating more loans, and to provide investment to bond holders — which were expected to be relatively safe.

42. The Securitized Trusts, if ever formed properly, are subject to and governed by (1) the Pooling and Servicing Agreement ("**PSA**"); (2) the Mortgage and Loan Agreement; (3) the 424B5 Prospectus; (4) the common law trust rules of Delaware or New York, depending on its origin, and (5) Internal Revenue Code section 860A through 860G, better known as the Real Estate Mortgage Investment. Conduit ("REMIC") rules.

43. An essential aspect of the mortgage securitization process is that the Trust must obtain and maintain good title to the mortgage loans comprising the pool for that certificate offering. This is necessary in order for the Trustee of the purportedly Securitized Trust to be legally entitled to enforce the mortgage loans in case of default. In addition to other required documentation to complete the Collateral File of any given loan, two documents relating to each mortgage loan

risk. CDS insurance was especially attractive to investors who had knowledge of the subprime mortgage industry, since they knew the likelihood of default on those loans was much higher. Notably, AIG Insurance Company ("AIG"), an insurance carrier who owned a considerable market share of these CDS policies, was unable to make Rood on these policies after the housing bubble burst resulting in AIG seeking a Government bailout. *See* Justin Fox, *Why the Government Wouldn't Let AIG Fail?*. TIME Business (September 16, 2008) http://www.time.comtime/business/article/0,8599,1841699,00.html. Thus, in the end, it was the American taxpayer who bore the burden of these CDS

must be validly transferred to the Trust as part of the securitization process — the promissory note and the security instrument (deed of trust or mortgage). In this case, on information and belief, neither document was validly transferred. The DOT was purportedly assigned by a fictitious robo signer, but the Note wasn't even purportedly assigned.

44. Here, Plaintiff alleges that the "true sales" never took place due to the failure to follow the basic legal requirements for the transfer of a negotiable instrument and thereby, US Bank National Association did not acquire any legal, equitable, and pecuniary interest in Plaintiff Mayotte's Note and Mortgage. As a result, thereof, USB as Trustee, which purports to be Plaintiff Mayotte's creditor, actually has no secured or unsecured right, title, or interest in Plaintiff Mayotte's Note and Mortgage, (not a Real Party In Interest) and has no right to collect mortgage payments, demand mortgage payments, or report derogatorily against Plaintiff Mayotte's credit.[3]

45. Nonetheless, USB as Trustee attempts to take advantage of the complex structured finance system to defraud yet another homeowner. USB as Trustee did in fact submit a blatantly fabricated "Assignment" thereby committing fraud on the Court, and attempting to further mislead Plaintiff Mayotte into believing that USB as Trustee was her actual creditor, and was entitled to enforce her obligation.46. Plaintiff Mayotte does dispute that she may have, in the past, owed money on her Deed of Trust and Note obligation.[4]

46. Plaintiffs' information and belief is based on (1) a title report and analysis of the Property's county records; (2) direct written and oral communication with Defendants; (3) their research

---

[3] Plaintiffs allegations are supported by the recent ruling of the Massachusetts Supreme Judicial Court in *U.S. Bank vs. Ibanez*, SJC-10694, 2011 WL 38071. In *Ibanez,* the court invalidated two foreclosure sales, finding that the lower court did not err in concluding that the securitization documents submitted by U.S. Bank and Wells Fargo failed to demonstrate that they were the holders of the mortgages. The court rejected the banks' argument that the mortgages were transferred via the applicable Pooling and Servicing Agreement and made clear that, to foreclose, the banks must prove a complete and unbroken chain of title from origination to securitization trust in full compliance of the PSA, i.e. establish ownership of the mortgage

[4] However, simply because Plaintiff does dispute this fact, the Court should not condone USB's and Well's fraudulent and predatory mortgage servicing practices and allow it to collect on money it was not owed. Simply put, the Court should not allow USB or Wells to trample over 200 years of well-settled property laws.

and extensive review of depositions, case law, amicus briefs, correspondence, news articles, reports, and publicly available securitization documents and practices; (4) a review of the purported "Assignment of Deed of Trust" signed by Ryan Amato, a robo signer; and (5) an audit of US Bank National Association as Trustee's filings with the Securities and Exchange Commission ("SEC"), including US Bank National Association as Trustee's 424B5 Prospectus.

47.     Plaintiff alleges and believes thereon that on or around the time of origination of Plaintiff Mayotte's loan, New Century Mortgage Corporation attempted to securitize and sell her loan to another entity or entities. That entity was not US Bank National Association as Trustee.

48. Plaintiff alleges on information and belief that NCM never sold or transferred, her Note or Mortgage to the Sponsor, Depositor, or USB as Trustee and that USB as Trustee is merely a third-party interloper to the loan transaction. Furthermore, Plaintiff alleges that none of the Defendants or Doe Defendants can demonstrate or document that Plaintiff's Note was ever properly endorsed, and transferred to USB as Trustee.  In fact, Plaintiff has requested that America's Servicing Company, a non-existent entity, which appears to be operated by Wells Fargo Bank N.A., as servicer, verify and validate the debt. Although this information should be readily available to any mortgage servicer, ASC/Wells Fargo Bank N.A. has failed to provide any evidence to verify the owner and amount of Plaintiff's Mortgage or validate the claim to Plaintiff's debt obligation.

49. The parties involved in the alleged Securitization and transfer of Plaintiff's Note and Mortgage failed to adhere to what generally would have been standards for Mortgage or Collateral Files in Defendant, USB as trustee for Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates Series 2006-4's PSA (a document which Plaintiffs' believe does not actually exist), requires that Plaintiff's Note and Mortgage be properly endorsed, transferred, accepted, and deposited with the Securitized Trust (or its custodian) on or before the "closing date" indicated on the Prospectus. The "closing date" is the date by which all of the Notes and Mortgages must be transferred into the Structured Asset Investment Loan Trust. The failure to do so results in the Note and Mortgage not being part of the Structured Asset

Investment Loan Trust Mortgage Pass-Through Certificates Series 2006-4, such that it is not a loan that either US Bank N.A., as the alleged Trustee to the Structured Asset Investment Loan Trust, or ASC/Wells Fargo Bank N.A. as alleged servicer for US Bank N.A. as Trustee, or as servicer for the alleged Structured Asset Investment Loan Trust, can attempt to collect on. For a 2006 loan, the Closing Date will typically have been in 2006, not in 2011 as the purported Assignment states.

50. The failure to deposit Plaintiff's Note into the Structured Asset Investment Loan Trust (if such deposit ever occurred) before the closing date is a violation of the PSA and of New York, or Delaware, trust law. Consequently, the Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates Series 2006-4 cannot claim any legal or equitable right, title, or interest in Plaintiff Mayotte's Note and Deed of Trust, since US Bank N.A. as Trustee cannot take any action which is not authorized by the Securitization agreements that created and govern the alleged Structured Asset Investment Loan Trust.

51. Plaintiff does not allege or assert that she is a beneficiary or party to the PSA. Rather, Plaintiff alleges that the failure to securitize her Note makes it impossible as a matter of *fact* for US Bank N.A. as Trustee, Structured Asset Investment Loan Trust, New Century Mortgage Corporation, and/or ASC/Wells Fargo Bank N.A to claim, allege or assert that it was assigned, transferred or granted Plaintiff's Note or Mortgage, or any interest therein, in any manner whatsoever. Plaintiff also alleges that the failure to securitize the Note and Mortgage has resulted in an unperfected lien that Defendants cannot enforce in any manner whatsoever.[5]

---

[5] These allegations are identical to those brought by the Nevada Attorney General against Bank of America, BAC Home Loans Servicing, and Recontrust, in which Attorney General Catherine Cortez Masto alleges that these entities engaged in unlawful and deceptive practices by misrepresenting to homeowners that they had authority to foreclose despite the fact that there were fatal deficiencies in transfers to the securitization Trusts. *State of Nevada vs. Bank of America et al.*, No. 3:11-cv-00135- RCJ, (C.D. Nev August 30, 2011). The AG concludes that, "These are not mere technicalities. The PSA's spelled out specific procedures in order to ensure a proper transfer, protect the Trusts as the holders in due course, and avoid subjecting the Trusts to taxation. In addition, borrowers need to know the actual holders of their mortgages so that, for example, they can investigate and assert available defenses in foreclosures, including that the agent of the trustee lacks authority or standing under the Note." Id. at ¶ 146.

52. Plaintiff Mayotte relied on US Bank N.A. as Trustee, Structured Asset Investment Loan Trust and/or ASC/Wells Fargo Bank N.A. misrepresentations and has been damaged, harmed, and/or prejudiced in the following ways: (1) multiple parties may seek to enforce Plaintiff Mayotte's debt obligation against Plaintiff Mayotte, (2) the title to Plaintiff's home has been clouded and rendered unmarketable, as any would-be buyer of Plaintiff's home will find themselves in legal limbo, unable to know with any certainty whether they can safely buy Plaintiff's home or get title insurance; (3) Plaintiff has been paying the wrong party for an undetermined amount of time and overpaid in interest that was over calculated; (4) Plaintiff is unable to determine whether she sent her monthly mortgage payments, and the final tender of payment via Draft as funds (more fully plead below) to the right party; and (5) Plaintiff has expended significant funds to cover related costs to discover the details on these allegations.

53. Plaintiff alleges upon information, belief, and knowledge such as that derived from direct communication with the United States Securities and Exchange Commission that STRUCTURED ASSET INVESTMENT LOAN TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-4 has either not been formed by PSA, or in the alternative, if the PSA is not a formative document, it is not governed by the PSA.

54. In addition to seeking compensatory, consequential, punitive, and other damages, Plaintiff seeks Declaratory Relief as to whether the Deed of Trust (Mortgage) secures any obligation of Plaintiff in favor of US Bank N.A. as Trustee, Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2006-4, and/or ASC/Wells Fargo Bank N.A., such that any of them can collect Plaintiff's past payments, demand payment or engage in debt collection activities.

## V. ADDITIONAL BACKGROUND FACTS

55. On or about February 13, 2006 Plaintiff Mayotte executed a Promissory Note, ("Note") in the favor of New Century Mortgage Corp., ("NCM"). An unexecuted copy of the purported Note is attached hereto as **Exhibit "C"** for reference, because despite numerous written requests for certified true and correct **current** copies of the executed Note, with any

endorsements now appearing on it, or allonges attached to it, along with information as to its current location, Defendants have not produced any such records for Plaintiff's examination and confirmation. **Therefore Plaintiff specifically and hereby disputes the authenticity of the Note referenced on the Assignment and/or in the Deed of Trust.**

56. Moreover, Plaintiff contends that the Note referenced in the Deed of Trust is void because NCM was not the source of funding for the loan allegedly given, and therefore could not, and did not lend money.

57. On or about February 13, 2006, Plaintiff executed a Deed of Trust for the purpose of securing payment of the purported Note, wherein NCM was defined as "Lender". Plaintiff Mayotte lacks information to confirm that the Deed of Trust signed is the same document that was recorded on February 20, 2006, in the official records of the City and County of Denver Office as instrument number 2006033470. A true and correct copy of the recorded copy of the Deed of Trust purported by US Bank N.A. as Trustee to be the instrument they are enforcing at the time of foreclosure is attached hereto as **Exhibit "D"** and included herein by this reference.

58. Plaintiff has sought to inspect the original of said Deed of Trust by a document expert, in order to confirm or deny its authenticity. Plaintiff has not seen nor been presented with the original Deed of Trust for their inspection despite numerous requests commencing in the summer of 2010. Therefore Plaintiff specifically and hereby disputes the authenticity of the Deed of Trust document.

59. The DOT names the Public Trustee of Denver County, Colorado as Trustee, and NCM, a California Corporation as "Lender".

60. If a valid enforceable agreement was created as set forth in the DOT and Note, then the DOT is necessarily the expression of all terms and conditions between Plaintiff Mary Mayotte, her successors, and all successors or assigns to the lender and beneficiary named in the Deed of Trust.

61. Plaintiff contends the only recorded "Assignment" was executed five years after the closing date of the trust, should the trust be proven to actually exist. The dubious "Assignment" raises

numerous red flags and further demonstrates that Plaintiff's Note and Mortgage were not deposited into the Trust by the closing date, and that the "Assignment" was fabricated in attempt to "paper over" the fatal securitization defects.

62. Plaintiff, upon information, belief, and knowledge alleges the Foreclosure is therefore not just voidable, but void ab initio.

63. Plaintiff upon information, belief, and knowledge denies that US Bank, or ASC/Wells Fargo Bank N.A. has at any time earned "holder in due course" status or "person entitled to enforce" status relating to the underlying obligation, which the DOT secures, and has not been assigned any interest in the Deed of Trust as of December 27, 2011.

64.   Plaintiff is informed and believes that the foreclosing beneficiary must be the beneficiary to a Deed of Trust such that the beneficiary is in a position to declare the default for which the power of sale derived from the Deed of Trust is exercised as remedy.  Here the alleged assignment occurred after the alleged default occurred and a Notice of Trustee's Sale was recorded. It is called "Standing at Inception" or the lack thereof. On information and belief Plaintiff denies the ability of ASC/Wells Fargo Bank, N.A., as "holder" to assign, transfer or otherwise negotiate the Note in conjunction with the Deed of Trust as ASC/Wells Fargo Bank N.A. has no            powers conferred to it via the Note or Deed of Trust.

65.   Plaintiff alleges on information and belief that even if ASC/Wells Fargo Bank, N.A. had been a valid assignor of interest in the Note and DOT, that Defendant was never an entity entitled to enforce the Note.  Plaintiff alleges that the dates appearing on the face of the Assignment and Notice of Sale show that interest in the Note was taken by Defendant with actual, constructive, or implied notice that the Note was overdue, in default, or has been otherwise dishonored .

66.   Plaintiff on information and belief denies that ASC/Wells Fargo Bank, N.A. had any pecuniary interest it could transfer, and was not given pecuniary interest in the Note in order to make such transfer. Plaintiff believes that there is negligence on the part of a purchaser to purchase any interest without a modicum of due diligence.  It is clear on the face of the records

in the office of the City of Denver County recorder for any reasonable person to see that there is no chain of title from NCM to US Bank N.A. as Trustee.

67. Plaintiff believes that discovery will show that the Note and Deed of Trust were never in possession of US Bank N.A. as Trustee, Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2006-4, or ASC/ Wells Fargo Bank N.A.

68. On numerous occasions before and after the purported sale beginning in May of 2009, and as recently as November 2014, Plaintiff requested records to show that US Bank N.A. possessed additional records to fill in the missing link in the chain of title as demonstrated from the recorder's office records. No such records have ever been produced.

69. In December of 2010, ASC/Wells Fargo Bank N.A. executed a Notice of Trustee's Sale, hereinafter "NOTS", a true and accurate copy of which is attached hereto and incorporated herein as **Exhibit "H"**, wherein a sale date was scheduled regarding the Property. The NOTS was recorded into the Official Records of the City of Denver County Clerk and Recorder's Office. US Bank N.A. as Trustee was never entitled to payments on the Note, thus were never the "Note Holder.

70. Plaintiff is informed and believes that when someone takes property that doesn't belong to them, such act is illegal and may constitute fraudulent misrepresentation, larceny by conversion, or other illegal acts. Plaintiff requires discovery to uncover the facts necessary to demonstrate the unlawful conduct of the Defendants.

## VI. THE FABRICATED ASSIGNMENT OF DEED OF TRUST IS A FRAUDULENT DOCUMENT THAT CONVEYED NO LEGAL, EQUITABLE, OR PECUNIARY INTEREST, RIGHT, OR TITLE TO US BANK N.A. AS TRUSTEE, STRUCTURED ASSET INVESTMENT LOAN TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-4 OR ASC/WELLS FARGO BANK N.A.

71. The Assignment alleged that for "value received" WELLS FARGO BANK N.A., as attorney in fact assigned, and transferred to US BANK all beneficial interest in the Deed of Trust from

New Century Mortgage (purported original lender).  The Assignment was signed by Ryan Amato as the "Vice President Loan Documentation" of WELLS FARGO BANK N.A.  Plaintiff alleges that no such transfer ever occurred, and that Ryan Amato is not the "Vice President Loan Documentation" of WELLS FARGO BANK N.A."

72. Plaintiff alleges that Ryan Amato is a "robo signer" who simply signs thousands of property record documents without any legal or corporate authority whatsoever.

73. In fact, the Assignment was fraudulently executed without US Bank N.A. as Trustee, Wells Fargo Bank, N.A., and New Century Mortgage Corp.'s knowledge or authorization.[6]

74. Ryan Amato was never, in any manner whatsoever, appointed as the "Vice President Loan Documentation" by the Board of Directors of Wells Fargo Bank, N.A. as is required by Wells Fargo Bank N.A.'s corporate by-laws and an adopted corporate resolution by the Board of Directors of Wells Fargo Bank N.A.  For that reason, Ryan Amato never had, nor has, any corporate or legal authority from Wells Fargo Bank N.A., or the lender's successors and assigns, to execute the purported "Assignment."[7] This was an intentional act undertaken by US Bank N.A. as Trustee, ASC/Wells Fargo Bank, N.A., and New Century Mortgage Corp. done knowingly with the specific intent that the consequences of their actions be brought to fruition, which they have as evidenced by the instant debt collection activities.

75. The "Assignment" is a fraudulent title transfer claim (the Deed of Trust is a title transfer instrument), and the execution, filing, and recordation of the document was created for the

---

[6] A recent "60-Minutes" television news segment reported on the epidemic of "phony" and "forged" documents used to evict homeowners, including the various different and forged signatures of "Linda Green" added to thousands of foreclosure documents filed in foreclosure proceedings all over the country, available at http://www.youtube.com/watch?v—UdeFvPC5MNI. Ms. Green was interviewed by "60-Minutes" and admitted that her signature was forged by many DocX employees who were paid only $10 an hour and required to forge 4,000 documents a day. These individuals are now known as "robo-signers."
[7] The instant case is analogous to *Kingman Holdings, LLC v. Citimortgage, Inc. and Mortgage Electronic Registration Systems, Inc.,* WL 1883829 (E.D. Tex. 2011) *("Kingman"),* where the court denied a motion to dismiss with similar causes of action as those that are pled here on the basis that the plaintiff had adequately challenged the signatory's alleged title as "Vice President" of MERS. The *Kingman* court held that the plaintiff had adequately pled that the assignment executed by Nate Blackstun as "Vice President" on behalf of MERS, was void because Blackstun was not actually appointed by MERS to be its Vice President.

1 purpose of facilitating and aiding and abetting the illegal, deceptive, and unlawful collection of

2 Plaintiff's mortgage payments, as well as engaging in other debt collection activities.

3 76. Plaintiff further alleges that any amount allegedly owed under the Note is subject to equitable

4 offset by the actual, consequential, special, and punitive damages owed to Plaintiff from

5 Defendants, which amount is currently unknown, but will be determined upon conducting

6 discovery. Plaintiff believes this amount will be in excess of the amount of their obligation.

7 77. Most importantly this particular DOT gives Wells Fargo Bank N.A. <u>no powers to perform</u>

8 <u>duties attributed to the Lender</u>. (see **"Exhibit D"**)

9 78. Attempting to "assign" or transfer a Deed of Trust by itself, as Defendants did here, does not

10 allow enforcement of Plaintiff's Note and DOT. As alleged herein, Plaintiff's Note was not

11 properly negotiated, endorsed, and transferred to US Bank N.A. as Trustee in any manner.

12 76.    US Bank N.A. as Trustee seeks to cause its purported authorized agent(s) to collect

13 mortgage payments and engage in other unlawful collection practices.

14 77.    On information and belief, none of the Defendants were/are present holders in due course

15 of Plaintiff's Note such that they can enforce Plaintiff's obligation and demand mortgage

16 payments or have the status necessary to foreclose.

17 78.    On information and belief, Defendants were not, and are not, a note holder in possession

18 of Plaintiff's Note who has rights of the holder.

19 79.    If there is a holder in due course of Plaintiff's Note at issue, it is the entity that can

20 establish a pecuniary, legal, and equitable interest in the Property, and provide an unbroken

21 chain of title to Plaintiff's Note and DOT.[8]

22

23 [8] The testimony of Linda DeMartini, a 10-year litigation manager for Countrywide, in *In Re Kemp,* Case No. 08-18700-JHW, (Bankr. D. N.J. November 16, 2010) (for publication) exposed the shoddy handling of mortgage
24 notes and deeds of trust of securitized mortgages required to perfect "holder in due course" status. In that case Linda DeMartini described how Countrywide failed to adhere to the most rudimentary of securitization
25 procedures, such as transferring the original promissory note to the trusts that had purchased the loans, as required under the pooling and servicing agreement. Ms. DeMartini testified that it was standard practice for Countrywide
26 to warehouse the original mortgage notes, which were stored in Simi Valley, California, despite securitization contracts that required the notes to be physically transferred to sponsors, trustees or custodians of the securitized
27 trusts. The findings in court decisions all over the country, news stories, attorneys generals' complaints, and state and federal investiaations reveal that business practices like Countrywide's were common place and, like...??
28 Countrywide, most lenders failed to properly comply with protocols renuired to properly securitize mortaaae loans. Ms. Martini's testimony has been corroborated by Abigail Field of CNN, who reviewed foreclosures filed in

80.   On information and belief, none of the Defendants were/are entitled to enforce Plaintiff's Note pursuant to Colorado Title 4 Commercial Code § 3-309 or subdivision (d) of Colorado Title 4 § 3-418 et seq.

81.   Plaintiff alleges that, prior to demanding mortgage payments from Plaintiff Mayotte, none of the Defendants or Doe Defendants had, nor presently have, a secured or unsecured legal, equitable, or pecuniary interest in Plaintiffs Note and/or Deed of Trust as required under Colorado law — irrespective of who is actually in physical possession of Plaintiff Mayotte's Note.

82.   Plaintiff alleges that, on information and belief, US Bank N.A. as Trustee or Wells Fargo Bank, N.A., and/or its agents are fraudulently enforcing a debt obligation in which they have no pecuniary, equitable or legal interest. Thus, US Bank N.A., as trustee, and Wells Fargo Bank N.A. conduct is part of a fraudulent debt collection scheme.

## VIII.  PLAINTIFF MAYOTTE'S LOAN MODIFICATION AND DEBT VALIDATION EFFORTS

83.   In November 2008 Defendant received an Order Authorizing Sale, under Rule 120, but it was suspended while Plaintiff worked with ASC/Wells Fargo Bank N.A. for a Loan Modification.  During that time, ASC accepted loan payments even though they claimed Plaintiff was in default and not eligible for a loan modification agreement.

84.   On December 18, 2009, a Second Motion was filed to retain case in suspension and March 9, 2010 the foreclosure was dismissed.

85.   .      After **first** foreclosure dismissal, Plaintiff was offered trial modification pursuant to HAMP.  Plaintiff made the three months of payments and made numerous calls to ASC about her status. She got the run around about not receiving her paperwork that was mailed

to them and they continued to ask for more paperwork as she continued to make payments.

two New York counties between 2006 and 2010 in which Bank of New York was foreclosing on behalf of a Countrywide securitizaton trust, and found that none of the 104 loans that were examined were endorsed by Countrywide: "..If the lack of endorsement on these notes is typical—and 104 out of 104 suggests it its—the problem occurs across Countrywide securities." See Abigail Field, At Bank of America, More Incomplete Mortgage Docs Raise More Questions, Fort., (June 3, 2011), http://finance.fortune.cnn.com/2011/06/03/at-bank-of-america-more-incomplete-mortgage-docs-and-more-questions/

86.   Plaintiff started working with the office of President of Wells Fargo Mortgage Division and was told a modification loan was ready if Plaintiff cleared title by making outstanding dues payments to Homeowners Association by a stipulated date, signing Forbearance Agreement and making a payment of $2617.56. .

87.   Plaintiff met the requirements and signed forbearance on November 2, 2010, knowing that it was a one  month forbearance. Note was also made on the document to "suspend proceedings once initial installment received".

88.   The Notice of Foreclosure was posted on Plaintiff's door in December, 2010.

89.   For several years, until November 2010, Plaintiff was working with America's Servicing Company (ASC) for a modification of her mortgage and during that time was making payments to ASC as instructed, at a reduced payment amount, which was being held " in suspense" on her account, as testified by Wells Fargo Bank Employee, Dara Robinson, at Rule 120 Hearing on May 5, 2011. **Exhibit "E"**

90.   In Voir Dire examination at the Rule 120 Hearing on May 5, 2011, Dara Robinson testified that "suspense balance is when we take payments and don't apply them to anything…we don't apply to Principal or to Interest….it sits there kind of like a savings account…it does not get applied to the loan". Only $8,000 of approximately $100,000 of payments were held insuspense, thus no reason to put Plaintiff in default.

91.   Plaintiff asked for a copy of her Note in summer of 2010 and three months later received a copy of someone else's note and a cover letter which was addressed to her.

92.   Plaintiff spoke to over fourteen different people, over the phone, in over a two hour period as regards to her most recent foreclosure and not one of them could give her information on her current status.

93.   Finally, an underwriter told Plaintiff "some other party was involved and the reason for foreclosure was PMI and the loan did not fit the formula"; citing "investor guidelines"

94.   ASC instructed her to default on loan payments in order to be eligible for loan modification.   Plaintiff has been working diligently to resolve the matter with ASC for several years now to no avail.  She has been cooperating with ASC in providing financial statements in connection with the Federal Government's Financial Stability Plan including the Making Home Affordable Program and the Home Affordable Modification Program ("HAMP") and making monthly mortgage payments according to ASC's recommendations.

95.   In a recent ruling before the United States Court of Appeals for the Ninth Circuit, *Corvello v WELLS FARGO BANK, N.A., No. 11-16234, No. 11-16242,* judgment was

reversed and case was remanded for further proceedings as "in the context of the Home Affordable Modification Program, bank was contractually required to offer buyers a permanent mortgage modification after they complied with the requirements of the trial period plans (TPP); district court should not have dismissed the borrowers' complaints when the record showed the bank had retained the payments demanded by the TPP, but neither offered a permanent modification, nor notified borrowers they were not entitled to one; Bank was engaged in debt collection activities when it offered the TPP with its concomitant demand for trial payments (TPP was more than informational circulation); Bank's defense (that it determine the borrowers were not qualified) presented a factual dispute that could not be resolved at the motion to dismiss stage." …The Panel reversed the district court's dismissals of diversity actions challenging the decision of Wells Fargo Bank not to offer permanent mortgage modifications to plaintiff borrowers. In this case at the Rule 120 the attorney offered into evidence fabricated letters from Defendant Mayotte that she did not qualify. Defendant had never received any of those letters.

96. In an effort to verify and validate her debt, payments owed, and the true identity of the creditor and servicer, Plaintiff Mayotte sent a Qualified Written Request letter on or around July 12, 2013, pursuant to Real Estate Settlement Procedures Act, 12 U.S.C. 2605(e), in which she requested that the purported servicer (ASC/Wells Fargo Bank N.A.) provide, among other things, "The name, address, name of a contact person and telephone number of the current holder in due course and owner of the mortgage note." 12 U.S.C. § 2605(e) requires that the servicer provide this information and respond to a written request within 60 days of receipt. See **Exhibit "F"**, attached hereto is a true and correct copy of Plaintiff's Qualified Written Request.

97. The entire loan modification process made Plaintiff Mayotte very upset, and caused numerous sleepless nights for multiple years. Plaintiff Mayotte experienced worry, anger, frustration, physical and emotional decline due to the complete waste of time, effort, and energy in filling out the packages taking her away from her business in a recession, not to mention all of the legal fees.

98. Plaintiff Mayotte was feeling like no one was seriously taking any time to review the applications for modification.

## IX.  COLORADO LAW WITH RESPECT TO FORECLOSURES SUMMARY

99. Under current law, a foreclosing party may choose to file a Rule 120 foreclosure either: (1) with competent evidence that it is the holder of the evidence of debt, with authority to invoke the power of sale contained in the deed of trust, or, in the alternative, (2) with a certification that it is a qualified holder of the evidence of debt, or a statement by an attorney that it's client is a qualified holder of the evidence of debt. The former is referred to herein as a "full-doc" foreclosure, the latter as a "no-doc" foreclosure.

100. The proposed Initiative would leave intact Colorado law that allows "full-doc" foreclosures, and would embody statutory "full-doc" foreclosure requirements in the Constitution. It would not interfere in any way with foreclosures filed by parties who have the requisite documentation for a "full-doc" foreclosure. On the other hand, the proposed Initiative would constitutionally prohibit "no-doc" foreclosures in Colorado, and repeal current statutory provisions that allow "no-doc" foreclosures. It would require parties who attempt to foreclose to "get their docs in a row" before attempting to foreclose on a Colorado homeowner.

### *1. Constitutional Basis*

101. Article I of the Constitution of the State of Colorado is nothing more – and nothing less – than a legal description of the boundaries of the State, as follows:

Article I

The boundaries of the state of Colorado shall be as follows: Commencing on the thirty-seventh parallel of north latitude, where the twenty-fifth meridian of longitude west from Washington crosses the same; thence north, on said meridian, to the forty-first parallel of north latitude; thence along said parallel, west, to the thirty-second meridian of longitude west from Washington; thence south, on said meridian, to the thirty-seventh parallel of north latitude; thence along said thirty-seventh parallel of north latitude to the place of beginning.

102. Article XIV, Section 1 adopts the Counties of the Territory of Colorado as the Counties

of the State of Colorado, and Article XIV, Section 8 requires each County to elect a County Clerk, who shall be the ex officio Recorder of Deeds for the County. Official records of ownership of real property within the boundaries of the State of Colorado – from Territorial Days to the present – are, accordingly, maintained in County Clerk and Recorder offices, under authority of the State Constitution.

103. The statutory "full-doc" foreclosure provisions – which have been in effect in some form for more than a century prior to the recent enactment of the "no-doc" foreclosure provisions – complement the Constitutionally mandated records of real property ownership by requiring a foreclosing party to produce records of any assignments of interests in a homeowner's property, to assure the foreclosing party has a right to invoke the power of sale contained in a recorded deed of trust, in the constitutionally grounded records of ownership at the County Clerk and Recorder's office in the County in which the property is located. The recently enacted "no-doc" provisions, in contrast, require no such proof.

### 2. Current Statutory Requirements for "Full-Doc" Foreclosure

104. Under C. R. S. §§38-38-100(3) and 38-38-101, a "holder of evidence of debt" or its attorney may file a foreclosure with:

(1) ". . . [t]he original evidence of debt, <u>together with the original endorsement or assignment thereof</u>, if any, <u>to the holder of the evidence of debt</u> . . .," (C. R. S. §38-38-101(1)(b)), or ". . . <u>a certified copy of the endorsement or assignment</u> [of the evidence of debt] <u>recorded in the county where the property being foreclosed is located</u> . . .". C. R. S. §38-38-101(1)(b) and (6)(a) (incorporated by reference in 38-38-101(1)(b)); and
(2) ". . . [t]he original recorded deed of trust securing the evidence of debt . . ." (C. R. S. §38-38-101(1)(c)) or a ". . . certified copy of the recorded deed of trust . . . .". C. R. S. §38-38-101(1)(c)(I).

See C. R. S. §38-38-101(1) & (6) (emphasis added).

105. A foreclosing party who meets these requirements, with original or certified copies of

recorded documents that show evidence of title and valid assignments of the note to that party, would presumably meet it's burden of showing that it is a real party in interest [Goodwin v. District Court, 779 P.2d 837, 842-843 (Colo. 1989)) by producing evidence that it currently holds legal title to the note (Platte Valley Savings & Loan v Crall, 821 P.2d 305, 307 (Colo. App. 1991); American Surety Co. v. Scott, 63 F.2d 961, 964 (10th Cir. 1933) and citations therein (under Colorado law, the one who holds the legal title is the real party in interest)]; or that it has a full and complete assignment of the note, valid at the time its claim arose and at the time the case was filed [Alpine Associates, Inc. v. KP & R,, Inc., 802 P. 2d 1119, 1121 (Colo. App. 1990)]. If the foreclosing party claims to be acting as an agent for the real party in interest, it must also prove the existence of the agency relationship with competent evidence. Hancock v. Minneapolis-Moline, Inc., 482 P.2d 426, 428 (Colo.App. 1971) [citing 3 Am.Jur.2d Agency § 348; burden of proof is on the party who claims to be an agent with authority to file suit to prove the existence of the agency relationship].

### *3. Current Statutory Requirements for "No-Doc" Foreclosure*

106. "Full-doc" foreclosures have become rare in Colorado in recent years, due to the prevalence of securitized mortgages, and various recent amendments to the foreclosure statutes that allow "no-doc" foreclosures of those mortgages.

107. Specifically, the "certification" provisions of §§38-38-101(1)(b)(II) and (c)(II) allow a foreclosure to be initiated with a certification or a statement of the attorney for a party who ". . . claims to be a qualified holder . . ." (id.) (emphasis added), and also allow (as an alternative to an " . . . original endorsement or assignment . . . to the holder of the evidence of debt . . .") ". . . other proper endorsement or assignment in accordance with subsection (6) . . .". 38-38-101(1)(b) (emphasis added).

108. Subsection (6), in turn, allows two alternatives for establishing a proper endorsement or assignment. The first, in subsection (a), is an essential part of a "full-doc" foreclosure under current law (C. R. S. §38-38-101 (1)); the second, in subsection (b) allows a "no-doc" foreclosure, by allowing a mere "certification" or "statement" to serve as complete and determinative substitute for any evidence whatsoever of any endorsement or assignment whatsoever. Specifically:

> (6) Endorsement or assignment. (a) Proper endorsement or assignment of an evidence of debt shall include the original endorsement or assignment or a certified copy of an endorsement or assignment recorded in the county where the property being foreclosed is located.
> (b) Notwithstanding the provisions of paragraph (a) of this subsection (6), the original evidence of debt or a copy thereof <u>without</u> proper endorsement or assignment shall be <u>deemed to be properly indorsed or assigned</u> if a qualified holder presents the original evidence of debt **or a copy thereof** to the officer *together with a statement in the certification* of the qualified holder or <u>in the statement of the attorney for the qualified holder</u> pursuant to subparagraph (II) of paragraph (b) of subsection (1) of this section <u>that the party on whose behalf the foreclosure was commenced is the holder of the evidence of debt</u>.

C. R. S. §38-38-101(6) (emphasis added).

109. This provision allows a mere "statement" by an attorney for one who "claims to be" a qualified holder to serve as a complete and determinative substitute for any evidence whatsoever of any endorsement or assignment whatsoever, and allows an Order Authorizing Sale to be entered based solely on the certification or statement.

110. That part of §38-38-101(6) that presently deems an improperly endorsed or assigned evidence of debt to be properly endorsed or assigned, based on a mere certification or statement that the foreclosing party is the holder of the evidence of debt, renders all other statutory definitions of "holder of an evidence of debt" meaningless. Specifically:

> (10) "Holder of an evidence of debt" means the person in actual possession of or otherwise entitled to enforce an evidence of debt. For the purposes of articles 37 to 40 of this title, the following persons are **presumed to be** the holder of an evidence of debt:
> (a) The person who is the obligee of and who is in possession of an original evidence of debt;
> (b) The person in possession of an original evidence of debt together with the proper

endorsement or assignment thereof to such person <u>in accordance with section 38-38-101 (6)</u>;
(c) The person in possession of a negotiable instrument evidencing a debt, which has been duly negotiated to such person or to bearer or indorsed in blank; or
(d) The person in possession of an evidence of debt with authority, which may be granted by the original evidence of debt or deed of trust, to enforce the evidence of debt as agent, nominee, or trustee or in a similar capacity for the obligee of the evidence of debt.
C. R. S. §38-38-100.3(10) (emphasis added)

111. The problem with the "deemed to be" provision of §38-38-101(6) – cross-referenced in §38-38-100.3(10)(b) – is that it allows a mere certification or statement that a foreclosing party ". . . is the "holder of the evidence of debt". . . ." (§38-38-101(6)) (emphasis added) to constitute conclusive proof of same. This statute, both on its face and as applied routinely in Rule 120 proceedings, renders the entire definition, and sub-definitions, of "holder of an evidence of debt" in §38-38-100.3(10) unnecessary and meaningless, and effectively eliminates the requirement of evidence to support the foreclosure.

### 4. "No-Doc" Foreclosure Is the Only Proceeding under Colorado Law that Requires No Disclosures Whatsoever

112. Current Colorado Law violates due process in foreclosure proceedings, by NOT requiring full disclosures of documentation that supports a foreclosure at the outset of the proceeding. By allowing a mere "statement" by an attorney for one who "claims to be" a qualified holder to serve as a complete and determinative substitute for any evidence whatsoever of any endorsement or assignment whatsoever, and therefore permitting an Order Authorizing Sale to be entered based solely on the attorney certification or statement is in direct conflict with Federal Case law such as the So-called "landmark case: *Trinsey v. Pagliaro D.C.Pa.* 1964, 229 F. Supp. 647 which held:

> "Statements of counsel in brief or in argument are not facts before the court and are therefore insufficient for a motion to dismiss or for summary judgment."
> and
> "An attorney for the plaintiff cannot admit evidence into the court. He is either an attorney or a witness."

> The practice of an attorney filing an affidavit on behalf of his client asserting the status of that client is not approved, inasmuch as not only does the affidavit become hearsay, but it places the attorney in a position of witness thus compromising his role as advocate. ***Porter v. Porter***, (N.D. 1979 ) 274 N.W.2d 235

113. In all other Federal civil proceedings, Rule 26 requires mandatory disclosures of evidence by all parties.

114. In criminal proceedings, the People must provide "discovery" of the facts on which criminal charges are based.

115.  But in a "no-doc" foreclosure under the "certification" provisions of 38-38-101, disclosures are not only optional, but a "certification" alone is statutorily "deemed" to be proof of valid assignments of the right to expeditiously take someone's home, even when the limited documents that have been filed refute the claim of valid assignments. And a homeowner has to litigate for 2-3 years, against the best lawyers money can buy, just to get documentary evidence that should have been disclosed the moment the case was filed. This is logically, morally, legally, and constitutionally unacceptable.

It is the creditor's responsibility to keep a borrower and the Court informed as to who owns the note and mortgage and is servicing the loan, not the borrower's or the Court's responsibility to ferret out the truth. . . *In Re Nosek*, 2009 U. S. Dist LEXIS 44835, at **9-11 (D. Mass. 2009).


## X.  PLAINTIFF HAS SUFFERED AND CONTINUES TO SUFFER SIGNIFICANT MONETARY, LEGAL, AND EQUITABLE DAMAGES

116.    The conduct described above by US Bank N.A. as Trustee and ASC/Wells Fargo Bank, N.A was malicious because Defendants knew that they were not acting on behalf of the current pecuniary beneficiary of the Note and Mortgage. However, despite such knowledge, said Defendants continued to demand and collect Plaintiff's mortgage payments.

117.    Defendants engaged and are engaging in a pattern and practice of defrauding Plaintiff, in that, on information and belief, during the entire life of the mortgage loan, Defendants failed

to properly credit payments made, incorrectly calculated interest on the accounts, and failed to accurately debit fees.

118.    On information and belief, at all times material, US Bank N.A. and Wells Fargo Bank N.A. had and have actual knowledge that Plaintiff's accounts were not accurate, but that Plaintiff would continue to make further payments based on Defendants' inaccurate accounts.

119.    On information and belief, Plaintiff made payments based on the improper, inaccurate, and fraudulent representations as to Plaintiff's accounts.

120.    As a direct and proximate result of the actions of the Defendants set forth above, Plaintiff overpaid in interest.

121.    As a direct and proximate result of the actions of the Defendants set forth above, Plaintiff's credit and credit score have been severely damaged. Specifically, because of the derogatory credit reporting on her credit report by US Bank N.A. and/or ASC/Wells Fargo Bank N.A., Plaintiff Mayotte is, and has been since 2008 unable to refinance on present loan, buy another property, or sell her home or even rent.

122.    As a direct and proximate result of the actions of the Defendants set forth above, the title to Plaintiff's home has been slandered, clouded, and its salability has been rendered unmarketable.

123.    As a direct and proximate result of the actions of the Defendants set forth above, Plaintiff does not know who the current beneficiary of her Note and Deed of Trust actually is, such that she is now subject to double financial jeopardy.

124.    As a direct and proximate result of the actions of the Defendants set forth above, multiple parties can attempt to enforce Plaintiff's debt obligation.

125.    The conduct of US Bank N.A., ASC/Wells Fargo Bank N.A. and one or more of the Doe Defendants has led to the imminent loss of Plaintiff's home and to pecuniary damages. The pecuniary damages include, but are not limited to, the costs of over calculation and overpayment of interest, the costs of repairing Plaintiff's credit, the reduction and/or elimination of Plaintiff's credit limits, the costs associated with removing the cloud from his

property title and attorneys' fees, in an amount to be proven at trial. Loss of National

reputation, and New York City home and business/office/client base/visibility.

126.    The conduct of US Bank N.A. and ASC/Wells Fargo Bank N.A. and one or more of

the Doe Defendants' conduct was malicious because Defendants did not know the identity

of the current and true beneficiary of Plaintiff's Note and Deed of Trust, yet they

intentionally and fraudulently covered up this defect by wrongfully recording a fraudulent

Assignment, which would enable them to *illegally and fraudulently* collect on Plaintiff's

debt, and which in essence has rendered the title to the property unmarketable.

127.    The title to Plaintiff's Property has been rendered unmarketable and unsalable because

of the possibility of multiple claims being made against Plaintiff's debt and underlying security

(the Subject Property). If the Assignment of Deed of Trust is not cancelled and set aside,

Plaintiff will be incurably prejudiced. Plaintiff will be denied the opportunity to identify and

negotiate with her *true creditor* and exercise their right to verify and validate Plaintiff

Mayotte's debt.

128.    Plaintiff has offered to and is ready, willing, and able to unconditionally tender her

obligation.[9]

## XI. FIRST CAUSE OF ACTION — DECLARATORY RELIEF: TO DETERMINE

## STATUS OF DEFENDANTS' CLAIMS [28 U.S.C. §§ 2201, 2202]

### [Against All Defendants and Doe Defendants]

---

[9] Case law makes clear that Plaintiff is only required to allege a credible offer of tender, not actually tender. *Alicia v. GE Money Bank*, No C 09-00091 SBA, 2009 WL 2136969 at *3 (N.D. Cal. July 16, 2009) ("...debtor must allege a credible tender of the amount of the secured debt..."). Moreover, tender is not required when the owner's action attacks the validity of the underlying debt because the tender would constitute an affirmation of the debt. *Sacchi v. Mortgage Electronic Registration Systems, Inc.*, No. CV 11-1658 AHM, 2011 WL 2533029 (C.D.Cal June 24, 2011), at *16 (emphasis added) (citing Onofrio v. Rice, 55 Cal. App. 4th 413, 424 (1997); *Stockton v. Newman*, 148 Cal. App. 2d 558, 564 (1957). See also, *Foulkrod v. Wells Fargo Financial California Inc.*, No. CV 11- 732-GHK (AJWx) (C.D. Cal. May 31. 2011) ("...requiring plaintiff to tender the amount due on his loan at this time would be illogical and inequitable given that he disputes that Wells Fargo has any rights under the loan.") In light of the fact that Plaintiff contests the legitimacy of the Defendants' claim to the mortgage payments, it would be illogical and inequitable to require Plaintiff to actually tender the amount given that Plaintiff disputes whether Defendants have any rights under the loan. See *Onofrio v. Rice*, 55 Cal. App. 4th 413, 424 (1997).

129. Plaintiff re-alleges and incorporates by reference each and every one of the preceding and successive paragraphs as if the same were fully set forth herein.

130. Section 2201(a) of Title 28 of the United States Code states:

In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country as defined in section 516A(f)(10), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

131. Section 2202 of Title 28 of the United States Code states:

Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

132. Plaintiff alleges that neither US Bank N.A., Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2006-4, nor ASC/Wells Fargo Bank N.A. has a secured or unsecured legal, equitable, or pecuniary interest in the property transfer evidenced by the Deed of Trust and that its purported assignment has no value since the Deed of Trust has been bifurcated from the alleged corresponding Note.

133. On or about December 13, 2011, the date of the Assignment of Deed of Trust, Defendants claim they have a secured enforceable interest in, and perfected lien against, the Plaintiff's Note, Deed of Trust and Property upon which Defendants have relied to file a foreclosure action.

134.    Thus, the competing allegations made by Plaintiff, above, establish that a real and actual controversy exists as to the respective rights of the parties to this matter, including ownership of the Property.

135.    Accordingly, Plaintiff requests that the Court make a finding and issue appropriate orders stating that none of the named Defendants or Doe Defendants, have any right or interest in Plaintiff's Note, Deed of Trust, or the Property which authorizes them, in fact or as a matter of law, to collect Plaintiff's loan payments or enforce the terms of the Note or Deed of Trust in any manner whatsoever.

136.    Plaintiff will suffer prejudice if the Court does not determine the rights and obligations of the parties because: (1) Plaintiff will be denied the opportunity to identify their true and current creditor/lender and negotiate with them; (2) Plaintiff will be denied the right to conduct discovery and have US Bank N.A. and/or ASC/Wells Fargo Bank N.A. claims verified by a custodian of records who has personal knowledge of the loan and all transactions related to it; and (3) Plaintiff will be denied the opportunity to discover the true amount they still owe minus any illegal costs, fees and charges, or in the alternative, Plaintiff will be denied the right to recoup payments made to a third party stranger to the written contracts known herein as the Note and Deed of Trust.

137.    Due to the actual case and controversy regarding competing claims and allegations, it is necessary that the Court declare the actual rights and obligations of the parties and make a determination as to whether ASC/Wells Fargo Bank, N.A.'s claim against Plaintiff is enforceable and whether it is secured or unsecured by a right, title, or interest in Plaintiff's Property.

138.    Furthermore, the conduct of US Bank N.A. as trustee, Structured Asset Investment Loan Trust, and ASC/Wells Fargo Bank N.A. as their agent, and one or more of the Doe Defendants, and each of them, as herein described, was so malicious and contemptible that it would be looked down upon and despised by ordinary people. Plaintiff is therefore entitled to

punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in similar conduct.

## XII. SECOND CAUSE OF ACTION — NEGLIGENCE

### [Against All Defendants and Doe Defendants]

139.    Plaintiff hereby incorporates by reference each and every one of the preceding and successive paragraphs as if the same were fully set forth herein.

140.    At all times relevant herein, Wells Fargo Bank N.A. was acting as a purported agent for US Bank N.A., the alleged Beneficiary. Defendants are jointly and severally liable for US Bank N.A., and ASC/Wells Fargo Bank, N.A.'s negligent and reckless conduct.

141.    US Bank N.A. as the purported beneficiary of the Note and Deed of Trust, and ASC purported Deed of Trust servicer, and Wells Fargo Bank N.A. as purported agent for the Beneficiary, all have a duty to exercise reasonable care[10] and skill to follow Colorado law with regard to enforcement of monetary obligations, and to refrain from taking or failing to take any action against Plaintiff that they did not have the legal authority to do. This includes not collecting or demanding payments arising from the Note, and Deed of Trust, when they do not have the right to enforce the obligation, causing the Plaintiff to overpay in interest, making derogatory credit reports to credit bureaus, and failing to keep an accurate accounting of Plaintiff's Deed of Trust payments, credits, and debits (if ASC is in fact the legally authorized Deed of Trust servicer for Plaintiff).

142.    US Bank N.A. and ASC/Wells Fargo Bank N.A. have a duty to exercise reasonable care and skill to refrain from taking any action against Plaintiff that they do not have the legal authority to do. As a direct and proximate result of the reckless negligence, utter carelessness, and blatant fraud of the Defendants as set forth above, the Chain of Title to Plaintiff's Property

---

[10] Normally lenders and servicers do not owe a borrower a duty of care. *Nymark v. Heart Fed. Savings & Loan Assn.*, 231 Cal. App. 3d 1089, 1093 (1991). However, a bank may be liable in negligence if it fails to discharge its contractual duties with reasonable care. *Das v. Bank of Am.*, 186 Cal. App. 4th 727, 741 (2010). Additionally, a bank may be liable for aiding and abetting a tort when it renders "substantial assistance" to a tortfeasor during a business transaction that it knowingly aided in the commission of the tort. *Id.* (citing *Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 114445).

has been rendered unmarketable and fatally defective and has caused Plaintiff to lose saleable title to the subject property.

143.    US Bank N.A. and Wells Fargo Bank N.A. breached that duty when they failed to follow the guidelines established in the PSA (if it should be proven to actually exist) requiring the transfer of the Note and Deed of Trust into the Structure Asset Investment Loan Trust by the closing date.

144.    As a direct and proximate result of the negligence and carelessness of the Defendants as set forth above, Plaintiff suffered, and continues to suffer, general and special damages in an amount to be determined at trial, including attorneys' fees and costs of bringing suit to dispute, validate, and challenge said Defendants' purported rights to enforce the debt obligation.

## XIII. THIRD CAUSE OF ACTION — QUASI CONTRACT AND DETRIMENTAL RELIANCE

### [Against All Defendants and Doe Defendants]

145.    Plaintiff hereby incorporates by reference each and every one of the preceding and successive paragraphs as if the same were fully set forth herein.

146.    US Bank as Trustee and/or ASC/Wells Fargo Bank N.A. demanded monthly loan payments from Plaintiff and continued to collect payments from Plaintiff. Plaintiff reasonably relied upon US Bank N.A. as Trustee and/or Wells Fargo Bank N.A. assertion that it/they are/were entitled to the benefit of Plaintiff's loan payments.

147.    US Bank as Trustee and/or Wells Fargo Bank N.A. knowingly accepted payments and retained them for its own use knowing that US Bank N.A. as Trustee and/or Wells Fargo Bank N.A. did not acquire an interest in Plaintiff's Note, such that they could accept or keep Plaintiff's payments. It would be inequitable for US Bank N.A. as Trustee and/or Wells Fargo Bank N.A. to retain the payments it received from Plaintiff, which it did not have legal authority to collect. The equitable remedy of restitution when unjust enrichment has occurred is an obligation created by the law without regard to the intention of the parties, and is designed

1 | to restore the aggrieved party to their former position by return of the thing or its equivalent in
2 | money.

3 | 148.     Section 23 of the Deed of Trust states that: "Upon payment of all sums secured by this
4 | Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender
5 | this Security Instrument and all notes evidencing debt secured by this Security Instrument to
6 | Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally
7 | entitled to it."

8 | 149.     The obligations to NCM Corp. under the Deed of Trust were fulfilled when NCM
9 | Corp. received the balance on the Note as proceeds of sale of Plaintiff's Note and Deed of
10 | Trust to a presently unknown entity. US Bank N.A. as Trustee, Structured Asset Investment
11 | Loan Trust, and ASC/Wells Fargo Bank N.A. has been unjustly enriched by collecting monthly
12 | payments from Plaintiff when it has no interest in her Note. Plaintiffs seek restitution and
13 | recoupment for any payments they made to US Bank as Trustee and/or Wells Fargo Bank, N.A.
14 | that were not paid to the lender or beneficiary, if any.

15 | Moreover, US Bank entered into an implied contract with Plaintiff when it represented that it
16 | would modify Plaintiff's loan if she would stop making payments for a requisite amount of
17 | time.  She complied, which turned out to be a detrimental reliance, thus Defendant should be
18 | estopped from filing foreclosure and ordered to honor their side of the bargain.

19 | **XIV.   FOURTH CAUSE OF ACTION - VIOLATION OF 12 U.S.C. § 2605 (RESPA)**

20 | **[As Against Wells Fargo Bank N.A. and one of more of the Doe Defendants]**

21 | 150.     Plaintiff hereby incorporates by reference each and every one of the preceding
22 | paragraphs as if the same were fully set forth herein.

23 | 151.     The Subject Loan is a federally regulated loan and is subject to the federal Real Estate
24 | Procedures Act (RESPA) and its implementing regulation, Regulation X.

25 | 152.     On or about July 12, 2013, Plaintiff sent a **Qualified Written Request,** ("QWR") via
26 | U.S. Post Certified Mail. See **Exhibit "G".**

27 |
28 |

153.    On information and belief and/or ASC/Wells Fargo Bank N.A. received the QWR on or about July 14, 2013.

154.    The QWR contained information to enable ASC/Wells Fargo Bank N.A. to identify Plaintiff's Loan and also contained requests for information of the loan, specifically the identity and contact information of the holder in due course of Plaintiff's Note, accumulated late fees and charges, and requested information to verify the validity of the purported debt owed to USB and Wells.

155.    ASC/Wells Fargo Bank N.A. did not and have not provided the contact information for the purported holder of Plaintiff Mayotte's Note, as required by § 2605, et seq.

156.    Because the Deed of Trust and Loan is subject to RESPA and Regulation X, all Defendants were required to comply with Section 6 of RESPA appearing at 12 U.S.C. § 2605. Defendant violated Section 6 of Regulation X upon receipt of Plaintiff's QWR by their actions including, but not limited to: (a) failure to make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of the correction; and (b) failure to protect Plaintiff's credit rating upon receipt of Plaintiff's QWR by furnishing adverse information regarding payment to credit reporting agencies as defined in § 603 of the Fair Credit Reporting Act, 15 U.S.C. § 1681(a).

157.    Thus, Wells Fargo Bank N.A. violated 12 U.S.C. § 2605 and is subject to statutory damages, civil liability, penalties, attorneys' fees and actual damages. See 12 U.S.C. § 2605. The actual pecuniary damages include, but are not limited to, the over calculation and overpayment of interest on Plaintiff's loan, the costs of repairing Plaintiff's credit, the reduction and/or elimination of Plaintiff's credit limits, costs associated with removing the cloud on the property title and setting aside the trustee's sale, and attorneys' fees and costs, in an amount to be proven at trial, but not less than $500,000.00.

158.    As a direct and proximate result of the violations of RESPA and Regulation X by ASC/Wells Fargo Bank, N.A., Plaintiff has suffered actual pecuniary damages, including but

1  not limited to statutory damages, civil liability, and attorneys' fees, in an amount to be proven

2  at trial.

3

4  **XV. FIFTH CAUSE OF ACTION — FOR VIOLATION OF 15 U.S.C. § 1692, ET SEQ.**

5  **[Against All Defendants and Doe Defendants]**

6  159.    Plaintiff hereby incorporates by reference each and every one of the preceding

7  paragraphs as if the same were fully set forth herein.

8  160.    Federal law prohibits the use of "any false, deceptive, or misleading representation or

9  means in connection with the collection of any debt... including the false representation of...

10  the character, amount, or legal status of any debt... and the threat to take any action that cannot

11  legally be taken..."

12  161.    Defendants ASC/Wells Fargo Bank N.A. are "debt collectors" within the meaning of

13  the FDCPA as demonstrated by the purported acquisition of debt when it was already in

14  default. Defendants ASC/Wells Fargo Bank N.A. have attempted to collect Plaintiff's debt

15  obligation. "The term 'debt collector' means any person who uses any instrumentality of

16  interstate commerce or the mails in any business the principal purpose of which is the

17  collection of any debts, or who regularly collects or attempts to collect, directly or indirectly,

18  debts owed or due or asserted to be owed or due another." [15 U.S.C. § 1692a(6)].  Defendants

19  ASC/Wells Fargo Bank N.A. are debt collectors based on their own statements in written

20  communications to the Plaintiff where in they stated they were debt collectors attempting to

21  collect a debt. (true and correct copies of such communications are attached hereto as **Exhibit**

22  **"H"**) In violation of the FDCPA Defendants have continually threatened in written

23  communications and advertisements and on the internet and in written communications to take

24  action to effect dispossession of the subject property, even though they have actual knowledge

25  that US Bank N.A. as Trustee has no perfected security interest, pecuniary interest, equitable

26  interest, or legal interest in Plaintiff Mayotte's Note such that they can enforce Plaintiffs'

27

28

1  obligation (Note and DOT), and thus had no present right to possession of the property

2  illegitimately claimed as collateral.

3  162.   On information and belief, at all times material, ASC/Wells Fargo Bank, N.A. and its

4  agents (Defendants) had, and have, actual knowledge that Plaintiffs account was not accurate.

5  163.   Plaintiff had made payments based on these improper, inaccurate, and fraudulent

6  representations.

7  164.   Plaintiff could not have reasonably known of the existence of a claim for violation of

8  15 USC § 1692e or 1692f  before, because Defendants fraudulently concealed the fact that they

9  were not entitled to enforce Plaintiff's debt obligation and that they were falsely representing to

10  Plaintiff that the character and amount of money Plaintiff Mayotte still owed on her debt.

11  165.   On or about July 12, 2013, Plaintiffs sent a Notice of Dispute of Debt and Demand for

12  Verified Debt Validation pursuant to the Fair Debt Collections Practices Act (15 U.S.C.§

13  1692f(6) et seq) and the Colorado Fair Debt Collections Practices Act Colorado Civil Code

14  C.R.S. 12-14-101 et seq. request for statement. Attached hereto as **Exhibit "I"** is a true and

15  correct copy of the proof of service of Plaintiff's notice and demand for verified debt

16  validation.

17  166.   Defendants failed to provide verified debt validation, the current right to possession of

18  the Property [1692f(6)(A)], or to verify the current creditor.

19  167.   In illegally attempting to collect on Plaintiffs debt obligation in the manner described

20  herein, Defendants US Bank N.A., as the purported assignee, and, ASC/Wells Fargo Bank

21  N.A.as purported Deed of Trust servicer:

22      (a)         falsely represented the status of the debt, in particular, that it was due and

23              owing to Defendant ASC/Wells Fargo Bank N.A. at the time the suit was filed;

24      (b)         falsely represented or implied that the debt was owing to Defendant Wells

25              Fargo Bank N.A. as an innocent purchaser for value, when in fact, such an

26              assignment had not been accomplished;

27      (c)         threatened to take action, namely engaging in collection activities that

28

cannot legally be taken by them; and

(d)     attempted to collect on the promissory note under false pretenses; namely that ASC/Wells was assigned Plaintiff's debt when in fact they were not.

168.    As a result of each and every Defendant's violations of the FDCPA, Plaintiff is entitled to actual damages pursuant to 15 USC §1692k(a)(1); statutory damages in an amount up to One Thousand Dollars ($1,000.00) per violation pursuant to 15 USC §1692k(a)(2)(A); reasonable fees and costs pursuant to 15 USC § 1692k(a)(3); and declaratory relief, from each and every Defendant herein.

169.    Plaintiff relied on Defendants' misrepresentations and has been damaged in the following ways: (1) multiple parties may seek to enforce the debt obligation against her; (2) the title to the subject property has been clouded and its salability has been rendered unmarketable, as any buyer of Plaintiff's home will find themselves in legal limbo, unable to know whether they can safely buy Plaintiff's home or get title insurance; (3) Plaintiff paid the wrong party for an undetermined amount of time and overpaid in interest that was over-calculated; (4) Plaintiff is unable to determine whether she sent payments to the right party; (5) Plaintiff Mayotte's credit and credit score have been damaged; and (6) Plaintiff has expended significant funds to cover the cost of researching and compiling material for this action, unavailability to be gainfully employed during that time, and related costs such as 6 years of legal fees during the HAMP and ensuing "modification" offers and foreclosure defense actions/ensuing BK. 6 years declining business due to this inability to get credit lines to run business.

## XVI. SIXTH CAUSE OF ACTION — CANCELLATION OF INSTRUMENTS
### [Against All Defendants and Doe Defendants]

170. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

171.  The claims established by the aforementioned written instruments: Notice of Trustee's Sale, and Assignment of Deed of Trust for, or by Defendant US Bank N.A., Structured Asset

Investment Loan Trust, and/or ASC/Wells Fargo Bank N.A., and Doe's 1-20 are false as is more fully described above.

172. The Assignment of Deed of Trust and the Notice of Trustee's Sale were created by persons without any legal existence, or right, title, interest, or authorization by any legitimately authorized party pursuant to the pleadings above.

173. The claims of the aforementioned Assignment of Deed of Trust and the Notice of Trustee's Sale, US Bank N.A., Structured Asset Investment Loan Trust, and or ASC/Wells Fargo Bank N.A., and Doe's 1-20 are false and constitute a cloud on Plaintiff's title pursuant to the pleadings above, thereby injuring Plaintiff by damaging plaintiff's reputations, and threatening foreclosure imminently.

174. Plaintiff alleges on information and belief and knowledge the Property has a clouded title due to the void Note, Deed of Trust, Assignment of Deed of Trust, and the Notice of Trustee's Sale.

175. Therefore, the following written instruments: Note, Deed of Trust, Assignment of Deed of Trust, and the Notice of Trustee's Sale should hereby be cancelled.

176. Plaintiff asserts that these aforementioned written instruments will harm Plaintiff because the instruments purport to transfer Plaintiff's interest in the subject property and beneficial interest under the Deed of Trust to Defendant US Bank N.A., ASC, Wells Fargo Bank N.A., or Does 1-20. Finally, Plaintiff states that the Deed of Trust, Assignment of Deed of Trust, and the Notice of Trustee's Sale are executed by parties lacking legal authority to execute them and are not employed by Defendants, or are not duly appointed agents of Defendants, and had no authorization to execute any documents on behalf of Defendant, as is more fully described above.

## XVII. SEVENTH CAUSE OF ACTION — QUIET TITLE

[Against All Defendants and Doe Defendants]

177. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

178. Plaintiff is entitled to release of Deed of Trust pursuant to Clause 23 there in, under C.R.S. § 38-39-103 *et seq.*

179. Plaintiff alleges on information and belief and knowledge Plaintiff is owner of the Property in fee simple pursuant to the Grant Deed (See **Exhibit "A"),** and is entitled to possession of the property.

180.  Plaintiff alleges on information and belief and knowledge that Plaintiff is entitled to possession, and ownership of the Property free of any security instruments currently encumbering the Property.

181. Plaintiff alleges on information and belief and knowledge the Defendants jointly and Doe's claims are adverse to plaintiff for the aforementioned reasons more fully described above.

182. Plaintiff alleges on information and belief and knowledge hereby sues all Defendants US Bank N.A., Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2006-4, ASC, Wells Fargo Bank N.A., New Century Mortgage Corp., and Defendants Does 1-20, and all unknown parties claiming any legal or equitable right, title, estate, lien or interest in the property described in paragraph one of the complaint adverse to Plaintiff's title or any cloud upon Plaintiff's title thereto pursuant to Code of Civil Procedure Section 762.060 because their names are not presently known to Plaintiff.  These unknown Defendants, each of them, claim some right, title, estate, lien or interest in the Property described in paragraph three, herein adverse to Plaintiff's title and their claims constitute a cloud on Plaintiff's title to the Property.

183. Plaintiff alleges on information and belief and knowledge the title clearly should be quieted.  Plaintiff is informed and believes that Defendant US Bank N.A., and/or Defendants Does 1-20, may try at a later unknown date to claim an interest in Property as the assignee of the beneficial interest of the DOT, or as another party or successor.

184. Plaintiff sues DOES 1 thru 20 inclusive, by fictitious names because their names, status, and/or facts showing them liable, are not presently known to Plaintiff.  Unless otherwise

indicated Plaintiff is informed, believes, has reason to know, and thereon alleges, that each of DOES 1 through 20, inclusive, is or was the agent, employee, joint venturer, co-venturer, partner, or associate of each other and Defendant acting within the course and scope of said agency and/or employment, with the knowledge and/or consent of said Co-Defendants. Plaintiff will amend this Complaint to allege the true names and capacities of DOES 1 through 20, inclusive, when sufficient facts have been ascertained.

185. For the above reasons, the title to the Property should be quieted once and for all time in the name of Mary Mayotte and against Defendant's US Bank N.A., ASC, Wells Fargo Bank N.A., New Century Mortgage Corp. and Defendants Does 1-20; AND. If a valid interest in the DOT by US Bank N.A., ASC, or Wells Fargo Bank N.A. existed, then Plaintiff is exercising her contract remedies included in the terms and conditions of the DOT to complete, terminate, render void, or otherwise extinguish the obligations referenced in said DOT .

## XVIII. EIGHTH CAUSE OF ACTION — VIOLATION OF 42 U.S.C. § 1983 DUE PROCESS AND 14TH AMENDMENT CONSTITUTIONAL DUE PROCESS VIOLATION

### [Against All Defendants and Doe Defendants]

186. Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

187. The aforementioned Colorado law, and conduct of the parties including the authorization of the sale of the property, and the declaration of the holder status by attorneys for US Bank N.A. as trustee for Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2006-4, and Wells Fargo Bank N.A. have violated Plaintiff's rights to due process and equal protection under the law.

188. In this case Plaintiff raised the Real Party in Interest issue in the Rule 120 hearing. When the Real Party In Interest is raised as the Court in *Goodwin vs District Court*, 779 P.2d 837, 842,843 (1989) said "Therefore, the burden should devolve upon the party seeking the order of sale to show that he is indeed the real party in interest".

189. Colorado Rule of Civil Procedure 17(a) requires that every action "be prosecuted in the name of the real party in interest." The real party in interest is that party which, by virtue of

substantive law, has its own funds at risk and therefore has the right to invoke the aid of the court in order to vindicate the legal interest in question. Implicit in Rule 120 is the requirement that the party seeking an order of sale have a valid interest in the property allegedly subject to the power of sale. Unless the "real party in interest" defense is considered at a Rule 120 hearing, any order for sale might well result in the sale of a property in favor of an interloper who has no legitimate claim to the property at all. Once a debtor in a Rule 120 proceeding raises the "real party in interest" defense, as here, the burden necessarily devolves upon the party seeking the order of sale to show that it is indeed the real party in interest.

190. It is well established in Colorado law that, in an action on a promissory note, the real party in interest is the entity who holds legal title to the note. *Platte Valley Savings & Loan v. Call*, 821 P.2d 305, 307 (Colo. App 1991)

191. Furthermore, notwithstanding Colorado case law to the contrary, the Uniform Commercial Code Section 3-501, as codified under Colorado statutes, provides that the party claiming to be a real party in interest must exhibit the original note with Homeowner's signature and a valid assignment if it was not the original lender in order to show a chain of title that is not broken for failure of valid assignments.

192. A Plaintiff's mere Certification that it is a "Qualified Holder" under C.R.S. 38-38-100.3(20) does not eliminate the threshold requirement that it prove that it is the real party in interest in this proceeding, nor should the ability to post a bond or the actual posting of a bond eliminate this threshold requirement, either. Such Certification or posting of a bond may be sufficient to initiate a Rule 120 proceeding, and may even be sufficient to secure an Order Authorizing Sale under Rule 120 without a hearing when a Defendant does not raise the affirmative defense of "real party in interest" and the Court does not raise the issue, itself. But when a Defendant does raise a real party in interest defense in a Rule 120 proceeding, as it did here, the burden is on the party seeking the order of sale to show that it is indeed the real party in interest and holder in due course. The burden is, therefore, on US Bank to come forward with evidence that it currently holds legal title to Plaintiff's promissory note as obligee on the original Note and possesses same, as well, (*Platte Valley, supra; American Surety, supra*), or that it has a full and complete assignment of the note that is sufficient to protect Plaintiff from other actions by any other alleged assignors. Further, US Bank must prove that it was the real party in interest both at the time its claim arose ("Standing At Inception"), and at the time this case was filed. US Bank has been unable to comply and the summary proceeding, at best, was an expedited hearing

and provided very little due process safeguards.

193.  Finally, Plaintiff denies she is in default in any amount to Defendant, because Defendant has not established that it is the Real Party In Interest, i.e., that it is the party whose funds are at risk or to whom payments of any valid amounts due under the Note are payable.  "Reasonable probability of default" under Rule 120 is <u>not</u> to be determined solely by reference to the language of the instruments creating the secured obligation, but by all relevant evidence.

The C.R.C.P. 120 courts seem to take a restrictive view of the language of the Rule 120, holding that "the existence of a default" is to be determined solely by reference to the language of the instruments creating the secured obligation. This cramped reading of the rule is inconsistent with its purpose to test whether, <u>considering all relevant evidence,</u> there is a reasonable probability that a default exists.

194.  CRCP Rule 120 is an expedited hearing or better known as a summary proceeding that limits the discussion to default and military status with very little latitude to either demand or present other evidence that might otherwise result in an order in favor of the Homeowner.

195.  Due process protection implies that a Defendant is entitled to a full and fair hearing on matters relevant to its case and be presented with valid evidence that supports Plaintiff's claim that it is entitled to foreclose and that the outcome is appealable, if necessary. A court that does not permit a full and fair hearing and have all matters fully examined and confines the hearing to "default" and "Soldiers' and Sailors" issues "commits due process violations and reversible error"

196.   Plaintiff further alleges that without valid proof of ownership Defendant should not be allowed to file for eviction which would further the injustice committed by Defendants who unconstitutionally deprived Plaintiff of her property pursuant to the procedurally defective Rule 120 as amended under HB 06-1387 foreclosure statute.  "Abuse of process is by definition a denial of due process." *Jennings vs. Shuman,* 567 F.2d 1213 (3rd) Appellants' in that case were harmed by the eviction, and defendants' conduct was a substantial factor in causing the harm.

## XIX. NINTH CAUSE OF ACTION

(ex Parte Young Injunction)

197.    Plaintiff Mary Mayotte alleges that the state foreclosure statute as amended through HB 06-1387, C.R.S. § 38-38-101 *et seq* is procedurally defective under the 14th Amendment, Section 1 and therefore unconstitutional and is therefore entitled to injunctive relief under Ex Parte Young, 209 U.S. 123,126 (1908) which states: While a Federal court cannot interfere in a criminal case already pending in a state court, and while, as a general rule, a court of equity cannot enjoin criminal proceedings, those rules do not apply when such proceedings are brought to enforce an alleged unconstitutional state statute, after the unconstitutionality thereof has become the subject of inquiry in a suit pending in a Federal court which has first obtained jurisdiction there over;  and, under such circumstances, the Federal court has the right in both civil and criminal cases to hold and maintain such jurisdiction to the exclusion of all other courts. [B, U]

198.    US BANK N.A., AS TRUSTEE FOR STRUCTURED ASSET INVESTMENT LOAN TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-4 are proper Defendants to enjoin so as to prevent Plaintiff from having to concurrently litigate a Forcible Entry and Detainer action which is a pre-deprivation.

199.    For the collective combined aforementioned reasons the State Court 120 hearing did not provide an adequate forum to hear the claims raised in this instant action.

200.    The original purpose of Rule 120 was to provide a method of establishing compliance with the Soldiers' and Sailors' Civil Relief Act of 1940. *See Moreland v. Marwich, Ltd.,* 665 P.2d 613, 616 (Colo.1983). In 1976, the Rule 120 proceedings' inquiry was expanded to include the existence of a default and/or other circumstances authorizing the exercise of a power of sale. *See Plymouth Capital Co., Inc. v. Dist. Ct. of Elbert Cnty.,* 955 P.2d 1014, 1016-17 (Colo. 1998) ("The Rule 120 hearing is not the proper forum for addressing the various and

1   complex issues that can arise in some foreclosures. Such expansion would defeat the purpose

2   of the streamlined public trustee foreclosure and afford little advantage over a judicial

3   foreclosure. Consequently, the rule provides that parties aggrieved by the Rule 120 court's

4   decision may seek injunctive or other relief in a court of competent jurisdiction.")

5   201.    In the instant case, there exists a substantial question as to whether Plaintiff's due

6   process claims could have adequately been heard within the limited scope of a Rule 120

7   proceeding. *See Rosenfield v. HSBC Bank USA,* 681 F.3d 1172, 1190 (10th Cir. 2012).

8

9   ## XX. <u>TENTH CAUSE OF ACTION — ACCOUNTING</u>

10  [Against All Defendants and Doe Defendants]

11  202.    Plaintiff hereby incorporates by reference each and every one of the preceding

12  paragraphs as if the same were fully set forth herein.

13  203.  US Bank N.A., ASC and Wells Fargo Bank N.A. as its purported agent, have held

14  themselves out to be Plaintiff's creditor and Deed of Trust servicer. As a result of this purported

15  relationship with Plaintiff, said Defendants have a fiduciary duty to Plaintiff to properly

16  account for payments made by Plaintiff.[11]

17  204.   As a result of the aforementioned fraudulent conduct, Plaintiff Mayotte paid ASC, a non

18  existent entity operated fraudulently by Wells Fargo Bank N.A., the Deed of Trust payments

19  for a period of approximately four and a half years. However, for the reasons stated herein,

20  none of this money was actually owed to ASC/Wells Fargo Bank N.A or was accurately

21  applied to the loan balance.  For that reason, these monies are due to be returned to Plaintiff in

22  full.  There are several cases now that have held that when payments have been made to a non-

23  existent entity that all such payments are to be returned.

24

25  [11] To state a cause of action for accounting, a plaintiff must allege the existence of a fiduciary

26  relationship, or accounts so complicated that an ordinary legal action demanding a fixed sum is
    impracticable. 5 Witkin, Cal. Proc. 4th (1997) Pleading, section 775, p. 233. The elements for a

27  claim for accounting are: 1) fiduciary relationship or other circumstances appropriate to the remedy;
    and 2) a balance due from the defendant to the Plaintiff that can only be ascertained by an

28  accounting. *See* Witkin, California Procedure, Pleadings, section 776, p. 233 (4th ed.).

205.   The amount of the money due from Defendants to Plaintiff is unknown to Plaintiff and cannot be ascertained without an accounting of the receipts and disbursements of the aforementioned transactions. Plaintiff is informed and believes and thereon alleges that the amount due to them exceeds $75,000.00.

206. Finally, Defendants over stated the cure amount to prevent Plaintiff from curing and to preclude other entities or persons from bidding on the property at the Public Trustee Sale.

## XXI. SANCTION FOR DUAL TRACKING

207.  All the time Defendant was negotiating a loan modification with Plaintiff, it was accepting monies from Plaintiff and filing foreclosure documents.  The law is clear that actions by a lender with respect to a borrower, which are inconsistent with each other is illegal.  It is known in the industry as dual tracking.  Defendants should be sanctioned for this type of behavior.

## XXII. SET ASIDE THE PUBLIC TRUSTEE SALE

208.  As set above in more detail, Defendant was not a proper Plaintiff because it was not a holder in due course of any valid instrument which would have transferred ownership of the Note and DOT to it.  The assignment was fraudulent and even if it could demonstrated that it was not fraudulent, it did not assign the note; only the Deed of Trust.  The Note and DOT were bifurcated which rendered each instrument worthless and ineffective.  Defendant not having ownership of any Note or valid security interest is without the ability to seek foreclosure or foreclose, as it did in this case.  Therefore the Public Trustee Sale should be set aside and the void order issued in the 120 hearing be quashed.

## XXIII. CONCLUSION

209.   Plaintiff Mary Mayotte has been damaged, injured, harmed and prejudiced including but not limited to all manners above and as follows:

a. Plaintiff's credit rating has been damaged;

b. Plaintiff has been threatened with dispossession of property for years;

c. Real property having the legal Description in ¶ was sold unlawfully;

d. Plaintiff has expended significant funds to cover the related costs of bringing suit;

e. Plaintiff has been denied equity of redemption by being denied the identity of a true creditor to pay.

f. Plaintiff has made payments to Defendants who have failed to adjust the account to show the payments and who overstated the cure amount such that Plaintiff or anyone else could not cure.

g. Plaintiff has suffered damage to her reputations in the community and in the global community in which she makes her living;

h. Plaintiff may have to face multiple parties coming after her for the alleged owing debt;

i. Any would-be buyer of Plaintiff's property will find themselves in legal limbo, unable to know with certainty whether they can safely buy Plaintiff's property or get title insurance.

**WHEREFORE,** in consideration of the above Plaintiff respectfully requests this court grant the following relief requested. Plaintiff prays the Court enter judgment as follows:

Judgment against Defendants US BANK NATIONAL ASSOCIATION, AND "ALL PERSONS or ENTITIES CLAIMING ANY LEGAL or EQUITABLE RIGHT, TITLE, ESTATE, LIEN or INTEREST in the PROPERTY DESCRIBED in this COMPLAINT ADVERSE to PLAINTIFF'S TITLE, or ANY CLOUD UPON PLAINTIFF'S TITLE THERETO" AND DOES 1-20

Judgment for Plaintiff Mary Mayotte and the issuing **FORTHWITH** of a Temporary Restraining Order enjoining the Defendant's' right to file a Forcible Entry and Detainer complaint while the matters herein setout are reviewed and adjudicated.

**In the Alternative Judgment as follows.**

Judgment that the Assignment of Deed of Trust is void.

Judgment to set Aside the Trustee Sale

Judgment that the Deed of Trust is cancelled, or in the alternative be re-conveyed because it was not legally assigned to US Bank.

Judgment that the Title of the Property is hereafter and forever quieted in favor of Plaintiff Mayotte.

Judgment for Punitive Damages

Judgment for Compensatory, incidental and consequential damages in an amount not less than $500,000, according to proof at the time of trial.

Judgment for costs of suit.

10. Judgment for reasonable attorney fees.

11. Judgment for return of funds paid to a non-existent entity.

12. Judgment for the production of a valid cure statement.

13. Judgment for any further relief the Court deems just and proper.

Dated: December 8, 2014 with all rights reserved.

By: _Mary M. Mayotte_    12-8-14

Mary Mayotte, Pro Se

## **Verification**

I, the undersigned, Plaintiff in this action, have personal knowledge of the matters stated herein, except as otherwise indicated and cited, and if called to testify, could and would competently testify thereto. To the best of my knowledge, information, and belief, the facts and allegations contained above are true and correct. By signing hereunder, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 8, 2014 with all rights reserved.

.

By: _____

Mary Mayotte, Pro Se

# EXHIBITS

TW·902687

24

Return To:

New Century Mortgage
Corporation
18400 Von Karman, Ste 1000
Irvine, CA 92612

Prepared By:
New Century Mortgage
Corporation
18400 Von Karman, Ste 1000
Irvine, CA 92612

2006033470
Page: 1 of 24
02/20/2006 09:30A
City & County Of Denver    DOT    R121.00    00.00

————————————[Space Above This Line For Recording Data]————————————

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated  February 13, 2006
together with all Riders to this document.
(B) "Borrower" is MARY M. MAYOTTE

Borrower is the trustor under this Security Instrument.
(C) "Lender" is New Century Mortgage Corporation

Lender is a Corporation

COLORADO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

1006321606
Form 3006  1/01

-6(CO) (0005).01

Page 1 of 15          Initials: [signature]

VMP MORTGAGE FORMS - (800)521-7291

[signature]

organized and existing under the laws of **California**
Lender's address is **18400 Von Karman, Suite 1000, Irvine, CA 92612**

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is the Public Trustee of **Denver**                                    County, Colorado.
(E) "Note" means the promissory note signed by Borrower and dated **February 13, 2006**
The Note states that Borrower owes Lender **FOUR HUNDRED EIGHTY-ONE THOUSAND SIX**
**HUNDRED FIFTY AND 00/100**                                                        Dollars
(U.S. $ **481,650.00**          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **03/01/2036**
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☒ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] |

**Prepayment Rider**
**ARM Rider Addendum**

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower, in consideration of the debt and the trust herein created, irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County [Type of Recording Jurisdiction]
of Denver                                                       [Name of Recording Jurisdiction]:
See Legal Description Attached Hereto and Made a Part Hereof

Parcel ID Number: 05125-13-046-046                  which currently has the address of
23 SOUTH GARFIELD ST                                                               [Street]
Denver                                                 [City], Colorado  80209      [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record and liens for taxes for the current year not yet due and payable.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Initials: _____                1006321606

VMP -6(CO) (0005).01           Page 3 of 15                  Form 3006   1/01

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow

-6(CO) (0005).01                              Page 4 of 15          Initials:            1006321606
                                                                                        Form 3006   1/01

Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless

Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the

-6(CO) (0005).01                         Page 6 of 15                    Initials: _____          1006321606

Form 3006   1/01

work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

    If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

    6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

    7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

    Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

    8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

Initials: _MMM_     1006321606

-6(CO) (0005).01     Page 7 of 15     Form 3006   1/01

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source

-6(CO) (0005).01    Page 8 of 15    Initials: [signature]    1006321606    Form 3006   1/01

of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

-6(CO) (0005).01                    Page 9 of 15               Initials: ____           1006321606

                                                              Form 3006   1/01

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's

-6(CO) (0005).01                     Page 10 of 15                 Initials: [signature]   1006321606

                                                                              Form 3006   1/01

notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c)

certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any

-6(CO) (0005).01                        Page 12 of 15                        Initials: 𝖵𝖬𝖯   1006321606

Form 3006   1/01

Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Lender shall mail a copy of the notice to Borrower as provided in Section 15. Trustee shall record a copy of the notice in the county in which the Property is located. Trustee shall publish a notice of sale for the time and in the manner provided by Applicable Law and shall mail copies of the notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's certificate describing the Property and the time the purchaser will be entitled to Trustee's deed. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall request that Trustee release this Security Instrument and shall produce for Trustee, duly canceled, all notes evidencing debts secured by this Security Instrument. Trustee shall release this Security Instrument without further inquiry or liability. Borrower shall pay any recordation costs and the statutory Trustee's fees.

24. Waiver of Homestead. Borrower waives all right of homestead exemption in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _____ (Seal)
                                        MARY M. MARJOTTE            -Borrower

_____        _____ (Seal)
                                                                    -Borrower

_____ (Seal)  _____ (Seal)
                          -Borrower                                 -Borrower

_____ (Seal)  _____ (Seal)
                          -Borrower                                 -Borrower

_____ (Seal)  _____ (Seal)
                          -Borrower                                 -Borrower

                                                        1006321606

VMP -6(CO) (0008).01          Page 14 of 15            Form 3006   1/01

STATE OF ~~COLORADO,~~ New York
~~9th~~ Manhattan                                        County ss:

The foregoing instrument was acknowledged before me this 14th day of February 2006

by

*Mary M. Mayotte*

Witness my hand and official seal.

My Commission Expires: 5/24/08          *Dana McCabe*
                                        Notary Public

DANA McCABE
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01MC6110288
CERTIFIED IN QUEENS COUNTY
EXPIRES MAY 24, 2008

-6(CO) (0005).01                Page 16 of 16          Initials: ____

                                               1006321606
                                               Form 3006   1/01

# ADJUSTABLE RATE RIDER
### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 13th    day of February, 2006     , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to New Century Mortgage Corporation

("Lender") of the same date and covering the property described in the Security Instrument and located at: 23 SOUTH GARFIELD ST, Denver, CO  80209

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:
A. INTERESTRATE AND MONTHLY PAYMENT CHANGES
    The Note provides for an initial interest rate of      8.650 %. The Note provides for changes in the interest rate and the monthly payments, as follows:
4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
    (A) Change Dates
    The interest rate I will pay may change on the first day of March, 2008     , and on that day every 6th     month thereafter. Each date on which my interest rate could change is called a "Change Date."
    (B) The Index
    Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in <u>The Wall Street Journal</u>. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."
    If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.
    (C) Calculation of Changes
    Before each Change Date, the Note Holder will calculate my new interest rate by adding
                                                                    percentage points
Six And Three Tenth(s)
(        6.300 %) to the Current Index. The Note Holder will then round the result of
                                                                    1006321606

MULTISTATE ADJUSTABLE RATE RIDER - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL) - Single Family - Fannie Mae Uniform Instrument

-838R (0402)  Form 3138 1/01
Page 1 of 3       Initials: MM
VMP Mortgage Solutions, Inc.
(800)521-7291

this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would. be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.130 % or less than 8.650 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One And One-half** percentage points ( 1.500 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 15.650 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows :

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

1006321606

VMP®-838R (0402)                    Page 2 of 3        Initials: [signature]        Form 3138  1/01

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)  
MARY M. MAYOTTE            -Borrower

_____ (Seal)  
                          -Borrower

_____ (Seal)  
                          -Borrower

_____ (Seal)  
                          -Borrower

_____ (Seal)  
                          -Borrower

_____ (Seal)  
                          -Borrower

_____ (Seal)  
                          -Borrower

_____ (Seal)  
                          -Borrower

1006321606

-838R (0402)            Page 3 of 3            Form 3138  1/01

# ADJUSTABLE RATE RIDER ADDENDUM
### (Libor Index - Rate Caps)

This Adjustable Rate Rider Addendum is made this **13th** day of **February** **2006**, and is incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and Mortgage, Deed of Trust or Security Deed (the "Security Instrument") and Adjustable Rate Rider (the "Rider") of the same date given by the undersigned (the "Borrower") to secure repayment of Borrower's Note to

**New Century Mortgage Corporation.** (the "Lender").

Property securing repayment of the Note is described in the Security Instrument and located at:
### 23 SOUTH GARFIELD ST, Denver, CO 80209
#### (Property Address)

To the extent that the provisions of this Adjustable Rate Rider Addendum are inconsistent with the provisions of the Note and/or Security Instrument and/or Rider, the provisions of this Addendum shall prevail over and supersede any such inconsistent provisions of the Note and/or Security Instrument and/or Rider.

In addition to the covenants and agreements made in the Note, Security Instrument, and Rider, Borrower and Lender further covenant and agree as follows:

**4.     (D) LIMITS ON INTEREST RATE CHANGES**
The interest rate I am required to pay at the first change date will not be greater than **10.150** % or less than **8.650** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One And One-half** percentage point(s) ( **1.500** %) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **15.650** % or less than **8.650** %.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider Addendum.

_____     _____
**MARY M. MAYOTTE**

_____     _____

_____     _____

NCMC
Adjustable Rate Rider Addendum
RE-102   (082296)                     Page 1 of 1                     1006321606

# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this 13th day of February, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to New Century Mortgage Corporation

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

23 SOUTH GARFIELD ST, Denver, CO 80209
[Property Address]

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:

CARRIAGE ROW
[Name of Condominium Project]

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest.

CONDOMINIUM COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. Condominium Obligations. Borrower shall perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance, then: (i) Lender waives the provision in

1006321606

MULTISTATE CONDOMINIUM RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP-8R (0411)      Form 3140 1/01
Page 1 of 3      Initials:
VMP Mortgage Solutions, Inc.
(800)521-7291