**Mary M. Mayotte**

23 South Garfield St.
Denver, CO 80209
Phone Number: 303-321-8935

FILED
UNITED STATES COURT
DISTRICT OF COLORADO

2015 FEB 27

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

## UNITED STATES DISTRICT COURT

## DISTRICT OF COLORADO

| | |
|---|---|
| **MARY M. MAYOTTE,** an individual; | Court Case Number: 14-CV-3092-RBJ-CBS |
| Plaintiff, | |
| vs. | **VERIFIED SECOND AMENDED COMPLAINT FOR:** |
| US BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR STRUCTURED ASSET INVESTMENT LOAN TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-4; WELLS FARGO BANK N.A.; AMERICA'S SERVICING COMPANY; and ALL PERSONS OR ENTITIES CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE, ESTATE, LIEN OR INTEREST IN THE PROPERTY DESCRIBED IN THIS COMPLAINT ADVERSE TO PLAINTIFF'S TITLE, OR ANY CLOUD UPON PLAINTIFF'S TITLE THERETO; | **DECLARATORY RELIEF AND JUDGEMENT WRONFUL FORECLOSURE EXISTANCE OF QUASI CONTRACT AND UNJUST ENRICHMENT VIOLATIONS OF 12 U.S.C. §2605 VIOLATIONS OF 15 U.S.C. §1692 ET SEQ [FDCPA] RELIEF UNDER 42 USC § 1983 VIOLATION OF DUE PROCESSS CLAUSE IN THE 14TH AMENDMENT AND IN THE FIFTH AMENDMENT** |
| DEBRA JOHNSON, PUBLIC TRUSTEE OF DENVER COUNTY | **JURY TRIAL** |
| Defendants. | |

# WORKING TABLE OF CONTENTS

I.  COMPLAINT
II.  INTRODUCTION
III.  JURISDICTION, VENUE, AND PARTIES
IV.  STATEMENT OF THE CASE
V.  FACTUAL BACKGROUND
VI.  PLAINTIFF'S LOAN MODIFICATION AND DEBT VALIDATION EFFORTS
VII.  FRAUDULENT FABRICATED ASSIGNMENT OF DEED OF TRUST
VIII.  COLORADO FORECLOSURE LAW SUMMARY
IX.  FIRST CAUSE OF ACTION — DECLARATORY RELIEF: TO DETERMINE
        STATUS OF DEFENDANTS' CLAIMS [28 U.S.C. §§ 2201, 22021]
X.  SECOND CAUSE OF ACTION — WRONGFUL FORECLOSURE
        A. Unconstitutional Proceeding
        B No Real Party in Interest
        C. Invalid Assignment-Made By Spurious Document
        D. Breach of Contract
        E. Securitization Issues
        F. Lack of Accounting
        G. Not Holder In Due Course
        H. Lack of Original Documents
        I. Dual Tracking
XI.  THIRD CAUSE OF ACTION — DECLARE QUASI CONTRACT & UNJUST ENRICHMENT
XII.  FOURTH CAUSE OF ACTION — VIOLATION OF 12 U.S.C. § 2605 (RESPA)
XIII.  FIFTH CAUSE OF ACTION- VIOLATION OF 15 U.S.C. § 1692, ET SEQ (FDCPA).
XIV.  SIXTH CAUSE OF ACTION — REQUEST FOR RELIEF UNDER 42 U.S.C. § 1983
XV.  SEVENTH CAUSE OF ACTION — VIOLATION OF THE 14TH AND 5TH AMENDMENTS
XVI.  REQUESTS AND REASONS
        A. Injunctive Relief as To Eviction (Young)
        B. Set Aside the Public Trustee Sale
        C. Declare Existence of Implied Contract
        D. Declare Due Process Protections were Compromised
        E. Refund Payments
        F. Demand Proper Accounting
        G. Cancellation of Instruments
        H. Declare Public Trustee as a Proper Defendant (no damages)
        I. Demand Production of the Originals
        J. Quiet Title
        K. Acknowledge Securitization Defects
        L. Determine Six (6) Year Statute of Limitations Tolling Period
XVII.  CONCLUSION

# I. COMPLAINT

**COMES NOW**, Mary M. Mayotte, Pro Se, " who is unschooled in statutes and codes and therefore her pleadings are to be held to a less strict standard than pleadings filed by lawyers and thus are to be construed liberally. *Alba v. Montford*, 517 F.3d 1249, 1252 (11th Cir. 2008); see also *Haines v. Kerner*, 404 U.S. 519, wherein the Supreme Court has directed that those who are unschooled in law making claims, pleadings or complaints shall have the court look to the substance of the pleadings rather than in the form, without waiver of rights or defenses, for her Verified Original Complaint, her 1st Amended Complaint and this 2nd Amended Complaint against Defendants US BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR STRUCTURED ASSET INVESTMENT LOAN TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-4, (in its capacity as purported Assignee to Plaintiff Mayotte's Deed of Trust, or as a debt collector within the meaning of FDCPA) (hereinafter "USB"); and AMERICA'S SERVICING COMPANY, a DBA for Wells Fargo's servicing division (in its Capacity as purported Servicer for the loan in question within the meaning under RESPA, or as a debt collector within the meaning of FDCPA)(hereinafter "ASC")  and, WELLS FARGO N.A. (as Attorney in Fact, or in its Capacity as purported Servicer for the loan in question within the meaning under RESPA, or as a debt collector within the meaning of FDCPA) (hereinafter Wells) complains as follows:

## II. INTRODUCTION

This Complaint alleging Wrongful Foreclosure and Breach of Implied Contract, among other causes of action,  (now the 2nd Amended Complaint) is before this court due to (a) diversity jurisdiction 28 USC 1332, where the parties to this action are citizens of different states, (b) the amount in controversy is over $75,000, (c) documents which were known to be spurious were relied on by USB to give it the purported right to foreclose, (d) the party bringing the foreclosure action was an improper Plaintiff in the foreclosure action, and (e) the elements of due process protection were compromised in a semi-judicial hearing that authorized a foreclosure sale of Mayotte's home due to the presentation of documents by counsel for USB, which are

prescribed and allowed by a foreclosure state statute and it's Amendment, both of which Mayotte contends are unconstitutional, and the refusal to allow examination of such documents by Mayotte and/or a forensic document examiner, and (f) misrepresentations and fraudulent misconduct regarding debt collection procedures as protected by FDCPA and RESPA, to include the attending loan modification process preceding the foreclosure, and which led up to this foreclosure action, and which now, since January 2014, is illegal for debt collectors to do. (Dual Tracking)

In summary, Mayotte, in this Complaint for Wrongful Foreclosure and Breach of Implied Contract, among other causes of action, is seeking a declaration that she has the only valid interest in the subject property commonly known as 23 S. Garfield, Denver, CO 80209; that the foreclosure was wrongful, defective, invalid and unconstitutional in every respect, as described more particularly below; that the entity who is claiming an adverse interest is not a proper Plaintiff and therefore does not have standing to initiate this foreclosure proceeding (not a Real Party in Interest), and has made that claim in conjunction with its servicer Wells Fargo (ASC) by fraudulent means to strip Mayotte of her home and equity with spurious documents (a sham assignment to USB, as Trustee and a fraudulent Cure Statement filed with the Public Trustee), and who by misrepresentations and fraudulent misconduct regarding debt collection, including the loan modification process, has knowingly and fraudulently taken her home; and upon such declaration by this court that she has the only valid interest in the subject property, accordingly, set aside the Public Trustee sale as void and invalid and order the title to Mayotte's property to be quieted in favor of Mayotte.

Additionally, Defendants through their attorneys took advantage of the unconstitutional state foreclosure statute, which interfered with Mayotte's due process and equal protection of the law in the Rule 120 hearing (a semi-judicial proceeding). This action was part of a total scheme to deprive homeowner of her ownership in her home in order to advance Defendants' financial interest and which resulted in a wrongful foreclosure of Mayotte's property.

The Colorado state legislature made the Rule 120 foreclosure proceeding procedurally and substantively defective under section 1 of the 14th Amendment because it does not provide a meaningful hearing at a meaningful time. *Armstrong v. Manzo, 380* U. S. 545, 380 U. S. 552 (1965)

In 2006 the Colorado State Legislature passed HB 06-1387, which amended the foreclosure statute—§38-38-101 et seq., thus making it more procedurally defective under section 1 of the 14th Amendment because it lowered the standard of proof that the lender had to show that it was the Real Party in Interest. It was a kin to "shooting fish in a barrel."

The Rule 120 expedited hearing is like no other summary proceeding. It has no right to appeal; no right to a jury trial; no right to counter-claim; no right to discovery; and the real party in interest defense has been muted by enactment of HB 06-1387 in spite of *Goodwin v District Court*, 779 P.2d 837 (Colo.1989), which required the real party in interest defense be allowed and be given traction.

A judge's sole function in a 120 hearing then is restricted to only approve the foreclosure based on two issues: (a) whether there is a default and (b) whether the homeowner is in military service. Any other issues must be determined in a separate authorized action, known as a "collateral attack" on the hearing initiated by a separate lawsuit.

In that regard Mayotte is relying on the Rooker-Feldman doctrine to be inapplicable in this case because the determination of the motion to authorize sale by the Public Trustee is not a final order subject to appeal; and that an aggrieved party may initiate an independent action, such as here, to address issues related to the motion or order. This case was initiated prior to a Public Trustee Sale and therefore prior to the conclusion of the Rule 120 case. In re Miller, 666 F.3d 1255, 1262 n. 6 (10th Cir. 2012); Rousseau v. Bank of New York, Civil Action No. 08-cv-00205-PAB_BNB, 2009 WL 3162153 (D. Colo., Sept. 29, 2009) (noting that the text of Rule 120 contemplates that a plaintiff could re-raise arguments concerning the validity of a foreclosure in a subsequent proceeding); United Guar. Residential Ins. Co. v. Vanderlaan, 819 P.2d 1103, 1005 (Colo. App. 1991) (plaintiff's failure to raise a defense to deficiency in a Rule 120 proceeding did not preclude later challenge). These courts note that

Rule 120 expressly states that determination of the motion is not a final determination, and that an unhappy party may initiate a separate action to challenge the determination.

There are other foreclosure procedures in Colorado that are impacted by the due process clause of the Constitution, as well.

For example, National banks such as USB and Wells Fargo are federal instrumentalities/or quasi-public entities, which are created for public and national purposes and therefore are part of the government for application of constitutional constraints, as is the Public Trustee. *Mercantile Nat'l Bank v. Langdeau* 371 U.S. 555,558,559 (1963). *Easton v. Iowa*, 188 U.S. 220,230 (1903) *Easton v. Iowa*, 188 U.S. 220,230 (1903). *Lebron v National Railroad Passenger Corporation.* 513 U.S. pgs 374, 379 (1995). The Public Trustee who administers the Rule 120 proceeding is an agent of the state and therefore is a state actor and as such is a proper party for the application of constitutional constraints, as well.

At all times relevant herein, Defendants were state actors and their conduct was subject to 42 U.S.C. §§ 1983, 1985, and 1988. "Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of Section 1983 actions." *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980). *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922 (1982).

Accordingly, Mayotte has a fundamental property interest that cannot be taken in such summary proceedings by such Defendants without clear and convincing evidence as required under the 14th Amendment.

In *Addington v. Texas*, 441 U.S. 418, (1979) the court held:

> "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of fact finding, is to 'instruct the fact finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication."

## III. JURISDICTION, VENUE AND PARTIES

This Court has original jurisdiction over the claims in this action based on 28 U.S.C§§ 1331,

1343, 2201, 2202, 12 U.S.C §2605, 15 U.S.C.§1692(f)(6), 42 U.S.C. 1983 which confer original

jurisdiction on federal district courts in suits to address the deprivation of rights secured by federal law.

This Court also has supplemental jurisdiction over the pendant state law claims because they

form a part of the same case or controversy under Article III of the United States Constitution, pursuant

to 28 U.S.C. §1367.

This Court also has original jurisdiction over the claims in this action based on 28 U.S.C §1332,

which confers original jurisdiction on federal district courts in suits between diverse citizens that involve

an amount in controversy in excess of $75,000.00.

The unlawful conduct, illegal practices, and acts complained of and alleged in this Complaint

were all committed in Denver, Colorado and involved real property in the Denver District of Colorado.

Therefore, venue properly lies in this District, pursuant to 28 U.S.C. §1391(b).

Plaintiff Mayotte is now and at all times mentioned herein, an individual residing in the County

of Denver.

At all relevant times, US Bank N.A. is a National Association, having FDIC certification number

6548, is organized under the laws of the United States with its principal place of business in North

Carolina.

At all relevant times, Wells Fargo Bank N.A. is a National Association organized under the laws

of the United States with its principal place of business in California.

At all relevant times America's Servicing Company ("ASC"), is a DBA for the servicing

division of Wells Fargo Bank N.A., which is a National Association organized under the laws of the

United States with its principal place of business in California.

At all relevant times, New Century Mortgage Corporation ("NCM") was a corporation doing

business in California, but filed bankruptcy shortly after making the subject loan.

At all times relevant to this action Mayotte has owned real property commonly known as: 23 South Garfield, Denver, CO 80209, hereinafter ("Property") further described by APN Number 05125-13-046-046, with the following legal description:

> All the real property, together with improvements if any, situate, if lying and being in the County of Denver and State of Colorado, described as follows: Unit 38, Carriage Row at Cherry Creek, City and County of Denver, State of Colorado, according to the condominium map thereof recorded on December 13, 1996, at reception no. 9600170672, and the declaration recorded in February 5, 1996, at reception no. 960015196, and as amended in instrument recorded June 26, 1996 at reception 9600088649, and as amended in instrument recorded December 13,1996 under reception no. 9600170671 in the records of the clerk and recorder of the City and County of Denver, Colorado, as amended from time to time.

## IV.  STATEMENT OF THE CASE

Plaintiff Mayotte alleges that the Defendants are attempting to acquire title to her home under the name given on certain recorded non-judicial foreclosure instruments as "US BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR STRUCTURED ASSET INVESTMENT LOAN TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-4," (hereinafter "USB as Trustee"). Plaintiff believes that USB is not a holder of any evidence of debt and therefore has no ownership interest entitling them to collect payment or declare a default, or cause a default to be declared by any agent of USB as Trustee and therefore has insufficient evidence to invoke the jurisdiction of this or any court regarding standing to prosecute a foreclosure action against Mayotte.

By hiding behind the complexities of the banking (or mortgage) finance system, Defendants brazenly attempted to dupe Mayotte (and millions of other American homeowners) into believing that they have the right to collect a debt in which USB as Trustee has no ownership interest. In an attempt to further their fraudulent scheme and create the air of propriety surrounding their dubious debt collection and land grab efforts, Defendants have resorted to "papering the file" by <u>fabricating an "Assignment of Deed of Trust" and "Fabricating a Notice of Sale"</u>; employing individuals who have no authority or personal knowledge of the facts to which they attest, and falsely representing to Mayotte and *to the Court* that they have the right to take Mayotte's property away. Not only is Defendants' conduct a

criminal offense and an affront to long-standing Colorado property laws, but their reliance on fabricated and forged documents undermines the integrity of the judicial system.

Through this action Mayotte seeks to stop Defendants' fraudulent practices with regard to this case, discover the true holder in due course of Plaintiff Mayotte's Promissory Note ("Note"), if there is one, and determine the status of Defendants' claims arising from their publically recorded documents, as more particularly setout herein below.

Defendant USB like many "lenders" issued millions of predatory loans between 2001 and 2008 with the belief that borrowers, including Mayotte, would default for one reason or another and lose their homes, and thereafter these "lenders "bundled the loans into "Mortgage Backed Securities" through a process called "Securitization" and bought exotic insurance products called Credit Default Swaps so that when the loan did in fact go into default, the lender could collect the insurance and make even a greater profit on the loan.  These securities were then sold to investors in the form of certificates (bonds), whereby the investors became the "Certificate Holders" of the securities or "Bondholders" of the bonds that were to be fed by the abovementioned toxic loans, and who may be, interestingly enough, the only proper Plaintiff in these foreclosure actions, and moreover, actions for fraud as against the original lender, the assignee Trustee and its servicer and the sponsor of the particular certificate offering.

However, in the process of securitizing these predatory loans the sponsors often failed to follow the prescribed procedures, creating the instant situation wherein the bonds were not actually backed by any mortgages at all; that the Trustee was administering an empty Trust.

In addition to abiding by the pertinent Pooling and Servicing Agreement and the issuance of the 424B5 Prospectus, among other things, an essential aspect of the mortgage securitization process is that the Trustee first obtain and then maintain good title to performing loans comprising the pool for that certificate offering. Obtaining a valid Note and Deed of Trust either by way of a valid assignment or by a purchase of the Note and DOT is essential. This is necessary for the Trustee to be legally entitled to enforce the conditions of a defaulted loan.  In this case, on information and belief neither document was

validly transferred to USB. The DOT was purportedly assigned by a fictitious robo signer, Ryan Amato, and assigned more than five (5) years after the closing date set out in the prospectus and of the particular PSA, and the Note wasn't even purportedly assigned.

Mayotte alleges that the "True Sales" (valid and timely transfer of the Note and DOT into the Trust) never took place due to the failure to follow the basic legal requirements for the transfer of a negotiable instrument. The Note was in default, it was bifurcated from the Deed of Trust and was not in possession of the entity filing foreclosure. Further, New Century Mortgage was in Bankruptcy within a year after the original transaction so it was improbable that proper transfer could have been made. USB therefore did not acquire any legal, equitable and pecuniary interest in Mayotte's Note and DOT. As a result, thereof, USB which purports to be Mayotte's creditor, actually had no secured or unsecured right, title or interest in Mayotte's Note and DOT and therefore has no right to collect mortgage payments, demand mortgage payments, report derogatorily against Mayotte's credit or initiate a foreclosure action against Mayotte.

## V.  FACTUAL BACKGROUND

In anticipation of Defendants filing a Motion To Dismiss this Complaint under 12(b)(6), Mayotte submits sufficient facts to make the claims "plausible on their face" and "raise a right to relief above the speculative level" as follows:

Mayotte purchased her property initially in 1999 and made all payments on time until 2008 when she got instructions to miss payments in order for USB to work with her toward a loan modification.

In February of 2006, Mayotte refinanced her home with New Century Mortgage Corporation ("NCM") in the amount of $481,650 secured by real property located at 23 S. Garfield St., Denver, CO 80209. NCM subsequently filed for bankruptcy in April 2007. The Deed of Trust identified NCM as Lender and Beneficiary.

During the summer of 2007 Mayotte became aware that the Note she had signed, contrary to what she was told and agreed to, and what was stated in the Good Faith Estimate, was a five (5) year adjustable rate mortgage (ARM), with a two year prepayment penalty as one of the conditions and that the rate could increase 1.5% from 8.65% in early 2008 and continue to increase as much as 1.5% every six (6) months until a ceiling of 15% had been reached. Upon that discovery, Mayotte knew she would not be able to afford that kind of mortgage payment due to the economic decline in the country.

So during the summer of 2007 Mayotte, for the first time, contacted ASC, a name used by Wells Fargo servicing division (the Servicer for USB believed to be an unlicensed DBA in the state of Colorado) and was informed that in order to qualify for a loan modification she would have to miss three (3) payments to demonstrate hardship in order for USB to work with her toward a loan modification with no mention that she would be in "default" if she complied. This was the first of four calls Mayotte placed to the Loss Mitigation department wherein she was similarly informed.

Mayotte continued, however, to make payments for another year until July 2008 at which time she missed the three (3) payments she was instructed to do earlier by ASC's Loss Mitigation department. No modification efforts were started and Mayotte was put into default immediately and payment of the entire debt was accelerated in July 2008 by the foreclosure department through Castle Meinhold, Stawiarski, counsel for USB, and dismissed without prejudice in March 2010. This was the first of what would eventually become four (4) foreclosures initiated by Castle Meinhold, Stawiarski, over a six year period.

In February 2009 Mayotte accepted an Interest Rate Freeze Agreement, which ASC claimed in later correspondence that Mayotte refused to sign. In fact it had been signed and returned immediately. This was just one of many examples of sloppy record keeping by ASC throughout this matter.

The records will further show that ASC told Mayotte that in addition to missing three (3) payments to show hardship as a condition precedent to qualifying for a loan modification, she would later be required to make three (3) trial payments first under the HAMP and then a second time pursuant

to an "in house" forbearance agreement in early 2010 through the office of Dawn Nelson at Wells Fargo Office of the President of the Home Mortgage Division.

In spite of Mayotte continuing to pay the <u>very same amount</u> as the HAMP trial payments for the required three (3) months and for an additional year and nine (9) months after, (a total of two years), per instructions of ASC, they, without any notice, later claimed the monthly payment amount Mayotte was making was insufficient to qualify her for the loan modification, and thereupon once again, filed a foreclosure action against Mayotte even though ASC continued to collect those payments and place them in a "suspense account", instead of giving her correct credit for the payments towards her loan balance, and taking steps to complete the loan modification, as promised under the original HAMP contractual offer, for which she qualified for per her accountants and attorneys.

This activity is known in the industry as Dual Tracking and although it was common practice and not illegal prior to January 2014, the rules issued by the Consumer Financial Protection Bureau (CFPB), which became effective in January 2014, would suggest the concerns lawmakers had regarding the egregious behavior of Servicers that tricked Debtors into believing they were to receive a loan modification, but at the same time were being processed for a foreclosure, and which activity ultimately led to Mayotte's foreclosure.

It is now illegal here in Colorado effective January 1, 2015 as provided for by HB 14-1295, which gives the Public Trustee the power to stop a foreclosure sale from occurring when a homeowner is in the process of applying for an alternative to foreclosure or the homeowner has accepted (and is in compliance with) a loss mitigation option, such as a loan modification.

Some portion of the loan modification process took place, however, in 2014 when it was illegal across the US, although not specifically illegal by a Colorado statute until January 2015. Mayotte contends that the final process (or lack thereof) took place during the period that it was illegal.

In defense of ASC's foreclosure action, in the November 2014 Rule 120 hearing, the newly retained attorneys for USB, Holly Shilliday of McCarthy Holthus, claimed that letters were sent timely

to Mayotte back in 2009 stating that she did not qualify for a loan modification, thereby giving her notice in lieu of a loan modification. Those letters were never written nor sent by ASC, nor received by Mayotte. The letters produced in the 2014 Rule 120 hearing were seen for the first time by Mayotte in the hearing, and without question, were fabricated and those who claimed they were authentic committed perjury. It was blatant fraud committed upon the court.

Had those letters actually been sent and received advising Mayotte that she did not qualify for a loan modification, Mayotte would have certainly pursued another course of action in April 2009 (date the 1st letter was allegedly sent and when her 3 trial payments had been completed), as would have ASC; she would have stopped making the "unqualified" payments that she has continued to make for the following nearly two (2) years. (Note: ASC usually communicated with Mayotte by some form of tractable mail, which she has proof of.) ASC should be required to show evidence that those letters were actually sent. None were received and the judge in the 120 hearing never asked for evidence that the letters were actually sent.

This back and forth drawn out conflicting discourse and blatant misrepresentation by ASC requiring endless financials to be presented each month in order 'to be considered for loan modification' took Mayotte away from her work and caused her severe emotional distress. In addition to misstated cure figures around the December 2010 foreclosure attempt which eventually led to Mayotte's loss of her New York Home and Office of 25 years along with her business presence, she was forced to file bankruptcy in May 2011 in a desperate attempt to save her home and only remaining place of business.

This in turn damaged her reputation and her business in amounts excess of One Million ($1,000,000) Dollars. Note that this was "coincidentally" right around the time that the bogus assignment of Mayotte's Deed of Trust from NCM to USB took place in order to "paper over" the securitization defects. Again, more than 5 years beyond the required timing for assignment by the PSA and while the loan was considered to be in default.

In 2013, following the closure of Mayotte's bankruptcy, another foreclosure action was initiated, but was stalled due to a short sale arrangement that Mayotte attempted to conclude. That effort failed because of "investor guidelines" as stated by ASC. . Mayotte had been working through a consultant to bring an investor. The consultant was working directly with a representative of the bank on pricing. The bank stated that 'the offer was too low'. ASC had plenty of chances to communicate a price they were looking for. Mayotte believes that ASC knew at the inception of the short sale effort that the investor guidelines that were in place at the time would preclude finalizing the short sale and was just another fraudulent act on the part of ASC.

In late 2014 the 4th and final Rule 120 hearing was scheduled which granted to USB the authorization for the Public Trustee to sell her home on December 4, 2014. In that hearing Mayotte's counsel argued that promises were made by ASC to Mayotte to modify her loan over years and that she relied on those statements to her detriment, and such detrimental reliance instigated by ASC, was a sufficient "consideration substitute" in the loan modification agreement between herself and ASC/USB to modify the loan, thereby making Promissory Estoppel and Detrimental Reliance valid arguments for finding the existence of an enforceable contract. Those arguments, although of much interest to the court, were not within the Rule 120 purview and as such, were not given the ruling they justly deserved deserved. This, along with the entire procedure, violated Mayotte's right to Due Process under the 14th Amendment.

## VI. MAYOTTE'S LOAN MODIFICATION AND DEBT VALIDATION EFFORTS

These are additional facts in support of Mayotte's claims set out in 12 U.S.C. §2605 (RESPA), 15 U.S.C. §1692 ET SEQ and the Quasi Contract Claim.

In November 2008 USB obtained an Order Authorizing the Sale of Mayotte's home, under Rule 120, but it was suspended while Mayotte worked with ASC/Wells Fargo Bank N.A. for a Loan Modification. On December 18, 2009, a Second Motion was filed to keep the foreclosure in suspension and on March 9, 2010 the foreclosure was dismissed again during which time ASC was collecting payments from Mayotte.

As mentioned above, Mayotte was instructed to miss three (3) mortgage payments, which she did, and immediately she was put into default and payment of the entire debt was accelerated by the foreclosure department through counsel in July 2008, and the first of which would eventually become the 1st of four (4) foreclosure initiatives, over a six year period; it was initiated in November 2008 and dismissed in March 2010 without prejudice. Upon completion of that process she was offered a trial modification pursuant to HAMP qualifications. Plaintiff made the required three months of payments plus four (4) more, and made numerous calls to ASC about her status. She got the run around about not receiving her paperwork, which was mailed (overnight/tractable mail) to them and yet they continued to ask for more of the same paperwork already sent to them as she continued to make payments.

Mayotte sent ALL required paperwork. There would have been no logical reason for her to have not complied when she wanted to save her home through achieving modification.

Mayotte asked for a copy of her Note in the summer of 2010 and three months later received a copy of someone else's Note with a cover letter, addressed to Mayotte. Another indication of the irresponsible communication and record keeping at that time.

Each time Mayotte corresponded with the ASC (often several times per week) and pushed back on anything or sent a complaint or query through Senator Bennet, ASC would close Mayotte's file, forcing her to start over at whatever stage she was in, in the process of workouts. She lost count at somewhere around 70 "single points of contact"-- later referred to as "mortgage preservation specialists" -- many of whom were rather new to ASC and had not even familiarized themselves with her file prior to contact. This disjointed manner of communication was confusing to the Mayotte. She alleges and believes this led to much of the loss of continuity on documentation and miscommunication during the "handoff" from one specialist to another—resulting in "inconsistencies", complete disconnect at times and lack of timely resolution over the 6 year process. Mayotte had the frequent impression that "the right hand did not know what the left hand was doing" between Loss Mitigation handling some pieces and the Office of the President or Office of Executive Complaints, others.

After an additional forbearance agreement while Mayotte worked with the office of President of Wells Fargo Mortgage Division and later that year (through efforts of Senator Bennett's office with the Office of Executive Complaints she was told both verbally and in writing that a modified loan was ready to be offered if Mayotte cleared title by making outstanding dues payments to the Homeowners Association and making a payment of $2,617.56 by a stipulated date.  Mayotte was offered a special one-month forbearance to allow time to comply with these two final requirements. Mayotte understood the modification was imminent.

Mayotte signed the forbearance agreement on November 2, 2010, and met the financial requirements late in November or early December, knowing that it was a one-month forbearance. A note was also made on one of the documents to "suspend proceedings once initial installment was received".

This did not happen. In fact, a foreclosure action had been restarted coincident with the offer of forbearance. Again, fraudulent and misleading practices on the part of Wells/ASC.

Shortly thereafter in December 2010 a Notice of Foreclosure was once again posted on Mayotte's door.  In complete disbelief, Mayotte called ASC, but no one she had been working with would return her calls nor could anyone explain or was willing to go on the record; she was transferred to over fourteen different people in a two hour period that day (documented) as regards to this foreclosure and not one of them could give her information on her current status until she reached the Underwriter Ret McCarthy who had been reviewing her loan; the same one who had said in a previous conversation that she was about to be modified. This is a documented call. The Underwriter told her that the Mortgage Insurer had rejected the modification because it did not meet their requirements. Mayotte had no previous dealings with "PMI" and no mortgage insurance on her loan.

For several years, until late 2013, Mayotte believed she was working with America's Servicing Company (ASC) for a modification of her mortgage and up until December of 2010  (and the 2cnd foreclosure attempt) was making payments to ASC at a reduced amount, in good faith, as instructed and as a condition precedent to obtain the loan modification, these payments were being held "in suspense"

on her account, as testified by Wells Fargo Bank employee, Dara Robinson, at a Rule 120 hearing on May 5, 2011.

In Voir Dire examination at the Rule 120 hearing on May 5, 2011, Dara Robinson testified that "suspense balance is when we take payments and don't apply them to anything...we don't apply to Principal or to Interest....the accumulated balance sits there kind of like a savings account...it does not get applied to the loan".  Only $8,000 of approximately $70,000 in payments, however, were held in suspense. This amount was not reflected anywhere in the cure balance which Mayotte contested through Senator Bennet's office, who conducted a Congressional inquiry around this, on two separate occasions. The bank's stalling on producing proper accounting led to Mayotte's Bankruptcy to stop the sale of her home.

Mayotte has been working diligently to resolve the matter with ASC for several years now, including not making payments when told not to, and making payments when told to do so.  She has been cooperating with ASC in providing financial statements in connection with the Federal Government's Financial Stability Plan including the Making Home Affordable Program and the Home Affordable Modification Program ("HAMP") and making monthly mortgage payments from 2008 to 2010 according to ASC's instructions.

In an effort to verify and validate her debt, payments owed, and the true identity of the creditor and servicer, Mayotte sent a Qualified Written Request letter on or around July 12, 2013, pursuant to Real Estate Settlement Procedures Act, 12 U.S.C. 2605(e), in which she requested that the purported servicer (ASC/Wells Fargo Bank N.A.) provide, among other things, "The name, address, name of a contact person and telephone number of the current holder in due course and owner of the mortgage note." 12 U.S.C. § 2605(e) requires that the servicer provide this information and respond to a written request within 60 days of receipt. (See: Exhibit " 1 ")-a true and correct copy of Mayotte's Qualified Written Request.

ASC did respond, but did not provide, and has not provided to date, the information required under 12 U.S.C. § 2605(c), including but not limited to the correction of errors, information regarding a loan modification in process which, in this case, was in process, the purported creditor, accumulated late fees and charges, and verification of the validity of the purported debt owed to USB/Wells Fargo.

The conduct described above by USB as Trustee and ASC/Wells Fargo was malicious because Defendants knew that they were not acting on behalf of the current pecuniary beneficiary of the Note and Mortgage. However, despite such knowledge, Defendants continued to demand and collect Mayotte's mortgage payments.

Frankly, Mayotte believes that NCM, except for the bogus assignment in 2011, never sold, transferred, or granted her Note or DOT to the Sponsor, Depositor or USB and that USB is merely a third party interloper to the loan transaction.

Furthermore, Mayotte, after a number of attempts, alleges that none of the Defendants can demonstrate or document that Mayotte's Note was ever properly endorsed and transferred to USB and consequently USB cannot provide either now or in a later trial any valid evidence to verify the owner and amount of Mayotte's mortgage or validate the claim to Mayotte's debt obligation.

Moreover, the parties involved in the alleged Securitization and transfer of Mayotte's Note and DOT failed to adhere to section 2.01 of the PSA, which requires that Mayotte's Note be properly endorsed, transferred, accepted and deposited with the Securitized Trust on or before the "closing date" indicated on the Prospectus. The "closing date" is the date which all of the Notes and DOT's must be transferred into the USB Trust. The failure to do so results in the Note and mortgage not being part of the Trust res, such that it is not a loan that either USB or ASC can attempt to collect on. The Note is nowhere to be found and the bogus assignment made in 2011 of the DOT is not only invalid, but attempts to transfer the DOT post- "closing date".

Mayotte does not allege or assert that she is a beneficiary or a party to the assignment or to the PSA. Rather she alleges that the failure to transfer her documents into the Trust and securitize her Note makes it impossible for USB to claim any interest upon which it can foreclose.

Defendants engaged in a pattern and practice of defrauding Mayotte, in that, on information and belief, during the entire life of the mortgage loan, Defendants failed to properly credit payments made, incorrectly calculated interest on the accounts, and failed to accurately debit fees.

On information and belief, at all times material, USB and Wells Fargo had and have actual knowledge that Mayotte's accounts were not accurate, but that Mayotte would continue to make further payments based on Defendants' representations, albeit inaccurate.

On information and belief, Mayotte did make payments based on the improper, inaccurate, and fraudulent representations as to Mayotte's accounts.

As a direct and proximate result of the actions of the Defendants set forth above, Mayotte overpaid in interest and fees.

As a direct and proximate result of the actions of the Defendants set forth above, Mayotte's credit and credit score have been severely damaged. Specifically, because the derogatory credit reporting on her credit report by USB and/or ASC/Wells Fargo, Mayotte is, and has been since 2008 unable to refinance on the present loan, buy another property, sell her home-or even rent to another party in good conscience, with the threat of imminent foreclosure over the past 6 years.

As a direct and proximate result of the actions of the Defendants set forth above, the title to Mayotte's home has been slandered, clouded, and its salability has been rendered unmarketable.

As a direct and proximate result of the actions of the Defendants set forth above, Mayotte does not know who the current beneficiary of her Note and Deed of Trust actually are, such that she is now subject to double financial jeopardy.

As a direct and proximate result of the actions of the Defendants set forth above, multiple parties can attempt to enforce Mayotte's debt obligation.

The conduct of USB and/or ASC/Wells Fargo has led to the imminent loss of Mayotte's home and to pecuniary damages. The pecuniary damages include, but are not limited to, the costs of over-calculation and overpayment of interest, the costs of repairing Mayotte's credit, the reduction and/or elimination of Mayotte's credit limits, the costs associated with removing the cloud from her property title and attorneys' fees, in an amount to be proven at trial, and loss of national reputation, and a New York City home and business/office/client base/visibility while waging this ongoing legal battle at a huge cost of time and money.

The conduct of Defendants' was malicious because Defendants did not know the identity of the current and true beneficiary of Mayotte's Note and Deed of Trust, yet they intentionally and fraudulently covered up this defect by wrongfully recording a fraudulent Assignment, which would enable them to <u>illegally and fraudulently</u> collect on Mayotte's debt, and which in essence has rendered the title to the property unmarketable.

The title to Plaintiff's Property has been rendered unmarketable and unsalable because of the possibility of multiple claims being made against Mayotte's debt and underlying security (the Subject Property). If the Assignment of Deed of Trust is not cancelled and set aside, Mayotte will be incurably prejudiced.  Mayotte will be denied the opportunity to identify and negotiate with her <u>true creditor</u> and exercise her right to verify and validate her debt.

Plaintiff has offered to and is ready, willing, and able to unconditionally tender her obligation to be setoff by the finding of damages regarding various causes of action, including damages resulting from the egregious behavior of Dual Tracking exercised by Defendants.

## VII. FRAUDULENT FABRICATED ASSIGNMENT OF DEED OF TRUST

On or about December 13, 2011, for "Value Received", an Assignment was created wherein Wells Fargo, as attorney in fact assigned, and transferred to USB all beneficial interest in Mayotte's Deed of Trust from New Century Mortgage (original lender).  The Assignment was signed by Ryan

Amato as the "Vice President for Loan Documentation" of Wells Fargo Bank N.A.  See: Exhibit "2")

Plaintiff alleges that no such transfer ever occurred, and that Ryan Amato is not the "Vice President for

Loan Documentation" of Wells Fargo Bank N.A.

Mayotte submits that Ryan Amato is a "robo signer" who simply signs thousands of property

record documents without any legal or corporate authority, whatsoever.

Ryan Amato never had the position of "Vice President for Loan Documentation" for Wells

Fargo and for that reason, Ryan Amato never had, nor has, any corporate or legal authority from Wells

Fargo, or the lender's successors and assigns, to execute the purported "Assignment." The person or

entity who hired him to become a robo signer is yet to be discovered and will thereafter be named.

Mayotte suspects that USB as Trustee, in conjunction with ASC/Wells Fargo, orchestrated this

assignment in order to paper over defects in the securitization process and give the appearance that they

hold the evidence of debt.

The "Assignment" is a fraudulent title transfer claim, and the execution, filing, and recordation of

the document was created for the purpose of facilitating and aiding and abetting the illegal, deceptive,

and unlawful collection of Mayotte's mortgage payments, as well as engaging in other debt collection

activities.

Most importantly this particular DOT gives Wells Fargo Bank N.A. no powers to perform duties

attributed to the Lender.

Attempting to "assign" or transfer a Deed of Trust by itself, as Defendants did here, does not

allow enforcement of Mayotte's Note and DOT. As alleged herein, Plaintiff's Note was not properly

negotiated, endorsed, and transferred to USB as Trustee in any manner and, moreover, it was an

assignment that was made after the closing date set out in the Prospectus and the Pooling and Servicing

Agreement, which even if it were an authentic assignment was not a valid asset of the security offering

because of the late transfer of the purported instruments.

Records will show that the only recorded "Assignment" was executed five years after the closing date of the PSA by NCM, who was out of business at that time, (should the trust be proven to actually exist). This was <u>after the alleged default occurred</u> and the Notice of Trustee's Sale was recorded in 2008.

It is called "Standing at Inception" or the lack thereof. On information and belief Mayotte (1) denies the ability of ASC/Wells Fargo, as "holder", to assign, transfer or otherwise negotiate the non existing and defaulted Note in conjunction with the Deed of Trust, and (2) ASC/Wells has no powers conferred to it via the Note or Deed of Trust to do so.

This dubious "Assignment" raises numerous red flags and further demonstrates that Mayotte's Note and Mortgage were not deposited into the Trust by the closing date, and that the "Assignment" was fabricated in attempt to "paper over" the fatal securitization defects five (5) years after the closing date set out in the Prospectus and PSA. The "closing date" is the date by which all of the Notes and Mortgages are to be transferred into the USB Trust. The failure to do so results in the Note and Mortgage not being part of the USB Trust , such that it is not a loan or set of documents that either USB or ASC can attempt to collect on.

In *SALDIVAR VS. JPMORGAN CHASE BANK. N.A.* et al, <u>11-10689</u>, (Texas, 2013) Chase and Deutsche Bank argued that the Saldivars lacked standing to challenge the validity of the assignment to the trust.

The Court held that:

> "if the assignment was void, ab initio, because it occurred after the closing date, the Saldivars have a valid argument that the banks are not valid Note Holders."

In *Glaski vs Bank of America,* FO64556 (5th Dist. CAL., 2013) the court said:

> "We conclude that Glaski's factual allegations regarding post-closing date attempts to transfer his deed of trust into the WaMu Securitized Trust are sufficient to state a basis for concluding the attempted transfers were void".

The Texas courts follow the majority rule that the obligor may defend:

> "on any ground which renders the assignment void. A contrary rule would lead to the odd result that Deutsche Bank could foreclose on the Reinagels' property though it is not a valid party to the deed of trust or promissory note, which, by Deutsche Bank's reasoning, should mean that it lacks "standing" to foreclose."

US Bank N.A. as Trustee seeks, however, to cause its purported authorized agent(s) to collect mortgage payments and engage in other unlawful collection practices.

Notwithstanding cases holding to the contrary, Mayotte believes she has standing to challenge the validity of the assignment in question, although not a party to the assignment, because to deny her standing status would be prejudicial and strip Mayotte of a legal claim/cause of action regarding Defendants' status as a "Real Party in Interest" that would exist or not as a result of the assignment.

Whether Defendants are real parties in interest is a central and core issue in this complaint and to determine that issue requires bringing into question the validity of the assignment regardless of who raises the question.

In *Goodwin vs District Court*, 779 P.2d 837, 842,843 (1989) the Goodwins were non-parties to the assignment, yet the Court in *Goodwin* said they were still entitled to challenge the assignment and raise the real party in interest defense, just as Mayotte should be entitled here.

Moreover, Mayotte is not relying entirely on being a party to the assignment in order to achieve standing to challenge it. She is also relying on C.R.C.P 105.1 to challenge standing of USB to bring about a foreclosure action when the assignment was made by a spurious document and used by USB to achieve the status of a proper Plaintiff in the foreclosure action against Mayotte.

On information and belief, none of the Defendants were/are present Holders in Due Course of Mayotte's Note such that they can enforce Plaintiff's obligation and demand mortgage payments or have the status necessary to foreclose.

On information and belief, Defendants were not, and are not a Note Holder in possession of Mayotte's Note giving them rights of a Note Holder.

If there is a holder in due course of Plaintiff's Note at issue, it is the entity that can at least, among other things, establish a pecuniary, legal, and equitable interest in the Property, and provide an unbroken chain of title to Mayotte's Note and DOT in exchange for good and valuable consideration.

On information and belief, none of the Defendants were/are entitled to enforce Plaintiff's Note pursuant to Colorado Title 4 Commercial Code § 3-309 or subdivision (d) of Colorado Title 4 § 3-418 et seq.

Finally, Mayotte contends that any amount allegedly owed under the Note is subject to equitable offset by the actual, consequential, special, and punitive damages owed to Mayotte from Defendants, which amount is currently unknown, but will be determined upon conducting discovery. Mayotte believes this amount will be much in excess of the amount of her obligation.

## VIII. COLORADO FORECLOSURE LAW SUMMARY

Financing of the purchase of real property in Colorado can be accomplished in a number of ways, but this case presents a method commonly used in residential transactions. The purchaser/owner/borrower obtains funding from a lender for which they execute a promissory note that specifies the terms of repayment. The promissory note is secured by a lien created by recordation of a deed of trust for the benefit of the lender. If there is a default by the purchaser/owner/borrower under the terms of the promissory note or deed of trust, the deed of trust authorizes the public trustee to sell the property to satisfy the lien.

A Public Trustee foreclosure is largely an administrative process governed by Colorado statute 38-38-100. Generally, it requires two steps - a request by the beneficiary of the deed of trust or its assignee that the public trustee schedule and conduct a sale of the property, and a Rule 120 Order authorizing a sale. The Rule 120 Order refers to C.R.C.P. 120, which sets out the process for obtaining a judicial order authorizing the public trustee to sell a property.

Under current law, a foreclosing party may choose to file a Rule 120 foreclosure either: (1) with competent evidence that it is the holder of the evidence of debt, with authority to invoke the power of sale contained in the deed of trust, or, in the alternative, (2) with a Certification that it is a "qualified holder" of the evidence of debt, or a statement by an attorney that their client is a "qualified holder" of

the evidence of debt. The former is referred to herein as a "full-doc" foreclosure; the latter as a "no-doc" foreclosure.

An eventual but imminent Initiative would leave intact Colorado law that provides for "full-doc" foreclosures, and would embody statutory "full-doc" foreclosure requirements consistent with due process protection in the Constitution. It would not interfere in any way with foreclosures filed by parties who have the requisite documentation for a "full-doc" foreclosure. On the other hand, a proposal of that sort would constitutionally prohibit "no-doc" foreclosures in Colorado, and repeal current statutory provisions that allow "no-doc" foreclosures. It would require parties who attempt to foreclose to "get their docs in a row" before attempting to foreclose on a Colorado homeowner.

### (a) Current Statutory Requirements for "Full-Doc" Foreclosure

The statutory "full-doc" foreclosure provisions, which have been in effect in some form or another for more than a century prior to the recent enactment of the "no-doc" foreclosure provisions, complement the constitutionally mandated records of real property ownership. Those provisions require a foreclosing party to produce records of any assignments of interests in a homeowner's property, to assure the foreclosing party has a right to invoke the power of sale contained in a recorded deed of trust, in the constitutionally grounded records of ownership at the County Clerk and Recorder's office in the County in which the property is located. The recently enacted "no-doc" provisions, in contrast, require no such proof.

Under C. R. S. §§38-38-100(3) and 38-38-101, a "holder of evidence of debt" or its attorney may file a foreclosure with:

(1) "the original evidence of debt, together with the original endorsement or assignment thereof, if any, to the holder of the evidence of debt . . .," (C. R. S. §38-38- 101(1)(b)), or ". . . a certified copy of the endorsement or assignment [of the evidence of debt] recorded in the county where the property being foreclosed is located. . .". C. R. S. §38-38-101(1)(b) and (6)(a) (incorporated by reference in 38-38-101(1)(b)); and (2) " the original recorded deed of trust securing the evidence of debt . . ." (C. R. S. §38-38-101(1)(c)) or a ". . . certified copy of the recorded deed of trust . . . .". C. R. S. §38-38-101(1)(c)(I).

See C. R. S. §38-38-101(1) & (6).

A foreclosing party who meets these requirements, with original or certified copies of recorded documents that show evidence of title and valid assignments of the note to that party, would presumably meet it's burden of showing that it is a real party in interest [*Goodwin v. District Court*, 779 P.2d 837, 842-843 (Colo. 1989)) by producing evidence that it currently holds legal title to the note (*Platte Valley Savings & Loan v Crall*, 821 P.2d 305, 307 (Colo. App. 1991); *American Surety Co. v. Scott*, 63 F.2d 961, 964 (10th Cir. 1933) and citations therein (under Colorado law, the one who holds the legal title is the real party in interest)]; or that it has a full and complete assignment of the note, valid at the time its claim arose and at the time the case was filed [*Alpine Associates, Inc. v. KP & R,, Inc.*, 802 P. 2d 1119, 1121 (Colo. App. 1990)]. If the foreclosing party claims to be acting as an agent for the real party in interest, it must also prove the existence of the agency relationship with competent evidence. *Hancock v. Minneapolis-Moline, Inc.*, 482 P.2d 426, 428 (Colo.App. 1971) [citing 3 Am.Jur.2d Agency § 348; burden of proof is on the party who claims to be an agent with authority to file suit to prove the existence of the agency relationship].

### (b) Current Statutory Requirements for "No-Doc" Foreclosure

"Full-doc" foreclosures have become rare in Colorado in recent years, due to the prevalence of securitized mortgages, and various recent amendments to the foreclosure statutes that allow "no-doc" foreclosures of those mortgages.

Specifically, the "certification" provisions of §§38-38-101(1)(b)(II) and (c)(II) allow a foreclosure to be initiated with a certification or a statement of the attorney for a party who ". . . claims to be a qualified holder . . ." (id.) (emphasis added), and also allow (as an alternative to an " . . . original endorsement or assignment . . . to the holder of the evidence of debt . . .") ". . . other proper endorsement or assignment in accordance with subsection (6) . . .". 38-38- 101(1)(b) (emphasis added).

Subsection (6), in turn, allows two alternatives for establishing a proper endorsement or assignment. The first, in subsection (a), is an essential part of a "full-doc" foreclosure under current law (C. R. S. §38-38-101 (1)); the second, in subsection (b) allows a "no-doc" foreclosure, by allowing a

mere "certification" or "statement" to serve as complete and determinative substitute for any evidence whatsoever of any endorsement or assignment whatsoever. Specifically:

Endorsement or assignment. (a) Proper endorsement or assignment of an evidence of debt shall include the original endorsement or assignment or a certified copy of an endorsement or assignment recorded in the county where the property being foreclosed is located. (b) Notwithstanding the provisions of paragraph (a) of this subsection (6), the original evidence of debt or a copy thereof <u>without</u> proper endorsement or assignment shall be <u>deemed to be properly indorsed or assigned</u> if a qualified holder presents the original evidence of debt **or a copy thereof** to the officer together with a statement in the certification of the qualified holder or <u>in the statement of the attorney for the qualified holder</u> pursuant to subparagraph (II) of paragraph (b) of subsection (1) of this section <u>that the party on whose behalf the foreclosure was commenced is the holder of the evidence of debt</u>.

C. R. S. §38-38-101(6) (emphasis added).

This provision allows a mere "statement" by an attorney for one who "claims to be" a qualified holder to serve as a complete and determinative substitute for any evidence whatsoever of any endorsement or assignment whatsoever, and allows an Order Authorizing Sale to be entered based solely on the certification or statement.

That part of §38-38-101(6) that presently deems an improperly endorsed or assigned evidence of debt to be properly endorsed or assigned, based on a mere certification or statement that the foreclosing party is the holder of the evidence of debt, renders all other statutory definitions of "holder of an evidence of debt" meaningless. Specifically:

"Holder of an evidence of debt" means the person in actual possession of or otherwise entitled to enforce an evidence of debt. For the purposes of articles 37 to 40 of this title, the following persons are **presumed to be** the holder of an evidence of debt:

(a) The person who is the obligee of and who is in possession of an original evidence of debt;

(b) The person in possession of an original evidence of debt together with the proper endorsement or assignment thereof to such person in accordance with section 38-38-101 (6);

(c) The person in possession of a negotiable instrument evidencing a debt, which has been duly negotiated to such person or to bearer or indorsed in blank; or

(d) The person in possession of an evidence of debt with authority, which may be granted by the original evidence of debt or deed of trust, to enforce the evidence of debt as agent, nominee, or trustee or in a similar capacity for the obligee of the evidence of debt. C. R. S. §38-38-100.3(10) (emphasis added)

The problem with the "deemed to be" provision of §38-38-101(6) – cross-referenced in §38-38-100.3(10)(b) – is that it allows a mere certification or statement that a foreclosing party ". . . is the "holder of the evidence of debt". . . ." (§38-38-101(6)) (emphasis added) to constitute conclusive proof of same. This statute, both on its face and as applied routinely in Rule 120 proceedings, renders the entire definition, and sub-definitions, of "holder of an evidence of debt" in §38-38-100.3(10) unnecessary and meaningless, and effectively eliminates the requirement of evidence to support the foreclosure which violates due process in the foreclosure proceedings, by NOT requiring full disclosures of documentation that supports a foreclosure at the outset of the proceeding. By allowing a mere "statement" by an attorney for one who "claims to be" a qualified holder to serve as a complete and determinative substitute for any evidence whatsoever of any endorsement or assignment whatsoever, and therefore permitting an Order Authorizing Sale to be entered based solely on the attorney certification or statement is in direct conflict with Federal Case law such as the so-called "landmark case: *Trinsey v. Pagliaro D.C.Pa.* 1964, 229 F. Supp. 647 which held:

> "Statements of counsel in brief or in argument are not facts before the court and are therefore insufficient for a motion to dismiss or for summary judgment." And "An attorney for the plaintiff cannot admit evidence into the court. He is either an attorney or a witness."

The practice of an attorney filing an affidavit on behalf of his client asserting the status of that client is not approved, inasmuch as not only does the affidavit become hearsay, but it places the attorney

in a position of witness thus compromising his role as advocate. *Porter v. Porter*, (N.D. 1979 ) 274 N.W.2d 235.

In all other Federal civil proceedings, Rule 26 requires mandatory disclosures of evidence by all parties.

But in a "no-doc" foreclosure under the "certification" provisions of 38-38-101, disclosures are not only optional, but a "certification" alone is statutorily "deemed" to be proof of valid assignments of the right to expeditiously take someone's home, even when the limited documents that have been filed refute the claim of valid assignments. And a homeowner has to litigate for 2-3 years, against the best lawyers money can buy, just to get documentary evidence that should have been disclosed the moment the case was filed. This is logically, morally, legally, and constitutionally unacceptable.

It is the creditor's responsibility to keep a borrower and the Court informed as to who owns the note and mortgage and is servicing the loan, not the borrower's or the Court's responsibility to ferret out the truth. . . .*In Re Nosek*, 2009 U. S. Dist LEXIS 44835, at **9-11 (D. Mass. 2009).

## IX. FIRST CAUSE OF ACTION: DECLARATORY RELIEF TO DETERMINE STATUS OF DEFENDANTS' CLAIMS (28 U.S.C. §§ 2201, 22021)

Plaintiff re-alleges and incorporates by reference each and every one of the preceding and successive paragraphs as if the same were fully set forth herein if they relate to this cause of action.

Section 2201(a) of Title 28 of the United States Code states:

In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country as defined in section 516A(f)(10), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

Section 2202 of Title 28 of the United States Code states:

> Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

Plaintiff submits that neither USB nor ASC/Wells Fargo has a secured or unsecured legal, equitable, or pecuniary interest in the property transfer evidenced by the Deed of Trust in question and that its purported assignment has no value since the Deed of Trust (a) has been bifurcated from the original Note (which does not exist) and is wholly unsecured without the Note, (b) the assignment itself is a spurious document in that it was signed by an unauthorized robo signer, Ryan Amato, with no authority to perform such a task, and (c) the purported assignment to USB as Trustee was made after the closing date set out in the Prospectus for that particular securitization. For any and all of those facts and reasons USB has no valid interest in the Note or DOT or the authority to exercise any of the terms set out in the related documents and corresponding agreements including those setout in the relevant PSA and therefore no ability to file a foreclosure action against Mayotte.

On or about December 13, 2011, the date of the Assignment of Deed of Trust, Defendants claim they have a secured enforceable interest in, and perfected lien against, Mayotte's defaulted and non existent Note, Deed of Trust and Property upon which Defendants have relied to file a foreclosure action.

Thus, the competing allegations made by Mayotte, above, establish that a real and actual controversy exists as to the respective rights of the parties to this matter, including ownership of the Property.

Accordingly, Mayotte requests that the Court make a finding and issue appropriate orders stating that none of the named Defendants have any right or interest in Mayotte's Note, Deed of Trust, or the Property which authorizes them, in fact or as a matter of law, to collect Mayotte's loan payments or enforce the terms of the Note or Deed of Trust in any manner whatsoever.

Mayotte will suffer prejudice if the Court does not determine the rights and obligations of the parties in her favor because: (1) Mayotte will be denied the opportunity to identify her true and current creditor/lender and negotiate with them; (2) Mayotte will be denied the right to conduct discovery and have USB and/or ASC/Wells Fargo claims verified by a custodian of records who has personal knowledge of the loan and all transactions related to it; and (3) Mayotte will be denied the opportunity to discover the true amount she still owes minus any legal costs, fees and charges, or in the alternative, Mayotte will be denied the right to recoup payments made to a third party stranger to the written contracts known herein as the Note and Deed of Trust.

Due to the actual case and controversy regarding competing claims and allegations, it is necessary that the Court declare the actual rights and obligations of the parties and make a determination as to whether ASC/Wells Fargo/USB claims against Plaintiff are enforceable and whether they are secured or unsecured by a right, title, or interest in Mayotte's Property.

Furthermore, the conduct of USB as Trustee and ASC/Wells Fargo was so malicious and contemptible that it would be looked down upon and despised by ordinary people. Mayotte is therefore entitled to punitive damages in an amount appropriate to punish Defendants and to deter other Lenders from engaging in similar conduct.

## X.   SECOND CAUSE OF ACTION: WRONGFUL FORECLOSURE

Mayotte submits that she is one of many victims of a wrongful foreclosure which has taken place in the State of Colorado County Court system, without any effective redress, which she seeks here, due to a number of reasons set out below.

**(a) Unconstitutional Proceeding**. Mayotte contends that she is a person the 14th Amendment and the 5th Amendment intended to protect when she was deprived of her property without due process as she was in this case.

The semi-judicial process, known as the Rule 120 hearing, used to enable a foreclose action to occur in the State of Colorado County Courts, as provided for under the statute §38-38-101 and the Amendment HB 06-1387 is procedurally defective within the constitutionally protected safeguards pertaining to a person's property rights.

The Rule 120 does not provide for a right to appeal, the right to discovery, the right to a jury trial, the right to a full and fair hearing, or the right to a counterclaim and as such severely compromises homeowner's due process protection. The existence of the Rule 120 together with the drafting of HB06-1387 which amended section 38-38-101 even furthers the unconstitutionality of the semi judicial process by virtually eliminating the burden of proof USB needs to demonstrate that it is a proper Plaintiff and has standing to foreclose.

The aforementioned Colorado law, and conduct of the parties that the law provides for, including the authorization of the sale of the property without any recognition of any relevant defenses, and the declaration by counsel that their client is a Qualified Holder of the debt without any proof, has violated Mayotte's rights to due process and equal protection under the law and therefore the granting of the order to proceed with a foreclosure sale is unconstitutional, fails to examine other relevant issues and is therefore an invalid proceeding and is a void order *ab initiao*, resulting in a wrongful foreclosure.

> In *Goodwin v. District Court*, 779 P.2d 237 (1989) the court made it more clear:
> *A court's refusal to consider such properly offered evidence in resolving the issue of default adversely to the debtor is tantamount to the taking of property in a summary fashion without any hearing at all—a deprivation clearly in violation of due process of law.*[B,I, U]

Additional specifics of why the 120 proceeding violate due process protections are set out in Section XV.

**(b) No Real Party In Interest**. USB, as Trustee for the purported Trust, was not the Real Party in Interest with standing to foreclose in the 120 hearing, nor do they at any point in the future have standing to evict Mayotte.

It is well established in Colorado law that, in an action on a promissory Note, the Real Party in Interest is the entity who holds legal title to the note. *Platte Valley Savings & Loan v. Call*, 821 P.2d 305, 307 (Colo. App 1991)

In this case Mayotte raised the Real Party in Interest issue in the Rule 120 hearing. When the Real Party In Interest is raised as the Court said in *Goodwin vs District Court*, 779 P.2d 837, 842,843 (1989) "Therefore, the burden should devolve upon the party seeking the order of sale to show that he is indeed the Real Party in Interest". USB was unable to provide that type of evidence.

Colorado Rule of Civil Procedure 17(a) requires that every action "be prosecuted in the name of the real party in interest." The Real Party in Interest is that party which, by virtue of substantive law, has its own funds at risk and therefore has the right to invoke the aid of the court in order to vindicate the legal interest in question.

The burden is, therefore, on US Bank to come forward with evidence that it currently holds legal title to Mayotte's promissory note as obligee on the original Note and possesses same, as well, (*Platte Valley, supra; American Surety, supra*), or that it has a full and complete valid assignment of the note and DOT that is sufficient to protect Mayotte from other actions by any other alleged assignors.

Further, US Bank must prove that it was the Real Party in Interest both at the time its claim arose ("Standing At Inception"), and at the time this case was filed. USB was unable to comply with any of these requirements.

If a party's status as Real Party in Interest is premised upon an assignment, as is here, USB must, in addition to the other elements of a claim, prove its' status as assignee. *Alpine Associates, Ind. v. KP&R, Inc.*, 802 P.2d 1119 (COA, 1990). A Lender must establish that "by virtue of substantive law, it has a right to invoke the aid of the court in order to vindicate the legal interest in question." *Goodwin v. District Court*, 779 P.2d 237 (1989).

In *Goodwin* at p.843, the *Goodwin* court said "[T]herefore, the burden should devolve upon the party seeking the order of sale to show that it is indeed the real party in interest".

The court in *Goodwin* made the Rule absolute and further said:

> The message of *Moreland* is clear. The due process protections contemplated by Rule 120 will be satisfied only when a court conducting a Rule 120 proceeding considers all relevant evidence in determining whether there is a reasonable probability of a default or other circumstance authorizing the exercise of the power of sale under the terms of the instrument described in the Rule 120 motion. The court's resolution of the Rule 120 motion, therefore, should necessarily encompass a consideration not only of the evidence offered by the creditor seeking the order of sale but also of any evidence offered by the debtor to controvert the moving party's evidence or to support a legitimate defense to the motion.

The law is clear that without standing the case can no longer proceed and therefore the order authorizing the public trustee sale in this case is void ab initio resulting in a wrongful foreclosure.

**(c) Invalid Assignment**. USB, in an attempt to demonstrate a legal right to foreclose and thereby achieve the status of a Real Party In Interest, which in turn gives it standing to prosecute a foreclosure action against Mayotte, is relying on a spurious document created by Wells Fargo labeled an Assignment of a Deed of Trust from NCM to USB dated December 13, 2011 and signed by a robo signer named Ryan Amato. Not only is this Assignment bogus and fraudulent, but it was dated five (5) years after the closing date of the certificate offering, set out in the Prospectus, that it was to be a part of.

Furthermore, it did not include the assignment of the Note for which the Deed of Trust is the security. This prevents the DOT or the missing Note from being part of the trust which USB claims it has the right to foreclose upon and otherwise enforce its terms; and all by itself, the DOT having been bifurcated from the Note, has no value whatsoever or any interest upon which to foreclose. With all of these defects in place it would seem that any attempt to foreclose would be an effort in futility resulting in a wrongful and invalid foreclosure.

**(d) Breach of Contract**. USB had no right to file a foreclosure action against Mayotte because it was in breach of an implied contract between itself and Mayotte resulting in unjust enrichment for USB. The foreclosure action was filed in bad faith, with unclean hands and based on numerous misrepresentations by ASC.

USB as Trustee and/or ASC/Wells Fargo demanded monthly loan payments from Mayotte and continued to collect payments from her. She reasonably relied upon USB as Trustee and/or Wells Fargo's assertion that it/they are/were entitled to the benefit of Mayotte's loan payments.

USB as Trustee and/or Wells Fargo knowingly accepted payments and retained them for its own use knowing that USB as Trustee and/or Wells Fargo did not acquire an interest in Mayotte's Note, such that they could accept or keep Mayotte's payments. It would be inequitable for USB as Trustee and/or Wells Fargo to retain the payments it received from Mayotte, which it did not have legal authority to collect. The equitable remedy of restitution when unjust enrichment has occurred, such as here, is an obligation created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to their former position by returning the thing or its equivalent in money or grant specific performance when that is possible.

More specifically, the records will show that ASC told Mayotte in 2008 that as a condition precedent to completing a loan modification, she would have to _miss_ three (3) payments, which she did resulting in an immediate filing by ASC of a foreclosure, and then following that exercise in 2009 make three (3) payments as part of the HAMP trial program, which she did throughout a period of two (2) years following. Both of these exercises were not only reasonable and foreseeable, but very costly, resulting in damage to Mayotte.

In the Rule 120 hearing Mayotte's asserted that her detrimental reliance, as designed by ASC, was a sufficient "consideration substitute" in an agreement between herself and ASC/USB, wherein if Mayotte performed certain conditions the loan modification would be forth coming, thereby making Promissory Estoppel and Detrimental Reliance valid arguments and an alternative to foreclosure.

Promissory estoppel can be viewed as a legal device that prohibits the promisor from denying the existence of a contract for lack of consideration.

In general, the elements of promissory estoppel are:
1) a promise reasonably expected by the promisor to induce action or forbearance,
2) action or forbearance by the promisee in justifiable reliance on the promise (i.e. "detrimental

reliance"), and

3) injustice can be avoided only through enforcement of the promise, which in this case would have precluded this wrongful foreclosure action.

**(e) Securitization Defects**. As stated in some detail throughout this complaint, an essential aspect of the mortgage securitization process is that the Trust, which this "loan" is supposedly a part of, must obtain and maintain good title to the mortgage loans comprising the pool for that certificate offering. This is necessary in order for the Trustee of the purportedly Securitized Trust to be legally entitled to enforce the mortgage loans in case of default.  In addition to other required documentation to complete the Collateral File of any given loan, two documents relating to each mortgage loan must be validly transferred to the Trust as part of the securitization process; the promissory note and the security instrument. In this case, neither document was validly transferred.  The DOT was assigned by a fictitious robo signer five years after the "closing date" of the offering and the Note, which was in default, was never assigned.

Here, Mayotte alleges that the "true sales" never took place due to the failure by USB to follow the basic legal requirements and therefore USB did not acquire any legal, equitable, and pecuniary interest in Mayotte's Note and Deed of Trust.

As a result, thereof, USB as Trustee, which purports to be Mayotte's creditor, actually has no secured or unsecured right, title, or interest in Mayotte's Note and Deed of Trust and neither they or their Servicer has the right to collect mortgage payments, demand mortgage payments, or report derogatorily against Mayotte's credit nor do they have the right to foreclose, as they have here, nor evict.

**(f) Lack of Accounting**. USB, ASC and Wells Fargo as its purported agent, have held themselves out to be Mayotte's creditor and Deed of Trust servicer. As a result of this purported relationship with Mayotte, said Defendants have a fiduciary duty to Mayotte to at least properly account for payments made by Mayotte and to whom the payments were made and how they were credited to her account. Although some of the payments were noted they were not reflected in the loan balance.

As a result of the aforementioned fraudulent conduct, Mayotte paid ASC, a fictitious entity operated by Wells Fargo, the Deed of Trust payments for a period of approximately four and a half years. However, for the reasons stated herein, none of this money was actually owed to ASC/Wells Fargo or was accurately applied to the loan balance. For that reason, these monies are due to be returned to Mayotte in full.

The amount of the money paid to Defendants and therefore due from Defendants to Mayotte and to what account the payments were made to are unknown to Plaintiff and cannot be ascertained without an accounting of the receipts and disbursements of the aforementioned transactions. Plaintiff is informed and believes and thereon alleges that the amount due to her exceeds $200,000.

Finally, Defendants overstated the cure amount on at least two foreclosure attempts, based on false accounting, and also to prevent Mayotte from curing her default and to preclude other entities or persons from bidding on the property at the Public Trustee Sale.

In the absence of such accounting Mayotte was unable to determine what defects and errors ACS was committing and therefore unable to determine what corrections were necessary to make.

Had the proper accounting been supplied to Mayotte she would have been on notice of the defects and errors committed by ASC and would therefore been able to make the necessary corrections, if any. The failure to provide this accounting resulted in this wrongful foreclosure.

**(g) Not Holder in Due Course.** ASC nor USB have earned Holders In Due Course status of Mayotte's Note and Deed of Trust, or a "person entitled to enforce" status.

A Holder in Due Course must have given value in good faith and be without notice of any previous dishonor in taking the instrument(s), which appears to be complete and regular. In this case Defendants did not give anything of value and took the DOT <u>knowing that the Note was in default at the time</u> and was bifurcated from the DOT.

If there is a Holder in Due Course of Mayotte's Note at issue, it is the entity that can establish a pecuniary, legal, and equitable interest in the Property, and provide an unbroken chain of title to Mayotte's Note and DOT and which is the only entity that can prosecute a foreclosure.

On information and belief, none of the Defendants were/are entitled to enforce Mayotte's Note pursuant to Colorado Title 4 Commercial Code § 3-309 or subdivision (d) of Colorado Title 4 § 3-418 et seq. and in so doing caused the foreclosure to be a wrongful and invalid foreclosure.

**(h) Lack of Original Documents.** Notwithstanding Colorado case law to the contrary, the Uniform Commercial Code Section 3-501 provides that the party claiming to be a Real Party in Interest must exhibit the original note with Homeowner's signature and a valid assignment, if the party claiming to be a Real Party in Interest was not the original Lender, in order to show a chain of title that is not broken for failure of valid assignments.

In this case USB apparently does not know where the original Note is and is relying on a fraudulent assignment of the DOT to support its motion for authorization to foreclose.

The language in the Deed of Trust states that the instrument is security for the Note. What Note? And who owns the Note? And where is the Note?

If Mayotte attended a Rule 120 hearing with funds sufficient to cure the alleged default, she certainly would be entitled to be given her original Note back <u>marked paid</u> along with the DOT in a simultaneous exchange.

The real question is what is the difference between Mayotte giving over funds in exchange for the original Note and giving over her home in exchange for the original Note? There is no difference; both are of value sufficient to discharge the alleged debt. Colorado law is therefore based on faulty reasoning when it excuses the production of the original documents in order to seek foreclosure, and this court presumably has discretion to require production under the provisions of the UCC, notwithstanding Colorado case law to the contrary.

Moreover, when the documents, which USB is relying on to prosecute a foreclosure action, are obviously spurious, as here, there is even more of a reason to see the originals to either prove up the contention that they are spurious, pursuant to C.R.C.P. 105.1, or demonstrate otherwise.

**(i) Dual Tracking**. Dual Tracking is another reason this foreclosure is wrongful. Not only was it illegal for a portion of time that Mayotte was engaged in the loan modification process, but the Dual Tracking directly contributed to the creation of an implied contract between Mayotte and USB, the breach of which by USB led to the eventual foreclosure.

Dual tracking occurs when a mortgage servicer continues to foreclose on a homeowner's home while simultaneously representing to the homeowner that a loan modification is forthcoming and at the same time the Servicer continues to collect payments. In this case, as set out in more detail elsewhere in this complaint, and as part of the Dual Tracking activity, ASC required Mayotte to perform certain tasks as conditions precedent for obtaining the loan and she complied expecting to obtain the loan modification, as promised, but was never given the loan modification and was eventually foreclosed upon.

In Colorado, the House Bill 14-1295 became effective as of January 1, 2015, which gives the public trustee the power to stop a foreclosure sale from occurring when a homeowner is in the process of applying for an alternative to foreclosure or the homeowner has accepted and is in compliance with a loss mitigation option, which Mayotte was.   In this case Mayotte was involved in a loan modification process for years, was being promised a loan modification if she complied with certain conditions, payments were being collected and USB was bringing foreclosure actions and dropping them alternately during that same time period which eventually led to the completion of a foreclosure in November 2014.

## XI.  THIRD CAUSE OF ACTION: FIND EXISTANCE OF QUASI CONTRACT AND UNJUST ENRICHMENT

Mayotte hereby incorporates by reference each and every one of the preceding and successive paragraphs as if the same were fully set forth herein if they relate to this cause of action.

USB and/or ASC/Wells Fargo demanded monthly loan payments from Mayotte and continued to collect payments from Mayotte when they had no right to do so because they were not legal owners of the Note and DOT, but yet Mayotte (See: Sections all through this complaint as to why) relied upon USB as Trustee and/or Wells Fargo's assertion that it/they are/were entitled to the benefit of Mayotte's loan payments.

USB as Trustee and/or Wells Fargo knowingly accepted payments and retained them for their own use knowing that USB and/or Wells Fargo did not acquire an interest in Mayotte's Note, such that they could accept or keep Mayotte's payments. It would be inequitable for USB and/or Wells Fargo to retain the payments they received from Mayotte, which they did not have legal authority to collect.

The equitable remedy of restitution when unjust enrichment has occurred is an obligation created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to their former position by return of the thing or its equivalent in money or require specific performance, if appropriate and possible.

Section 23 of the Deed of Trust states that: "Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to re-convey the Property and shall surrender this Security Instrument and all Notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall re-convey the Property without warranty to the person or persons legally entitled to it."

The obligations to NCM Corp. under the Deed of Trust were fulfilled when NCM Corp. received the balance on the Note as proceeds of sale of Mayotte's Note and Deed of Trust to a presently unknown entity. USB and/or Wells Fargo have been unjustly enriched by collecting monthly payments from Mayotte, when neither of them received any interest or have any interest in her Note. Mayotte seeks restitution and recoupment for any payments she made to USB and/or Wells Fargo that were not paid to the lender or beneficiary, if any.

Additionally, USB became a moving and integral party to a contract with Mayotte when it represented that it would modify Mayotte's loan if she would, as a condition precedent, (A) stop making

payments for three (3) months to demonstrate hardship and then (B) participate in ASC's trial loan program, which was very similar to the HAMP trial loan program, for a requisite amount of time.

Mayotte complied with each of these conditions precedent, which Mayotte asserts was detrimental reliance because of all the negative consequences that flowed from her foreseeable actions, and was therefore consideration sufficient enough to create an implied contract, the existence of which would impose a duty upon USB/ASC to complete and conclude the loan modification that was promised instead of filing foreclosure, as they did, for missing the very payment that was directed by ASC to miss.

USB/ASC did not conclude the loan modification, but instead filed an action to foreclose on Mayotte's property.  Mayotte submits that USB should therefore be estopped from filing a foreclosure action and ordered to honor their side of the bargain by completing the loan modification together with a reformation of the alleged debt by either correctly crediting Mayotte's mortgage account to her satisfaction or return all payments made pursuant to the agreement and ASC's misrepresentations, or release the lien on her property.

In a recent ruling before the United States Court of Appeals for the Ninth Circuit, *Corvello v WELLS FARGO BANK, N.A.*, *No. 11-16234, No. 11-16242,* judgment was reversed and case was remanded for further proceedings stating "in the context of the Home Affordable Modification Program, (HAMP) Wells Fargo was <u>contractually</u> required to provide borrowers with a permanent mortgage modification after borrowers complied with the requirements of the trial period plans (TPP); and that the district court should not have dismissed the borrowers' complaints when the record showed Wells Fargo had retained the payments demanded by the TPP, but did not offer a permanent modification, or notify borrowers they were not entitled to one.

Wells Fargo, in that case, was engaged in debt collection activities when it offered the TPP with its continued demand for trial payments (TPP was more than an informational circulation. Its application had to be signed by the borrower with acknowledgement of understanding of terms.)

Wells Fargo's defense "that it had to determine the borrowers were not qualified" presented a factual dispute that could not be resolved at the Motion to Dismiss stage. The Panel reversed the district court's dismissals of diversity actions challenging the decision of Wells Fargo Bank not to offer permanent mortgage modifications to plaintiff borrowers.

In the present case, in order to avoid a breach of contract or a detrimental reliance argument, counsel for Defendant offered into evidence, fabricated letters, which were supposedly sent from Defendant to Mayotte stating that she did not qualify.  Defendant never received <u>any</u> of those three (3) or four (4) letters and Holly Shilliday of McCarthy Holthus the attorney who offered those letters into evidence, committed perjury in conjunction with USB.  Ninety-five (95%) percent of all communications between Mayotte and ASC was by tractable form mail.

As stated elsewhere in this complaint, had Mayotte received any correspondence stating she was not qualified, she would have discontinued making payments and pursued another course of action, as would have ASC.

### XII.  FORTH CAUSE OF ACTION: VIOLATION OF 12 U.S.C. § 2605 (RESPA)

Mayotte hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein if they relate to this cause of action, if they relate to this cause of action.

The subject loan is a federally regulated loan and is subject to the federal Real Estate Procedures Act (RESPA) and its implementing regulation, Regulation X.

**12 U.S. Code § 2505 states:**

**Disclosure to applicant relating to assignment, sale, or transfer of loan servicing**

Each person who makes a federally related mortgage loan shall disclose to each person who applies for the loan, at the time of application for the loan, whether the servicing of the loan may be assigned, sold, or transferred to any other person at any time while the loan is outstanding.

**Notice by transferor of loan servicing at time of transfer**

Each servicer of any federally related mortgage loan shall notify the borrower in writing of any assignment, sale, or transfer of the servicing of the loan to any other person.

**Time of notice in general**

Except as provided under subparagraphs (B) and (C), the notice required under paragraph (1) shall be made to the borrower not less than 15 days before the effective date of transfer of the servicing of the mortgage loan (with respect to which such notice is made).

On or about July 12, 2013, Mayotte sent a Qualified Written Request, ("QWR") via U.S. Post Certified Mail to ASC/Wells Fargo.

On information and belief ASC/Wells Fargo, agent of USB received the QWR on or about July 14, 2013.

The QWR contained information to enable ASC/Wells Fargo to identify Mayotte's loan and also contained requests for information of the loan, specifically the identity and contact information of the Holder in Due Course of Plaintiff's Note, accumulated late fees and charges, and requested information to verify the validity of the purported debt owed to USB and Wells Fargo.

ASC/Wells Fargo did not and have not to date provided the contact information for the actual holder of Mayotte's Note, as required by § 2605, et seq.

Because the Deed of Trust and Loan is subject to RESPA and Regulation X, all Defendants were required to comply with Section 6 of RESPA appearing at 12 U.S.C. § 2605. Defendant violated Section 6 of Regulation X upon receipt of Mayotte's QWR by their actions including, but not limited to: (a) failure to make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of the correction; and (b) failure to protect Mayotte's credit rating upon receipt of Mayotte's QWR by furnishing adverse information regarding payment to credit reporting agencies as defined in § 603 of the Fair Credit Reporting Act, 15 U.S.C. § 1681(a).

Thus, Wells Fargo violated 12 U.S.C. § 2605 and is subject to statutory damages, civil liability, penalties, attorneys' fees and actual damages. See 12 U.S.C. § 2605. The actual pecuniary damages include, but are not limited to, the over calculation and overpayment of interest on Mayotte's loan, the costs of repairing Mayotte's credit, the reduction and/or elimination of Mayotte's credit limits, costs

associated with removing the cloud on the property title and attorneys' fees and costs, in an amount to be proven at trial, but not less than $500,000.00.

As a direct and proximate result of the violations of RESPA and Regulation X by ASC/Wells Fargo, Mayotte has suffered actual pecuniary damages, including but not limited to statutory damages, civil liability, and attorneys' fees, in an amount to be proven at trial.

## XIII.  FIFTH CAUSE OF ACTION: VIOLATION OF 15 U.S.C. § 1692 ET SEQ (FDCPA)

Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein if they relate to this cause of action.

Federal law prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt... including the false representation of... the character, amount, or legal status of any debt... and the threat to take any action that cannot legally be taken..." Defendants ASC/Wells Fargo are "debt collectors" within the meaning of the Fair Debt Collections Practices Act (FDCPA) as demonstrated by the purported acquisition of debt when it was already in default. Defendants ASC/Wells Fargo have attempted to collect Plaintiff's debt obligation. "The term 'debt collector' means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." [15 U.S.C. § 1692a(6)]. Defendants ASC/Wells Fargo are debt collectors based on their own statements in written communications to Plaintiff wherein they stated they were debt collectors attempting to collect a debt. (true and correct copies of such communications are attached hereto. (See: Exhibit " 3 ") In violation of the FDCPA Defendants have continually threatened in written communications and advertisements and on the internet and in written communications to take action to effect dispossession of the subject property, even though they have actual knowledge that USB as Trustee has no perfected security interest, pecuniary interest, equitable interest, or legal interest in Mayotte's Note such that they

can enforce Plaintiffs' obligation (Note and DOT), and thus had no present right to possession of the property illegitimately claimed as collateral.

On information and belief, at all times material, ASC/Wells Fargo and its agents had, and have, actual knowledge that Plaintiffs account was not accurate.

Plaintiff had made payments based on these improper, inaccurate, and fraudulent representations.

Plaintiff could not have reasonably known of the existence of a claim for violation of 15 USC § 1692e or 1692f before, because Defendants fraudulently concealed the fact that they were not entitled to enforce Plaintiff's debt obligation and that they were falsely representing to Plaintiff that the character and amount of money Mayotte still owed on her debt.

On or about July 12, 2013, Plaintiffs sent a Notice of Dispute of Debt and Demand for Verified Debt Validation pursuant to the Fair Debt Collections Practices Act (15 U.S.C.§ 1692f(6) et seq) and the Colorado Fair Debt Collections Practices Act Colorado Civil Code C.R.S. 12-14-101 et seq. request for statement. Attached hereto as Exhibit " _4_ " is a true and correct copy of the proof of service of Plaintiff's notice and demand for verified debt validation.

Defendants failed to provide verified debt validation, the current right to possession of the Property [1692f(6)(A)], or to verify the current creditor.

In illegally attempting to collect on Plaintiffs debt obligation in the manner described herein, Defendants USB, as the purported assignee, and, ASC/Wells Fargo as the purported Servicer:

(a) falsely represented the status of the debt, in particular, that it was due and owing to Defendant ASC/Wells Fargo Bank N.A. at the time the suit was filed;
(b) falsely represented or implied that the debt was owing to Defendant USB as an innocent purchaser for value, when in fact, such an assignment had not been accomplished;
(c) threatened to take action, namely engaging in collection activities that cannot legally be taken by them; and
(d) attempted to collect on the promissory note under false pretenses; namely that USB was assigned Plaintiff's debt when in fact they were not, and
(e) Misrepresented the status of the loan modification that was in process while collecting payments from Mayotte and orchestrating a foreclosure action against Mayotte's property.

As a result of each and every Defendant's violations of the FDCPA, Plaintiff is entitled to actual damages pursuant to 15 USC §1692k(a)(1); statutory damages in an amount up to One Thousand Dollars ($1,000.00) per violation pursuant to 15 USC §1692k(a)(2)(A); reasonable fees and costs pursuant to 15 USC § 1692k(a)(3); and declaratory relief, from each and every Defendant herein.

Plaintiff relied on Defendants' misrepresentations and has been damaged in the following ways:

(a) multiple parties may seek to enforce the debt obligation against her;
(b) the title to the subject property has been clouded and its salability has been rendered unmarketable, as any buyer of Plaintiff's home will find themselves in legal limbo, unable to know whether they can safely buy Plaintiff's home or get title insurance;
(c) Plaintiff paid the wrong party for an undetermined amount of time and overpaid in interest that was over-calculated;
(d) Plaintiff is unable to determine whether she sent payments to the right party;
(e) Plaintiff Mayotte's credit and credit score have been severely damaged; and
(f) Plaintiff has expended significant funds to cover the cost of researching and compiling material for this action, has been unavailable to be gainfully employed during that time, has incurred related costs such as 6 years of legal fees during the HAMP loan modification process, incurred costs and fees related to the filing of her bankruptcy, and suffering from a declining business due to this inability to get credit lines to run her, once successful business.

## XIV.  SIXTH CAUSE OF ACTION: REQUEST FOR RELIEF UNDER U.S.C 42 § 1983

Plaintiff incorporates by reference all the preceding paragraphs as if the same were fully set forth herein if they relate to this cause of action.

42 US 1983 (commonly known as "Section 1983") is an action as described in Section 5 of the 14th Amendment to enforce the provision of the article.

"Section 1983 provides for a cause of action for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws by any person acting 'under color of any statute, ordinance, regulation, custom, or usage of any State or Territory." 42 U.S.C. § 1983 Gomes v. Toledo, --U.S. ---100 S. Ct. 1920, 1922, 64 L. Ed. 2d 572 (1980)

At all relevant times herein, Mayotte had a right under the due process and equal protection clauses of the state and federal constitutions not to be deprived of her constitutionally protected interest in her property. (U.S.C. Const. Amend. 14)

When the Public Trustee of Denver County, an employee and agent of the State of Colorado, making her a State Actor, acting "under color of state law", provided for the deprivation of Mayotte's property through a Public Trustee Sale and did so pursuant to a state statute, §38-38-101 et seq., which in and of itself, together with the HB 06-1387 amendment, violated Section 1983, such action is addressable and should be enjoined by this court. The state statute has eliminated Mayotte's procedural safeguards pertaining to litigation of her property rights without due process and therefore any ruling stemming from that statute should be declared as unconstitutional and without any force or effect and void *ab initio*.

CRCP Rule 120 is an expedited hearing or better known as a "summary proceeding" which limits the discussion to default and military status with very little latitude to either demand or present other evidence that might otherwise result in an order in favor of the Homeowner.

Due process protection implies that a Homeowner is entitled to a full and fair hearing on matters relevant to their case and be presented with valid evidence that supports Lender's or Trustee's claim that they are entitled to foreclose, and that the outcome is appealable, if necessary. A court that does not permit a full and fair hearing, have all matters fully examined and confines the hearing to "default" and "Soldiers' and Sailors" issues "commits due process violations and reversible error".

Mayotte further alleges that without valid proof of ownership USB should not be allowed to file for eviction which would further the injustice committed by USB who unconstitutionally deprived Mayotte of her property pursuant to the procedurally defective Rule 120 as amended under HB 06-1387 foreclosure statute. "Abuse of process is by definition a denial of due process." *Jennings vs. Shuman,* 567 F.2d 1213 (3rd) Appellants' in that case were harmed by the eviction, and Defendants' conduct was a substantial factor in causing the harm.

In this case, this property is not only Mayotte's home, but her now <u>only</u> place of business at age

63 with very little opportunity to start over or recover from the sustained loss caused by the egregious

conduct of USB/ASC.

The specific elements, which make the above-mentioned state statute unconstitutional are

outlined in several difference sections of this complaint and are included herein by reference.


## XV.  SEVENTH CAUSE OF ACTION: VIOLATION OF SECTION 1 OF THE 14th AMENDMENT AND THE VIOLATION OF THE 5th AMENDMENT

Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same

were fully set forth herein if applicable to this section.

> The 5th Amendment states: No person shall be deprived of life, liberty, or property
> without due process of law, nor shall private property be taken for public use, without
> just compensation.
> Section 1 of the 14th Amendment*** No State shall make or enforce any law which shall
> abridge the privileges or immunities of citizens of the United States; nor shall any State
> deprive any person of life, liberty, or property, without due process of law; nor deny to
> any person within its jurisdiction the equal protection of the laws. [B]

Mayotte, in this Complaint contends as mentioned above, that she is a person who was deprived

of her property without due process and as a result, if not corrected, will no longer have a place to live

and conduct business and has and will continue to encounter expenses which she can longer afford due

to this deprivation.

The semi-judicial process, known as the Rule 120 hearing, used to enable a foreclose action to

occur in the State of Colorado County Courts, as provided for under the statute §38-38-101 and the

Amendment HB 06-1387 is procedurally defective within the constitutionally protected safeguards

pertaining to a person's property rights; and with very few exceptions all motions initiated by lenders for

the authorization to foreclose are granted here in Colorado, as was done in this case, due to the existence

of this statute and its amendment, notwithstanding the Real Party In Interest defense,  or any other

defense, such as Promissory Estoppel and Detrimental Reliance, that should necessarily be considered in

a meaningful hearing at a meaningful time.

The aforementioned Colorado law, and conduct of the parties including the authorization of the sale of the property without any consideration of any relevant defenses, and the declaration by counsel that their client is a Qualified Holder without any proof, has violated Plaintiff's rights to due process and equal protection under the law.

In this case Plaintiff raised the Real Party in Interest issue in the Rule 120 hearing. When the Real Party In Interest is raised as the Court in *Goodwin vs District Court,* 779 P.2d 837, 842,843 (1989) said "Therefore, the burden should devolve upon the party seeking the order of sale to show that he is indeed the real party in interest".

Colorado Rule of Civil Procedure 17(a) requires that every action "be prosecuted in the name of the real party in interest." The real party in interest is that party which, by virtue of substantive law, has its own funds at risk and therefore has the right to invoke the aid of the court in order to vindicate the legal interest in question. Implicit in Rule 120 is the requirement that the party seeking an order of sale have a valid interest in the property allegedly subject to the power of sale. Unless the "real party in interest" defense is considered at a Rule 120 hearing, any order for sale might well result in the sale of a property in favor of an interloper who has no legitimate claim to the property at all. Once a debtor in a Rule 120 proceeding raises the "real party in interest" defense, as here, the burden necessarily devolves upon the party seeking the order of sale to show that it is indeed the real party in interest.

It is well established in Colorado law that, in an action on a promissory note, the Real Party in Interest is the entity who holds legal title to the note. *Platte Valley Savings & Loan v. Call*, 821 P.2d 305, 307 (Colo. App 1991)

Furthermore, notwithstanding Colorado case law to the contrary, the Uniform Commercial Code Section 3-501, as codified under Colorado statutes, provides that the party claiming to be a Real Party in Interest must exhibit the original note with Homeowner's signature and a valid assignment if it was not the original lender in order to show a chain of title that is not broken for failure of valid assignments.

A Lender's mere Certification that it is a "Qualified Holder" under C.R.S. 38-38-100.3(20) does not eliminate the threshold requirement that it prove that it is the Real Party in Interest in this proceeding, nor should the ability to post a bond or the actual posting of a bond eliminate this threshold requirement, either. Such Certification or posting of a bond may be sufficient to initiate a Rule 120 proceeding, and may even be sufficient to secure an Order Authorizing Sale under Rule 120 without a hearing when a Defendant does not raise the affirmative defense of "Real Party in Interest" and the Court does not raise the issue, itself. But when a Defendant does raise a Real Party in Interest defense in a Rule 120 proceeding, as it did here, the burden is on the party seeking the order of sale to show that it is indeed the Real Party in Interest and Holder In Due Course. The burden is, therefore, on USB to come forward with evidence that it currently holds legal title to Plaintiff's promissory note as obligee on the original Note and possesses same, as well, (*Platte Valley, supra; American Surety, supra*), or that it has a full and complete valid assignment of the note and DOT that is sufficient to protect Plaintiff from other actions by any other alleged assignors. Further, USB must prove that it was the Real Party in Interest both at the time its claim arose ("Standing At Inception"), and at the time this case was filed. USB has been unable to comply with any of these requirements.

The first notice to accelerate Mayotte's debt occurred in 2008. The purported and bogus assignment that USB is relying on to give it a Real Party in Interest status took place in 2011, five years after the "Closing Date" for all Notes and Mortgages to be assigned and transferred into the Trust.

Finally, Plaintiff denies she is in default in any amount to Defendant, because Defendant has not established that it is the Real Party In Interest, i.e., that it is the party whose funds are at risk or to whom payments of any valid amounts due under the Note are payable. "Reasonable probability of default" under Rule 120 is not to be determined solely by reference to the language of the instruments creating the secured obligation, but by all relevant evidence.

The C.R.C.P. 120 courts seem to take a restrictive view of the language of the Rule 120, holding that "the existence of a default" is to be determined solely by reference to the language of the

instruments creating the secured obligation. This cramped reading of the rule is inconsistent with its purpose to test whether, <u>considering all relevant evidence,</u> there is a reasonable probability that a default exists.

CRCP Rule 120 is an expedited hearing or better known as a summary proceeding that limits the discussion to default and military status with very little latitude to either demand or present other evidence that might otherwise result in an order in favor of the Homeowner.

Due process protection implies that a Borrower is entitled to a full and fair hearing on matters relevant to its case and be presented with valid evidence that supports Lender's claim that it is entitled to foreclose and furthermore that the outcome is appealable, if necessary. A court that does not permit a full and fair hearing and have all matters fully examined and confines the hearing to "default" and "Soldiers' and Sailors" issues "commits due process violations and reversible error."

Plaintiff further alleges that without valid proof of rightful ownership Defendants should be prohibited from filing a Forcible Entry and Detainer action, which would further the injustice committed by Defendants who unconstitutionally deprived Plaintiff of her property pursuant to the procedurally defective Rule 120 as amended under HB 06-1387 foreclosure statute. "Abuse of process is by definition a denial of due process." *Jennings vs. Shuman,* 567 F.2d 1213 (3rd) Appellants' in that case were harmed by the eviction, as Mayotte would be here, and Defendants' conduct, in that case, was a substantial factor in causing the harm.

The Rule 120 denies due process in at least four ways:

**FIRST.** Prior to 2006, the Rule 120 did not provide a meaningful hearing at a meaningful time and did not provide any right to appeal and thus violated the due process clause of the 14th Amendment. In *Rosenfield v. HSBC Bank, USA,* 681 F.3d 1172 (10th Cir. 2012) the court analyzed the Rule 120 and said:

> The scope of inquiry at such hearing shall not extend beyond the existence of a default, and such other issues required by the Service Member Civil Relief Act (SCRA), 50 U.S.C. § 520... The court observed that "Neither the granting nor the denial of a motion under this Rule shall constitute an appealable order or judgment". CRCP.120 (d).

Although the constitutional issue was not raised in *Rosenfield*, the 10th Circuit described a violation of due process as explained in *Lindsey vs Normet* - 405 U.S. 56 at p.78 (1972) when the Court said:

> This Court has recognized that, if a full and fair trial on the merits is provided, the Due Process Clause of the Fourteenth Amendment does not require appellate review.

Accordingly, The Rule 120 violates the 14th Amendment because it neither accords a full and fair hearing, nor a right to appeal.

**SECOND.** In 2006 the foreclosure attorneys for Defendants in this case (Castle Law Group, who were indicted for fraud) and the Colorado State Legislature passed HB06-1387, which amended the foreclosure statute, §38-38-101 et seq., which further lowered the burden of proof that a lender had to present to the court to show that it was the Real Party in Interest.

All that was needed were copies of the originals and a "Statement of Qualified Holder" signed by the lender or the attorney (not under penalty of perjury) that the lender was the Real Party in Interest.

The amendment allows the court to "deem" any "blue ink" note to be an original without an expert examining the documents' authenticity.

Notwithstanding the existence of these conflicting and unconstitutional statutes that the courts routinely follow every day, Mayotte, has a fundamental property interest that can not be taken in such a summary proceeding without clear and convincing evidence as required under the 14th Amendment. *Addington v. Texas*, 441 U.S. 418, (1979)  In *Addington v. Texas*, 441 U.S. 418, (1979) the court held:

> "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of fact finding, is to 'instruct the fact finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication."
>
> The bar to support a lenders interest has been specifically lowered for the foreclosing lenders that society can no longer be confident in the correctness of factual conclusions made by the fact finder.

See reporter's transcript in case #12cv02716, **Brumfiel vs US Bank**. under Judicial notice 201 when Judge Martinez said:

> **THE COURT**: Correct me if I am wrong, we are the only state in the country that allows a..... on the basis of just an unsworn statement by an attorney working for the foreclosure counsel law firm to represent that the entities named in that unsworn statement -- it's not even an affidavit, it's not a declaration, it's not under pain of perjury, it's just a written statement by a lawyer saying, Trust me, Judge, these guys are the qualified holders of the note and deed of trust.
>
> Aren't we the only state that allows folks' homes to be taken away on that piece of paper?

**THIRD**. Pre-deprivation of Property Rights.

The Rule 120 could lead to a pre-deprivation of homeowner's home before the homeowner could get a meaningful hearing at a meaningful time.

Rule 120 (d) states:

> "The granting of a Rule 120 motion shall be without prejudice to the right of any person aggrieved to seek injunctive or other relief in any court of competent jurisdiction." R. Civ. P. 120(d) (emphasis added).

After the Judge in the Rule 120 issues the order, the lender will move quickly to sell the property and evict the homeowner before a meaningful hearing at a meaningful time can be had by the homeowner in a court of competent jurisdiction.

This leads to a pre-deprivation, if allowed, under the Supreme Court decision in *Fuentes vs Shevin*, 407 US 81 at 86 when the court said:

> The Fourteenth Amendment draws no bright lines around three-day, 10-day or 5-day deprivations of property. Any significant taking of property by the State is within the purview of the Due Process Clause. While the length and consequent severity of a deprivation may be another factor to weigh in determining the appropriate form of hearing, it is not decisive of the basic right to a prior hearing. (Prior to deprivation)

**FOURTH**. The Rule 120 denies the Equal Protection of the law.

Mayotte was denied the Equal Protection that other summary proceedings accord in Colorado such as the Colorado Forcible Entry and Unlawful Detainer ("FED") action, although a summary proceeding like the 120 hearing, does not have the restrictions that the Rule 120 has.

FED actions have a right to appeal; a right to a jury trial; a right to discovery and therefore do not deny a homeowner of the equal protection of the law when it is available to tenants in FED actions.

## XVI. REQUESTS AND REASONS

**(a) INJUNCTIVE RELIEF**: Mayotte alleges that both the state statute C.R.S.§ 38-38-101 *et seq* and the Bill HB 06-1387 are procedurally defective under the 14th Amendment, Section 1 and therefore unconstitutional and Mayotte is therefore entitled to injunctive relief under Ex Parte Young doctrine, 209 U.S. 123,126 (1908) which states:

> "While a Federal court cannot interfere in a criminal case already pending in a state court, and while, as a general rule, a court of equity cannot enjoin criminal proceedings, those rules do not apply when such proceedings are brought to enforce an alleged unconstitutional state statute, after the unconstitutionality thereof has become the subject of inquiry in a suit pending in a Federal court which has first obtained jurisdiction there over; and, under such circumstances, the Federal court has the right in both civil and criminal cases to hold and maintain such jurisdiction to the exclusion of all other courts."

USB and Wells Fargo are proper Defendants to be enjoined, when appropriate, so as to prevent Mayotte from having to concurrently litigate a Forcible Entry and Detainer action, which would be a pre-deprivation.

For the collective combined aforementioned reasons iterated throughout the Amended Complaint, the State County Court 120 hearing did not provide an adequate forum to hear the claims raised in this instant action.

The original purpose of Rule 120 was to provide a method of establishing compliance with the Soldiers' and Sailors' Civil Relief Act of 1940. *See Moreland v. Marwich, Ltd.,* 665 P.2d 613, 616 (Colo.1983). In 1976, the Rule 120 proceedings' inquiry was expanded to include the existence of a default and/or other circumstances authorizing the exercise of a power of sale. *See Plymouth Capital Co., Inc. v. Dist. Ct. of Elbert Cnty.,* 955 P.2d 1014, 101617 (Colo. 1998) ("The Rule 120 hearing is not the proper forum for addressing the various and complex issues that can arise in some foreclosures",

such as this one). An expanded review, although appropriate per the statutes, would defeat the purpose of the streamlined public trustee foreclosure proceedings. Accordingly, *Ex Parte Young* provides that parties aggrieved by the Rule 120 court's decision may seek injunctive or other relief in a court of competent jurisdiction.

In the instant case, there exists a substantial question as to whether Mayotte's claims, which are protected under due process could have adequately been heard within the limited scope of a Rule 120 proceeding, which is prescribed by a Colorado state statute C.R.S. § 38-38-101 and amended by HB 06-1387. *See Rosenfield v. HSBC Bank USA,* 681 F.3d 1172, 1190 (10th Cir. 2012).

The issuance by the Public Trustee of the Certificate of Purchase and Confirmation Deed, pursuant to that statute, which on its face blatantly violates due process, should only provide a voidable title to the successful bidder at the Sale and not therefore the ability to evict or interfere in anyway with her lawsuit against Defendants USB and Wells Fargo/ASC. An eviction typically removes the homeowner before a separate and fair hearing can be had, and is considered a pre-deprivation of rights, even temporarily, under the 14th Amendment and would certainly give rise for major damages, which up to now Mayotte has refrained from claiming, but herein reserves the right to do so at a future date if appropriate. *Fuentes v. Shevin*, 407 U.S. 67, p. 85 (1972) as against all Defendants.

Another application of the *Young* doctrine refers to the ability of a Federal Court to enjoin a state actor that participates in the enforcement of a state statute that is unconstitutional. For this reason, also, the doctrine is applicable and as such provides for the application of injunctive relief.

In this case, as in all cases in Denver County, this Public Trustee, a Defendant herein, administers the foreclosure sales in Denver County, State of Colorado, pursuant to unconstitutional state statutes and is therefore a state actor and therefore a proper Defendant along with USB against which an injunction is proper under the *Ex Parte Young* doctrine.

**(b) SET ASIDE PUBLIC TRUSTEE SALE**: It was a wrongful and illegal foreclosure. As setout above in more detail, USB was not a proper Plaintiff (not a real party in interest-no standing) because it

was not a Holder or a Holder in Due Course of any valid instruments, which would have transferred ownership of the Note and DOT to it, and for a court to allow a case to move forward without resolving that issue alone is illegal. The assignment was fraudulent and even if it could somehow be demonstrated that it was not fraudulent, there was no assignment of the Note; only the Deed of Trust.  The Note was in default and did not co-exist with the DOT, which rendered each instrument worthless and ineffective.

USB not having ownership of any Note or valid security interest gives USB no ability to foreclosure, as it did in this case.  Therefore the Public Trustee Sale should be set aside and the order issued in the 120 hearing be declared as void *ab initio* and as such be vacated, together with a declaration that the purported Assignee was a party to a fraudulent and an invalid assignment of the DOT because the transfer even if valid was not timely and was missing the debt instrument that it was the security instrument for, and therefore, among other reasons, the Trust does not "hold" a valid Note and DOT and is not a "Holder in Due Course" of a Note and Deed of Trust and is therefore without the ability to enforce the terms, including any action pertaining to foreclosure or eviction.

Furthermore, there was fraudulent behavior by USB regarding the loan modification process, as set out in more detail above and below, which consequently led to the authorization of a foreclosure sale. The failure of USB to abide by its contractual duty should be grounds enough to set aside a foreclosure sale and allow USB and Homeowner to conclude the loan modification that was already in process.  This action would necessarily include an injunction as to any eviction action that USB may be contemplating and allow for the reformation of the Note by reducing the principal to an amount equal to the value of the property with a mortgage rate at market.  This would be akin to finding a new buyer, but more in accordance with justice and morality.

Throughout this entire process from loan origination to foreclosure due process safeguards were severely compromised and not adequately protected.

**(c) DECLARE AN IMPLIED CONTRACT EXISTED AND WAS BREACHED**: Mayotte and USB over some extended period of time pursued a loan modification agreement conditioned upon

Mayotte satisfying certain conditions, which she did. Mayotte contends she provided sufficient "consideration substitutes" by detrimentally relying and performing as directed by USB and therefore submits that USB should be estopped from filing a foreclosure while in the midst of concluding said agreement and be held to their contractual duty including the reformation of any debt, if any, commensurate with the value of the property.

**(d) DECLARE DUE PROCESS PROTECTIONS HAVE BEEN COMPROMISED:** As more adequately detailed elsewhere in this complaint Mayotte contends that her due process rights were severely compromised and as a result was never given the opportunity to adequately defend her position and requests that she be given that opportunity in this case.

**(e) REFUND PAYMENTS:** Payment of funds were made to the wrong entity; the entity that falsely represented that it was the correct entity to which payments were to be made and therefore should be returned to Mayotte in full in order to avoid unjust enrichment as to USB.

**(f) DEMAND PROPER ACCOUNTING:** USB, ASC and Wells Fargo as its purported agent, have held themselves out to be Mayotte's creditor and Deed of Trust servicer. As a result of this purported relationship with Mayotte, said Defendants have a fiduciary duty to Mayotte to at least properly account for payments made by Mayotte and to whom the payments were made and how they were credited to her account. Not even a QWR got ASC to forward this information.

The amount of the money paid to Defendants and therefore due from Defendants to Mayotte and to what account the payments were made to are unknown to Plaintiff and cannot be ascertained without an accounting of the receipts and disbursements of the aforementioned transactions. Plaintiff is informed and believes and thereon alleges that the amount due to her exceeds $200,000.

In the absence of such accounting Mayotte was unable to determine what defects and errors ACS was committing and therefore unable to determine what corrections were necessary to make.

Had the proper accounting been supplied to Mayotte she would have been on notice of the defects and errors committed by ASC and would therefore been able to make the necessary corrections, if any. The failure to provide this accounting resulted in this wrongful foreclosure.

**(g) CANCEL CERTAIN INSTRUMENTS:** The claims established by the aforementioned written instruments: Notice of Trustee's Sale, and Assignment of Deed of Trust for, or by Defendant USB and/or ASC/Wells Fargo are false as is more fully described above.

The Assignment of Deed of Trust and the Notice of Trustee's Sale were created by persons without any legal existence, or right, title, interest, or authorization by any legitimately authorized party pursuant to the pleadings above.

The claims of the aforementioned Assignment of Deed of Trust and the Notice of Trustee's Sale, USB and/or ASC/Wells Fargo are false and constitute a cloud on Plaintiff's title pursuant to the pleadings above, thereby injuring Plaintiff by damaging Plaintiff's reputation, and continued threat of eviction.

Plaintiff alleges on information and belief and knowledge the Property has a clouded title due to a non-existent void Note, Deed of Trust, Assignment of Deed of Trust, and the instruments evidencing a Trustee's Sale. Therefore, the following written instruments: Note, Deed of Trust, Assignment of Deed of Trust, the Certificate of Purchase and Confirmation Deed should hereby be cancelled.

Finally, Plaintiff states that the Deed of Trust, Assignment of Deed of Trust, and the Notice of Trustee's Sale were executed by parties lacking legal authority to execute them and are not employed by Defendants, or are not duly appointed agents of Defendants, and had no authorization to execute any documents on behalf of Defendant, as is more fully described above.

**(h) DECLARE PUBLIC TRUSTEE A PROPER DEFENDANT**: Find that the Public Trustee is a proper Defendant because in her capacity she is a state actor, plays a role in a foreclosure proceeding which has been authorized by an unconstitutional state statute and has an ongoing duty, as the Public

Trustee, to insure the accuracy and validity of the documents presented by USB which allows it to prosecute a foreclosure action.  Note Mayotte is not seeking damages against the Public Trustee; only an injunction.

Furthermore, when this court recognizes the unconstitutionality of the Rule 120 proceeding, given the Public Trustee is already a Defendant in this case, it will therefore not become necessary to begin another lawsuit to enjoin her actions.

### (i) DEMAND PRODUCTION OF THE ORIGINALS: Notwithstanding Colorado case law to the contrary, the Uniform Commercial Code Section 3-501 provides that the party claiming to be a real party in interest must exhibit the original note with Homeowner's signature and a valid assignment if the party claiming to be a real party in interest was not the original Lender in order to show a chain of title that is not broken for failure of valid assignments.

In this case USB, although counsel represented in the Rule 120 case that the instrument in her possession was the original Note, Mayotte suspects that it was not and that no one knows where the original Note is, and moreover USB is relying on a fraudulent assignment of the DOT to support its motion for authorization to foreclosure.

The language in the Deed of Trust states that the instrument is security for the Note.  What Note? And who owns the Note? And where is the Note?

If Mayotte attended a Rule 120 hearing with funds sufficient to cure the alleged default, she certainly would be entitled to be given her original Note back marked "paid" along with the DOT in a simultaneous exchange.

The real question then is what is the difference between Mayotte giving over funds in exchange for the original Note and giving over her home in exchange for the original Note?  There is no difference; both are of value sufficient to discharge the alleged debt.  Colorado law is therefore based on faulty reasoning when it excuses the production of the original documents in order to seek foreclosure,

and this court presumably has discretion to require production of same under the provisions of the UCC provisions, notwithstanding Colorado case law to the contrary.

Moreover, when the documents, which USB is relying on to prosecute a foreclosure action, are obviously spurious, as here, there is even more of a compelling reason to see the originals to either prove up the contention that they are spurious pursuant to C.R.C.P. 105.1 or show otherwise.

**(i) QUIET TITLE IN FAVOR OF MAYOTTE:** Mary Mayotte obtained ownership interest in fee simple via a **Grant Deed** recorded as Instrument No.: 2006033470 on 02/20/2006 in the Denver County Recorder's Office, a true and correct copy is attached hereto as Exhibit " 2 " and included herein by this reference, and is entitled to possession, and ownership of the Property free of any security instruments currently encumbering the Property.

Mayotte has reiterated her contentions throughout this Complaint that the loan documents and foreclosure documents are not valid and Defendants are not entitled to enforce the terms of the Note and Deed of Trust for all of the reasons and theories setout above and below.   In a forum of competent jurisdiction, wherein a full and fair hearing is provided, the evidence will show that none of the allegations stated herein are legal conclusions and are true and correct facts occurring over a period of more than six years, and that the Rule 120 hearing, in violation of due process safeguards, precluded the introduction of same and restricted the discussion to default and military status.

Mayotte is not asking this court to determine whether she made payments or not, nor whether she is in the military.  Those issues were summarily decided in the County Court without any proof.  Instead Mayotte is asking for a full and fair hearing as to all matters the State County court did <u>not</u> have jurisdiction to examine, including, in particular, quieting the title in favor of herself, for, but not limited to the following reasons and facts:

The purported Trustee and Servicer (Defendants) were parties to an invalid assignment of the DOT and that no assignment was made of the Note to Defendants, and therefore, among other reasons,

do not "hold" a valid Note and DOT and are not "Holders in Due Course" and therefore are without standing and the corresponding ability to enforce the terms of those documents.

Payment of funds were made to the wrong entity and not accounted for; and was the entity that falsely represented that it was the correct entity to which payments were to be made and which placed said payments in a "Suspense Account" and not given credit to Mayotte for her mortgage payments.

ASC breached an implied contract regarding the loan modification process, and therefore should be estopped from filing a foreclosure action. That breach of an implied contract, set out in more detail above and below, led to this foreclosure and therefore has clouded Mayotte's title.

The denial and compromise of due process safeguards, perpetrated by various attorneys in this case and allowed by the court system over time have resulted in this foreclosure and clouding of Mayotte's title.

Defendants' failure to exercise their fiduciary duty by not responding to Mayotte's "QWR" responsibly, as required, and their failure to provide accounting in accordance with Generally Accepted Accounting Practices led directly to this foreclosure and has clouded Mayotte's title.

All parties to this transaction failed to follow the rules set out in the respective Pooling and Servicing Agreement, resulting in securitization deficiencies mentioned throughout this complaint, leaving Defendants without any standing to prosecute this foreclosure action.

**(k) ACKNOWLEDGE SECURITIZATION DEFICIENCIES**: Securitization deficiencies as set out in this complaint resulted in Defendants not having standing to bring this action and has therefore, as a result of doing so anyway, clouded Mayotte's title.

USB in its role as Trustee claims to be entitled, as either: note holder, beneficiary, or an entity entitled to move under a power of sale conferred only by a recorded purportedly valid Assignment of Deed of Trust, and is either a Mortgage Backed Securities Trust, or a Real Estate Mortgage Investment Conduit, **"REMIC"**, governed under 26 U.S.C §§860(A) - 860(g), and formed under either applicable New York or Delaware trust law or is a quasi existing entity with questionable status.

Nevertheless, in the rush to securitize the predatory loans, USB, like others, in conjunction with the Wall Street banksters failed to actually follow their own rules and regulations, creating the instant situation where the securities (bonds) are not actually backed by any mortgages at all. Under the standard model, the promissory notes were supposed to be sold and transferred into a trust pool ("Securitized Trust") that holds the promissory notes as collateral on the securities bought by the investors (Certificate Holders"). These "true sales" allow the original lenders to move the Notes off their books, eliminating the need to maintain capital-adequacy reserves against default. The purpose of securitizing collateralized debt obligation was to provide a large supply of money to lenders for originating more loans, and to provide investments to bond holders, which were expected to be relatively safe.

The securitized Trusts, if ever formed properly, are subject to and governed by (a) the Pooling and Servicing Agreement; (b) the Mortgage and Loan Agreement; (c) the 424B5 Prospectus; (d) the common law trust rules of Delaware or New York, depending on its origin, and (e) the Internal Revenue Code section 860An through 860G, better known as the Real Estate Mortgage Investment Conduit (REMIC") rules.

An essential aspect of the mortgage securitization process is that the Trust must obtain and maintain good title to the mortgage loans comprising the pool for that certificate offering. This is necessary in order for the Trustee of the purportedly Securitized Trust to be legally entitled to enforce the mortgage loans in case of default. In addition to other required documentation to complete the Collateral file of any given loan, two documents relating to each mortgage loan must be validly transferred to the Trust as part of the securitization process—the promissory note and the security instrument (Deed of Trust or Mortgage). In this case, on information and belief, neither documents were validly transferred. There is no evidence that the Note was ever transferred by any means to USB and the Deed of Trust was purportedly transferred by way of a bogus assignment years after the closing date prescribed by the Pooling and Serving Agreement and the Prospectus by an unauthorized Robo signer

that was not an agent of or associated with any of the Defendants in this case. As a result, thereof, USB, which purports to be Mayotte's creditor, actually has no secured or unsecured right, title, or interest in Mayotte's Note and DOT, and has no right to collect mortgage payments, or report derogatorily against Mayotte's credit or initiate a foreclosure action, but did so and has clouded Mayotte's title and damaged her beyond repair.

Furthermore, these instruments were bifurcated some time after the loan was made due to default on the Note, and therefore cannot collectively be considered "the loan" any longer. The fact that they were bifurcated and the reason they were bifurcated is one of Mayotte's main contentions in this case. USB was the Assignee of only the Deed of Trust (albeit fraudulent); not the Note, which made USB an improper Plaintiff in the foreclosure action, and as such, without standing to bring about a foreclosure because USB was not a legitimate "Holder" or a "Holder In Due Course" of any valid instrument.

Mayotte submits that the dates appearing on the face of the Assignment (2011) and Notice of Sale (2008) show that the interest in the Deed of Trust assignment was taken by USB with actual, constructive, or implied notice that the Note was overdue, in default, or had been otherwise dishonored.

The Notice of a Foreclosure Sale was recorded in 2008 and the Assignment was recorded in 2011. By definition USB could not be a Holder In Due Course because USB took with notice that the Note was in default and did not give value. See: Colorado Revised Statute §4-3-302(a)(2)(iii) below.

Moreover the Assignment took place five years after the closing date set out in the controlling Pooling and Servicing Agreement and Prospectus, which makes the assignment ineffective for that reason, as well.

Colorado Revised Statute §4-3-302(a)(2)(iii) states.

(a) Subject to subsection (c) of this section and section 4-3-106 (d) "holder in due course" means the holder of an instrument if:

(1) The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its

authenticity; and

(2) The holder took the instrument (i) for value, (ii) in good faith, (iii) <u>without notice that the instrument</u> <u>is overdue or has been dishonored or that there is an uncured default with respect to payment of another</u> <u>instrument issued as part of the same series,</u> (iv) without notice that the instrument contains an

unauthorized signature or has been altered, (v) without notice of any claim to the instrument described

in<u>section 4-3-306,</u> and (vi) without notice that any party has a defense or claim in recoupment described

in<u>section 4-3-305 (a).</u>

Counsel further claims that an original Note containing a blank endorsement was introduced at a

C.R.C.P. 120 hearing and that USB established that it was a "holder" and owner of the Note and thus

entitled to enforce its terms. Counsel must be referring to a Note that was in default in 2008 as recorded

in the Public Trustee's office and was never assigned along with the Deed of Trust to USB. The only

assignment was of a Deed of Trust by an invalid and bogus assignment made in 2011.

**(l) DETERMINATION OF SIX-YEAR STATUTE OF LIMITATIONS TOLLING PERIOD**: The

failure to prosecute this case to its conclusion within the required six (6) year time frame as set out in the

rules pertaining to the Statute of Limitations as that statute pertains to this type of litigation is currently

clouding Mayotte's title and is an overriding reason to quiet title. Notice of intent to accelerate the entire

debt was sent to Mayotte in July 2008 See: Exhibit ("*5*") and the motion for authorization to foreclose

and the granting of that motion in the Rule 120 hearing took place on November 11, 2014; more than six

(6) years following the Notice to Accelerate.

## CONCLUSION

Plaintiff Mary Mayotte has been damaged, injured, harmed and prejudiced including but not limited to

all manners above and as follows:

Mayotte's property was sold at a Public Trustee sale as a result of a wrongful foreclosure.

Plaintiff has been threatened with dispossession of her property for six years with all psychological and physical harm implicit.

Plaintiff has been denied equity of redemption by being denied the identity of a true creditor to pay.

Plaintiff has made payments to Defendants who have failed to adjust the account to show the payments and who overstated the cure amount such that Plaintiff or anyone else could not cure.

Plaintiff has suffered damage to her reputation in the local community and in the national community in which she makes her living and at 63 has little chance of recouping her losses.

Plaintiff has expended significant funds in an attempt to obtain a loan modification, and to cover the related costs of bringing suit.

Plaintiff's credit rating has been severely damaged.

Any would-be buyer of Plaintiff's property will find himself in legal limbo; unable to know with certainty whether they can safely buy Plaintiff's property or get title insurance.

**WHEREFORE,** in consideration of the above Plaintiff respectfully requests this court grant the following relief requested. Plaintiff prays the Court enter judgment as follows:

1. Judgment against Defendants US BANK NATIONAL ASSOCIATION, and Wells Fargo/ASC and any and "all persons or entities claiming any legal or equitable right, title, estate, lien or interest in the property described in this complaint adverse to Plaintiff's title, or any cloud upon Plaintiff's title thereto"

2. Judgment for Mayotte and the issuing of a Temporary Restraining Order enjoining the Defendant's' right to file a Forcible Entry and Detainer complaint while the matters herein setout are reviewed and adjudicated.

3. Judgment that the Order Authorizing Sale is VOID. Order that the Trustee Sale of the Property be vacated.

4. Find that USB had a duty based on contract law to conclude a loan modification, which was in process prior to the foreclosure and in connection therewith request that a reformation of the purported Note and mortgage terms be considered, including any offsets to her mortgage balance due as a result of the findings in this lawsuit.

5. Declaration that USB was an improper Plaintiff in the Rule 120 foreclosure action because it was not a Holder or a Holder In Due Course and therefore did and does not now have standing to bring any action whatsoever against Homeowner.

6. Award damages to Homeowner, to be determined, for the violation of state and Federal laws prohibiting deceptive practices against consumers

7. Declare that Homeowner's due process safeguards have so far been compromised but will be protected in this court.

8. Declaration that the Assignment dated December 13, 2013 is a spurious document as defined under C.R.C.P. 105.1 and does not convey any interest or title or ownership to USB and that it be cancelled or reconvened and the original documents be required to challenge this argument.

9. Find that the Public Trustee is a proper Defendant.

10. Find that the six (6) year Statute of Limitation has run out for a constitutional foreclosure to be completed.

11. Judgment for Punitive Damages.

12. Judgment for Compensatory, incidental and consequential damages in an amount not less than $1,000,000, according to proof at the time of trial.

13. Judgment for reasonable attorney fees.

14. Judgment for return of funds paid to an entity that was not entitled to payments (unjust enrichment).

15. Judgment for the production of a valid cure statement.

16. Judgment that the title of the Property is hereafter and forever quieted in favor of Mayotte.

17. Judgment for costs of Suit.

18. Judgment for any further relief the Court deems just and proper.

## **VERIFICATION**

I, the undersigned, Plaintiff in this action, have personal knowledge of the matters stated herein, except as otherwise indicated and cited, and if called to testify, could and would competently testify thereto. To the best of my knowledge, information, and belief, the facts and allegations contained above are true and correct. By signing hereunder, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 27,  2015 with all rights reserved.

By: _Mary M. Mayotte_

Mary Mayotte, Pro Se

CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of February, 2015, a true and accurate copy of Mayotte's Second Amended Complaint was mailed, postage prepaid to the following persons of record.

Allison Biles, Counsel for USB et.al.
Snell & Wilmer
1200 17th Street
Suite 1900
Denver, CO 80202

Patrick Wheeler, Assistant City Attorney
201 W. Colfax Ave. Dept. 1207
Denver, CO 80202

_____
Mary M. Mayotte