# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

MARY MAYOTTE,

     Plaintiff,

                                              Civil Action No: 14-cv-3092-RBJ-CBS

US BANK N.A.,

&

WELLS FARGO BANK N.A.,

     Defendant.

## PLAINTIFF'S THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW Plaintiff Mary M. Mayotte, by and through counsel, and alleges as follows:

1. Plaintiff Mary Mayotte's claims arise from illegal acts by US Bank and Wells Fargo. These acts include misrepresentations and omissions of material facts, negligent servicing, violations of the Colorado Consumer Protection Act, breach of contract, and violations of the FDCPA and the FCRA. The acts by US Bank, the purported trustee for a trust that asserts it holds Mayotte's note, and the acts by Wells Fargo, who serviced the loan, are not unique to this case. Instead, individual lawsuits, class actions, claims by attorney generals, and federal investigations, allege, and in many cases prove, substantially similar facts.   These include now well-known practices such as encouraging a homeowner to withhold payment in order to qualify for a modification and then alleging the homeowner is in default, a failure to grant a permanent modification after all required payments are made, the failure to honor permanent modifications, the

acceptance of payments consistent with a permanent modification followed by a belated threat of foreclosure, failure to provide a single point of contact or consistent information, and asserting that the homeowner did not send required paperwork in order to justify reneging on contractual obligations. These practices harmed Mayotte, and they have already harmed and will continue to harm homeowners around the country.

2.  Mayotte emphasizes that prior to her dealings with Wells Fargo she was a successful businesswoman. She is not a homeowner pursuing a free home. Before the events with Wells Fargo and U.S. Bank, Mayotte had already paid roughly $500,000 in payments on her home and was current on her note.

3.  This lawsuit, and all her efforts with Wells Fargo and US Bank, were designed to obtain a permanent modification and to continue paying on her home. Mayotte earned a permanent modification, and when Wells Fargo failed to honor that promise, Mayotte worked in good faith to attempt to let Wells Fargo resolve its errors.  Indeed, she paid on her home even after Wells Fargo's errors.  Mayotte only stopped paying because 1) Wells Fargo breached its promises repeatedly, 2) Wells Fargo failed to account for payments that were made, and 3) Wells Fargo indicated it will not accept partial payments when a property is in foreclosure.

4.  Mayotte offered throughout this process to pay the agreed modified amount. Had Wells Fargo honored its promises, Mayotte would have paid $2,900 per month.  Instead, due to incompetence and fraud, Wells Fargo refused to honor at least two separate written deals, resulting in this lawsuit.

5.  Mayotte is a communications coach who has trained celebrities, Olympic athletes, business executives and others.  In her trade, good credit is essential.

6. From the time Wells Fargo induced Mayotte to withhold payment, Mayotte has suffered severe harm. Harm to her credit, the stress of possibly losing her home, and the financial demands of trying to retain attorneys nearly wiped out Mayotte's business. She was forced to give up a New York property and her office of 25 years. She lost significant income.

7. Before this happened, Mayotte was on pace to retire. Now, she is seeking to rebuild a business and her future is uncertain.

8. This lawsuit is her only way to remedy the situation and move forward.

## JURISDICTION, VENUE AND PARTIES

9. This Court has original jurisdiction over the claims in this action based on 28 U.S.C§§ 1331 and 1332 because Mayotte asserts federal claim, Mayotte is diverse from the defendants, and the amount in controversy exceeds $75,000.

10. This Court also has supplemental jurisdiction over the pendant state law claims because they form a part of the same case or controversy.

11. The unlawful conduct, illegal practices, and acts complained of and alleged in this Complaint were all committed in Denver, Colorado. Therefore, venue properly lies in this Court.

12. Plaintiff Mayotte is now and at all times mentioned herein, an individual residing in the County of Denver.

13. At all relevant times, US Bank N.A. is a National Association organized under the laws of the United States with its principal place of business in North Carolina.

14. At all relevant times, Wells Fargo Bank N.A. is a National Association organized under the laws of the United States with its principal place of business in California.

15. US Bank, N.A. is the purported trustee for the trust that is alleged to hold Mayotte's note.

16. Wells Fargo serviced Mayotte's note.  Wells Fargo worked on behalf of US Bank, as its agent in all actions described in this complaint.

17. US Bank authorized Wells Fargo to service Mayotte's loan, to engage in loss mitigation, and to take the steps to foreclose.

18. At all times relevant to this action Mayotte has owned real property commonly known as: 23 South Garfield, Denver, CO 80209, hereinafter ("Property"), with the following legal description:

> All the real property, together with improvements if any, situate, if lying and being in the County of Denver and State of Colorado, described as follows: Unit 38, Carriage Row at Cherry Creek, City and County of Denver, State of Colorado, according to the condominium map thereof recorded on December 13, 1996, at reception no. 9600170672, and the declaration recorded in February 5, 1996, at reception no. 960015196, and as amended in instrument recorded June 26, 1996 at reception 9600088649, and as amended in instrument recorded December 13,1996 under reception no. 9600170671 in the records of the clerk and recorder of the City and County of Denver, Colorado, as amended from time to time.

## GENERAL ALLEGATIONS

19. Plaintiff Mayotte alleges that the Defendants are attempting to acquire title to her home under the name given on certain recorded non-judicial foreclosure instruments as "US BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR STRUCTURED ASSET INVESTMENT LOAN TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-4," (hereinafter "USB as Trustee").

20. Mayotte purchased her property in 1999.

21. In February of 2006, Mayotte refinanced her home with New Century Mortgage Corporation ("NCM") in the amount of $481,650 secured by real property located at 23 S. Garfield St., Denver, CO 80209. NCM subsequently filed for bankruptcy in April 2007. The Deed of Trust identified NCM as Lender and Beneficiary.

22. During the summer of 2007 Mayotte became aware that the Note she signed, contrary to what she was told and what was stated in the Good Faith Estimate, was a five (5) year adjustable rate mortgage (ARM), with a two-year prepayment penalty.

23. One of the conditions was that the rate could increase as much as 1.5% every six months until a ceiling of 15% had been reached. This is what is now regularly qualified as a predatory loan with an "exploding ARM."

24. Mayotte recognized that the increase in payments could eventually make it difficult for her to meet her obligations.

25. Proactively, during the summer of 2007, Mayotte, for the first time, contacted Wells Fargo. She spoke with a customer service representative by phone. She was informed that in order to qualify for a loan modification she would have to miss three (3) payments.

26. Mayotte is not alone in alleging that Wells Fargo instructed her to miss three payments. This is known by many familiar with the industry as the "miss three/make three." In the early days of the Home Affordable Modification Program (HAMP), Wells Fargo representatives were poorly trained. They regularly instructed homeowners to miss three payments (qualifying as a hardship under the governmental guidelines), so they could then make three payments under a Trial Period Plan (TPP). This, Mayotte and others were told, would qualify them for a permanent modification on more favorable terms.

27. The affirmative instruction to withhold payment was made to Mayotte by a Wells Fargo employee acting within the scope of his or her employment.  It constituted an express waiver of any right to payment or to claim default if the payments were missed.

28. Until the time Mayotte was induced to withhold payment, she was current on her loan and at no risk of foreclosure.  She had paid roughly $475,000 in loan payments.

29. As evidence that default was not imminent for Mayotte, and in good faith, she continued to make payments until July 2008.  At that time, she decided to follow Wells Fargo's advice and withhold three payments.

30. Mayotte withheld the payments because she relied, ultimately to her detriment, on Wells Fargo's promise that it would modify her loan.

31. At the time Mayotte withheld payment, she was current on her loan. Withholding payment altered her financial position.

32. Mayotte could have attempted to sell her home, refinanced the loan, or otherwise sought to address any potential problems she might encounter if her rate increased.  But she chose not to do those things based on Wells Fargo's representations.

33. As such, reliance on Well Fargo's unequivocal promises caused Mayotte harm.

34. Upon missing three payments, she communicated with Wells Fargo, but rather than honor its promise, Wells Fargo moved towards foreclosure.

35. Instead of honoring its promise to consider Mayotte for a modification, Wells Fargo punished Mayotte for following its advice. Wells Fargo claimed default.

36. Mayotte actively engaged in loss mitigation efforts, including regular communication with Wells Fargo.  She contacted Wells Fargo repeatedly, making clear that she wished to

pay on her loan, that Wells Fargo told her to miss payments, and that foreclosure was inappropriate.

37. During 2009 and 2010, Wells Fargo repeatedly asked Mayotte to send financial documents evidencing income and other information despite the fact Mayotte had already sent the documents.

38. In February 2009, Mayotte accepted an Interest Rate Freeze Agreement.  Wells Fargo asserted it did not receive the signed agreement. This was one example of many in which Wells Fargo claimed not to receive paperwork that was sent to it.   This pattern of asserting documents were not received was a common practice of Wells Fargo. Government audits, class actions, and individual claims repeatedly assert that Wells Fargo "lost" documentation, and then refused to honor its promises by blaming the homeowner.

39. Through her efforts, in 2009, working with her attorney and the now defunct Caste Law Group, Mayotte worked to obtain a modification.

40. Mayotte obtained the right to make the three trial period payments in a trial period plan (TPP) to Wells Fargo in 2010. She made each of them on time. She also mailed in a signed copy, as required by the document.   Mayotte was promised, and the loan documents required, that after making three payments, Mayotte would receive a permanent modification.

41. Mayotte met all the conditions of her contract by paying the TPP and providing all required documents.

42. The agreement promising a modification and requiring payments is attached as Exhibit 1.

43. The agreement contains a printed signature by American Servicing Company and a signature by Mayotte, dated September 11, 2009.

44. Proof of the payments, produced by Wells Fargo in state court, is attached as Exhibit 2.

45. Combined, those documents show Mayotte was required to make three payments of $2,931.08. Those payments were owed at the beginning of the months of October, November, and December of 2009.

46. Wells Fargo's own records show that the payments, in the exact amount required, were made on September 28, 2009 (early), October 30, 2009 (early), and December 2, 2009 (timely). See Exhibit 2.

47. The acceptance of the payments and the signed contract created a written contract between Mayotte and Wells Fargo, who asserted it was modifying the loan on behalf of U.S. Bank, in its role as trustee for a securitized trust.

48. Wells Fargo and U.S. Bank have also acknowledged the agreement in other ways. For example, in a letter dated June 30, 204911, Wells Fargo wrote to Senator Bennett's office.   The letter is allegedly a review of Mayotte's file.

49. Much of the information is inaccurate.  However, tellingly, the letter admits that Mayotte was offered a modification and recites the same three dates, asserting that if Mayotte made the payments, she would receive a modification.   The letter, which seems to be an admission of liability, admits that Mayotte was not ultimately given the permanent modification she had earned.  This was a direct violation of the terms of the agreement Mayotte and ASC (on behalf of Wells Fargo) signed.

50. Exhibit 1, the written agreement between Mayotte and Wells Fargo, explicitly required Wells Fargo to offer Mayotte a permanent modification if she made the required three payments.

51. Similarly, Well Fargo customer service representatives sent emails to Mayotte in 2009, 2010, 2011, and 2012 asserting that she would receive a modification.  These were written confirmation by Wells Fargo.   Several emails were sent stating that Mayotte would receive a modification.  Upon information and belief, these emails are in the possession of Wells Fargo.

52. The fact that Wells Fargo accepted the modified payments, including payments after the three required payments, is additional evidence the agreement was reached.

53. Wells Fargo's decision to accept Mayotte's payments further solidified a binding modification and are written proof of it.

54. Wells Fargo later asserted it didn't have sufficient paperwork for the modification that it granted and accepted.  Wells Fargo began demanding additional documentation, such as profit and loss statements.

55. Working through her business attorneys, Mayotte provided documentation as quickly as possible.

56. Wells Fargo never told Mayotte that her modification was rejected.

57. Because of ongoing confusion by Wells Fargo, Mayotte enlisted the help of Senator Bennett and his office.

58. Mayotte was again told verbally and in writing, in part through efforts of Senator Bennett's office with the Office of Executive Complaints, that the modified loan was available to Mayotte. This time, Wells Fargo said the loan would proceed so long as she

cleared title by making outstanding dues payments to the Homeowners Association and making a payment of $2,617.56 to Wells Fargo by a stipulated date.  Mayotte understood the modification was imminent.

59. Mayotte received another written agreement on or about November 2, 2010, and met the financial requirements late in November or early December, within the required time.

60. During the time that Mayotte faced foreclosure and eviction, Wells Fargo's explicit policy allowed for what is now known as dual-tracking.  Dual tracking occurs when a borrower is told by one department that the bank is working on a modification while, simultaneously, another department moves the loan towards foreclosure.

61. Dual tracking was made explicitly illegal by the Consumer Financial Protection Bureau in 2014, and by Colorado statute in 2015.  However, it was an unfair and deceptive practice from its inception.

62. By telling Mayotte that Wells Fargo would work in good faith to modify her loan, it prevented by Mayotte from pursuing other options to limit her losses. For example, Mayotte could not rent out her home to generate income because loan modifications require the home to be owner-occupied. And Mayotte realistically could not seek to sell the home while at the same time working to retain it through a loan modification program. Wells Fargo continued to hold out promises of attempting to work things out with Mayotte through November 2013.

63. By engaging in dual tracking, Wells Fargo engaged in practices that increased the likelihood Mayotte would face foreclosure. The dual tracking persisted into 2014.

64. Similarly, Wells Fargo engaged in affirmative misrepresentations and material omissions throughout the loss mitigation process up to the time of foreclosure.

65. Wells Fargo knew during the time it engaged with Mayotte that 1) its loan modification efforts rarely succeeded, 2) loan modification decisions often took years, instead of months, and 3) most people who engaged in loss mitigation with Well Fargo, far from mitigating their losses, increased them. Despite this knowledge, Wells Fargo never disclosed that it was inadequately staffed, and that its hardware and software ensured that many people would suffer harm from loss mitigation efforts.  It intentionally concealed the nature of its loss mitigation efforts.  And it affirmatively represented that its loss mitigation efforts were likely to be successful and to provide assistance to Mayotte.

66. Despite this, Wells Fargo concealed these facts, and instead continued to assert that it would find a loss mitigation solution for Mayotte.

67. Wells Fargo, and only Wells Fargo, had access to its investor guidelines and its internal modification rules.  It has never disclosed those to Mayotte.

68. Wells Fargo actively misrepresented to Mayotte that it was working to solve her problem and actively concealed its illegal behavior. Wells Fargo never communicated to Mayotte that it would not find a way to honor its promises. Instead, orally and repeatedly in letters, it asserted that it wanted to do everything it could to help.

69. Wells Fargo intentionally concealed a number of things from Mayotte, for a period running from 2008 until at least August of 2013.  It concealed that investor guidelines and internal rules would prevent Mayotte from modifying her loan.  It intentionally concealed from her that it intended to, and would in fact, affirmatively choose to refuse to honor its prior contractual promises, even if it exposed Wells Fargo to a lawsuit, so that Wells Fargo could avoid upsetting investors. Wells Fargo intentionally concealed from

Mayotte that its loss mitigation unit routinely lost paperwork, provided false information to customers, and denied modifications without justification.

70. The fraud and negligence was laid bare on September 19, 2014. On that day ASC (a servicing company that did work for Wells Fargo and who was servicing Mayotte's loan), sent a letter to Ms. Mayotte stating, "we expect to complete our research and provide the Office of U.S. Senator Michael F. Bennett and you with the results on or before 10/02/2014."

71. Mayotte believed that the investigation would finally reveal that Mayotte was not in default. Rather, she only withheld payment because of the explicit instructions of Wells Fargo. She also believed the investigation would finally reveal that she repeatedly paid amounts requested by Wells Fargo and ASC in order to obtain a modification and that she in fact had a permanent modification.

72. However, when ASC responded to the inquiries on or about October 2, 2014, it concluded that Mayotte was in default, never mentioned anything about the withheld payments, did not address past payments made to obtain a modification, and asserted Mayotte owed all past payments and penalties.

73. This response by ASC, who was an agent of Wells Fargo, made clear to Mayotte that even when all facts were presented, even when the facts were reviewed by someone higher than the call center, and even when a Senator was involved in the inquiry, ASC, Wells Fargo, and U.S. Bank wanted to foreclose.

74. Mayotte concluded that ASC, Wells Fargo, and U.S. Bank were engaging in fraud.

75. If any doubt remained, ASC, Wells Fargo, and U.S. Bank confirmed this fact when they caused to be issued a certificate of purchase on Mayotte's home on December 5, 2014.

76. Upon realizing that ASC, Wells Fargo, and U.S. Bank were engaged in fraudulent behavior, Mayotte immediately filed claims in this Court attempting to stop the sale and recover damages.

**Allegations Regarding Questions about Title and the Amount Owed**

77. In addition to the behavior described in the preceding paragraphs related to servicing and foreclosure, Wells Fargo also engaged in a variety of unfair and deceptive practices relating to record keeping and provision of those records.

78. Upon information and belief, although Wells Fargo consistently represented to Mayotte that it had the right to foreclose, in fact, it had no proof that Mayotte's note was in the alleged trust.

79. In an effort to verify and validate her debt, payments owed, and the true identity of the creditor and servicer, Mayotte sent a Qualified Written Request letter on or around July 12, 2013, pursuant to Real Estate Settlement Procedures Act, 12 U.S.C. 2605(e), in which she requested that the purported servicer (ASC/Wells Fargo Bank N.A.) provide, among other things, "The name, address, name of a contact person and telephone number of the current holder in due course and owner of the mortgage note." 12 U.S.C. § 2605(e) requires that the servicer provide this information and respond to a written request within 60 days of receipt.

80. Wells Fargo did respond, but did not provide, and has not provided to date, the information required under 12 U.S.C. § 2605(c), including but not limited to the correction of errors, information regarding a loan modification in process which, in this case, was in process, the purported creditor, accumulated late fees and charges, and

verification of the validity of the purported debt owed to USB/Wells Fargo.  Three months later she received a copy of someone else's Note with a cover letter, addressed to Mayotte. This was just another example of Wells Fargo's failure to keep records appropriately.

81. Similarly, the deed of trust was assigned in a robo-signed document to US Bank by Ryan Amato in 2011. There is no evidence that US Bank was secured and had the right to foreclose prior to that time.

82. Upon information and belief, neither US Bank nor Wells Fargo has ever produced clear evidence that US Bank, as the trustee for a trust, has a legal right to foreclose.

83. This is true even though U.S. Bank sought to evict Mayotte. It refused repeatedly in that proceeding to produce any evidence it had standing to foreclose.

### Allegations Regarding Public Impact

84. A few of the cases alleging Well Fargo engaged in illegal practices relating to servicing loans and foreclosures – practices substantially similar to those in this case are: *Cruz v. Wells Fargo*, Bankruptcy No. 10−43793−MSH, (D. Mass. Bankruptcy Ct.), *Rockridge Trust v. Wells Fargo*, C-13-01457, (N.D. Calif.), and *Rijhwani v. Wells Fargo,* C 13−05881 LB, (ND. Calif).

85. Specifically, counsel for Plaintiff discussed experiences with Wells Fargo with three separate families who were harmed by practices substantially similar to Mary Mayotte, including Ray Shahani (*Rockridge* case), Jose Cruz (*Cruz* case) and Ken and Tina Wivell, a family in Missouri.  Those cases occurred around the country, demonstrating the widespread harm caused. Each individual listed above encountered misleading statements during the loan servicing process and negligence. These experiences included promises to delay foreclosure that were not honored, enticement to withhold payment in order to

qualify for a modification followed by assertions the homeowner was in default, assertions that the plaintiff did not turn in required paperwork when in fact the plaintiff did, and acceptance of payments that qualified the homeowner for a modification that was later impermissibly denied.

86. In addition, Wells Fargo was found in 2012 to have significant problems servicing loans. This resulted in the National Mortgage Settlement, which involved Wells Fargo and several other major banks.  As part of the settlement, Wells Fargo was required to improve how it serviced loans. As early as 2013, while Mayotte continued to deal with Wells Fargo and it servicing and foreclosure unit, the Attorney General of New York sued Wells Fargo for violating the agreement, asserting that Wells Fargo was still failing to offer modifications to homeowners (this would include Mayotte) in a timely and fair way. See http://money.cnn.com/2013/10/02/news/companies/new-york-sues-wells-fargo/. In 2014, while Mayotte endured continued foreclosure issues, Wells Fargo was accused of fabricating foreclosure documents (an allegation also present in this case).  The allegations revealed that Wells Fargo possessed a manual that showed employees how to produce (falsify) lost or missing documents.

http://www.democracynow.org/2014/3/21/as_wells_fargo_is_accused_of.

87. Similarly, just last year the OCC entered into an amended consent order with Wells Fargo in which it found that Wells Fargo still wasn't complying with requirements of a 2011 consent order regarding servicing and foreclosures.  Instead, Wells Fargo was continuing to harm homeowners. As part of the order, Wells Fargo was prohibited from taking on any new servicing business. The document can be found at:

http://www.occ.gov/static/enforcement-actions/ea2015-067.pdf.

**Fraudulent Concealment and Continuing Negligence and Fraud**

88. Wells Fargo actively worked to conceal from Mayotte, investigators, and other consumers that it was engaging in negligent and fraudulent behavior.

89. Wells Fargo knew that they did not have enough staff to handle loan applications.

90. Wells Fargo knew that they had multiple computer systems that did not interact effectively with one another, making certain that no single customer service representative could see the whole file and file history.

91. Wells Fargo knew they did not retain all recording of conversations with borrowers.

92. Wells Fargo knew that they regularly lost documents that were sent to it.

93. Wells Fargo knew that they regularly told borrowers they did not send documents, when in fact they did.

94. Wells Fargo knew that it their customer service representatives often provided incorrect information.

95. Wells Fargo knew that many customers, like Mayotte, alleged they were told to withhold payments, only to then be told they would be foreclosed.

96. Wells Fargo knew that they used internal processes to determine when to modify a loan.

97. Wells Fargo knew that they calculated whether to modify a loan by considering the credit of the borrower, the number of missed payments, the value of the home, and other factors.

98. Wells Fargo knew that each of the problems described above applied to Mayotte's loan and its servicing.

99. Wells Fargo knew that every month that passed made it less likely that Mayotte could ever qualify for a modification.

100.     Wells Fargo knew that its delay worked to make sure Mayotte and others could not modify their loans.

101.     Wells Fargo actively concealed all the information above from Mayotte.

102.     To this day, Wells Fargo has not revealed this information. Instead, it has been discovered only through ongoing lawsuits and revelations in June 2015 that Wells Fargo was not honoring its servicing commitments, even after promising to reform its practices.

103.     Indeed, until Mayotte was represented, she had no access to this information, just as any reasonable consumer has no way of learning it.

104.     The information concealed by Wells Fargo is material, because if Mayotte had known that Wells Fargo was inept, fraudulent, and that it regularly misled and deceived customers, she would not have continued to believe that Wells Fargo and U.S. Bank would honor her modification or otherwise repair their mistakes.

105.     Wells Fargo accepted payments from Mayotte on multiple occasions, representing in writing (contract, emails, and payment records) that these would procure the promised modification.

106.     None of the communications by Wells Fargo disclosed the truth -  Wells Fargo was under investigation by attorney generals and others, it knew it could not process modifications accurately and honestly, and it was being sued for the exact same things it did to Mayotte.

107.     Wells Fargo's behavior constituted an unbroken chain of continuing and ongoing actions that resulted in the November 2014 foreclosure.

108.     None of the communications disclosed that Wells Fargo affirmatively decided to foreclose on homes even when it knew it should not.

109.     Mayotte was ignorant of the facts alleged above, and in general, of the actual nature of Wells Fargo.

110.     Mayotte believed Wells Fargo was a reputable servicers and that, although it was struggling, it was trying in good faith to make things right.

111.     Wells Fargo wanted Mayotte to rely on its concealment. In fact, in its own communications, Wells Fargo encouraged Mayotte to send in information, keep communicating, and to wait for conclusions.

112.     Wells Fargo strung Mayotte along to 1) get extra payments, 2) avoid being sued, and 3) cover its tracks so that its ineptitude and fraud would be harder to discover later.

113.     Wells Fargo knew that each day that passed without Mayotte suing reduced the likelihood she would file claims.  The risk of loss of a home, the financial strain it causes, the damage to credit, and the increasing complexity of the file, make it harder for homeowners to find representation.

114.     Due to Well Fargo's concealment Mayotte paid thousands of dollars to attorneys in an attempt to sort things out.

115.     In addition, Mayotte missed opportunities to work and earn income due to the time spent trying to work with Wells Fargo.

116.     Mayotte did not seek to sell her home when she still had equity in it because Wells Fargo concealed information about the certainty that it would deny her a modification and she would lose her home.

117.     Mayotte suffered foreclosure on her home because she did know that Wells Fargo would not honor the modification of her loan and that it had done the same thing to many others.

118.     Had Mayotte known that Wells Fargo had a pattern and practice of losing paperwork, saying it lost paperwork to create excuses for delay, had multiple computer systems that did not function well with one another, had untrained customer service representatives, had internal review processes that assured Mayotte's modification would not be honored, and was being investigated for its unfair practices, Mayotte would not have continued to work with Wells Fargo.

119.     Mayotte was unable, by reasonable diligence, to discover the facts necessary for determining the existence of a claim for relief.

120.     For example, Mayotte could not through reasonable diligence learn of the inner workings of Wells Fargo's service centers, she could not learn Wells Fargo's internal processes for determining a modification, she could not learn about investigations that were ongoing and not public, and she could not learn what Wells Fargo knew about its history of refusing to honor written modifications.

121.     To this day, Mayotte has more questions than answers. She still doesn't know what internal communications exist about her loan, whether Wells Fargo at some point audited the file and realized it misled Mayotte, what Wells Fargo learned when Senator Bennett became involved, or what audio recordings Wells Fargo has that might prove it harmed Mayotte.

122.     However, based on now publicly available documents, it is clear Wells Fargo engaged in negligence and fraud.

123.     On June 16, 2015, Wells Fargo entered a Consent Order with the Comptroller of the Currency of the United States that made clear that it continued to violate servicing standards and foreclosure standards that it previously agreed to repair.

124.     The Order makes clear that Wells Fargo, despite a promise to fix its practices, was continuing to endanger homeowners. Specifically, the report states "The OCC has determined the Bank is in continuing noncompliance with and in violation of the Consent Order, and continues to engage in unsafe and unsound practices."

125.     The report reveals extraordinarily dangerous practices existed while Wells Fargo communicated with Mayotte. Findings include a determination that Wells Fargo was in "noncompliance" with its promise to develop "processes to ensure that all factual assertions made in pleadings, declarations, affidavits, or other sworn statements filed by or on behalf of the Bank are accurate . . . and complete . . . ."

126.     The Order also notes that Wells Fargo is in noncompliance with its promises to use "reasonable and good faith efforts" in loss mitigation, to  provide a "single point of contact" for each borrower.

127.     This Order, and previous Consent Orders detailing Wells Fargo's behavior are attached as Exhibit 3.


**Damages**

128.     The foreclosure in November 2014 cost Mayotte her home.  It also cost her the equity in her home and attorney fees and it caused her reputational harm and emotional distress.

129.     In addition, upon information and belief, Wells Fargo and U.S. Bank are now reporting Mayotte's foreclosure on her credit, causing her harm.

130.     In addition, upon information and belief, Wells Fargo and U.S. Bank continue to attempt to collect amounts not owed including an alleged deficiency on the note.

131.     From 2012-2014, Mayotte suffered additional harms from the errors of Wells

Fargo and U.S. Bank including attorney fees, emotional harm, reputational harm, and

harm  to her business.

## CLAIM I
## Negligence against US Bank and Wells Fargo

132.    Plaintiff incorporates the preceding allegations as if fully set forth herein.

133.    US Bank hired and supervised Wells Fargo to service Mayotte's loan.

134.    US Bank was the principal of Wells Fargo and had the authority to control the way Wells Fargo serviced Mayotte's loan.

135.    Wells Fargo operated as the agent of US Bank in all its actions described in the complaint, or if the actions occurred prior to US Bank's involvement, US Bank is responsible as a successor.

136.    Wells Fargo owed a duty of ordinary care to service Mayotte's loan, which includes loss mitigation and foreclosure activities.

137.    In fact, Wells Fargo's exclusive job was to service Mayotte's loan, and other loans like it.

138.    Wells Fargo knew or should have known that failure to service the loan with reasonable care would lead to physical, emotional and financial harm to Mayotte and others like her.

139.    It was foreseeable that failure to exercise ordinary care would result in harm to Mayotte.

140.    Wells Fargo was paid to service Mayotte's loan.

141.    Wells Fargo negligently serviced Mayotte's loan, in all the ways described in this complaint, including but not limited to the following:

A.  Providing inaccurate information;

B.  Losing documents sent by Mayotte;

C.  Failing to properly communicate the risks of seeking a modification to Mayotte;

22

D.  Failing to properly staff its customer service units;

E.  Failing to obtain software and hardware that would allow it to effectively deal with the high volume of customers requesting modifications;

F.  Failing to implement HAMP appropriately;

G.  Failing to provide timely communications regarding modification decisions;

H.  Initiating foreclosure despite the existence of a permanent modification;

I.  Initiating foreclosure despite the lack of requisite documents;

J.  Failing to respond to requests by Mayotte for information, including information regarding how much was owed and to whom it was owed.

K.  Seeking an amount in excess of the amount owed.

L.  Reporting Mayotte as in default on her credit.

M.  Failing to send the permanent modification documents required in the written agreement with Mayotte.

N.  Servicing a loan and threatening foreclosure when U.S. Bank had no recorded security interest in the property.

142.      The negligence of Wells Fargo, who acted at all times on behalf of U.S. Bank, was an ongoing and continuing unbroken chain of acts that resulted in an illegal foreclosure.

143.      Mayotte acted in good faith to attempt to resolve the dispute with Wells Fargo before filing a lawsuit. She did so because Wells Fargo repeatedly asserted it would work on the issue and solve the problems it had created.

144.      The negligence of Wells Fargo caused or contributed to cause Mayotte significant harm, including physical, emotional and financial harm.

145.     The acts of Wells Fargo, and through principles of agency US Bank, were carried out with reckless disregard for Mayotte's well-being, and were carried out with full knowledge of the harm they would cause.

146.     The acts of Wells Fargo, and through principles of agency US Bank, were carried out with evil intent and after an affirmative decision to value profit over performing all responsibilities with ordinary care.

WHEREFORE Plaintiff prays this Court enter an order awarding compensatory damages, punitive damages, and such other and further relief this Court deems proper.

## CLAIM II
### Negligence Supervision and Hiring against US Bank

147.     Excluding the claims in Count I, Plaintiff incorporates all preceding allegations by reference as if fully set forth herein.

148.     US Bank owed Mayotte a duty of ordinary care to hire and supervise a competent servicer.

149.     Wells Fargo is one of the worst servicers in the United States. It has committed hundreds of thousands of serious errors in servicing.

150.     US Bank's decision to hire an utterly incompetent servicer was negligent.

151.     US Bank's failure to supervise Wells Fargo's servicing efforts, even after there was substantial evidence Wells Fargo was failing at its only job, was negligent.

152.     U.S. Bank's decision to retain Wells Fargo even after governmental audits and consent orders documented its failures was negligent.

153.     US Bank's negligence caused or contributed to cause Mayotte significant harm, including physical, emotional and financial harm.

154.     The acts of U.S. Bank were carried out with reckless disregard for Mayotte's well-being, and were carried out with full knowledge of the harm they would cause.

155.     The acts of U.S. Bank were carried out with evil intent and after an affirmative decision to value profit over performing all responsibilities with ordinary care.

WHEREFORE Plaintiff prays this Court enter an order awarding compensatory damages, punitive damages, and such other and further relief this Court deems proper.

## CLAIM III
### Violations of the Colorado Consumer Protection Act against Wells Fargo and U.S. Bank

156.     Excluding the claims in Count I and II, Plaintiff incorporates all preceding allegations by reference as if fully set forth herein.

157.     Wells Fargo, on behalf of U.S. Bank, engaged in a variety of unfair or deceptive practices, as described in this complaint. They include, but are not limited to:

A.  Representing that engaging in an attempt to modify the loan (loss mitigation) was likely to benefit Mayotte;

B.  Representing to Mayotte that withholding payments would assist her in obtaining a loan modification;

C.  Representing to Mayotte that withholding payments was a condition precedent to receiving a modification when in reality Wells Fargo had authority to modify loans even when payments were not withheld;

D.  Treating Mayotte as in default on her loan precisely because she followed Wells Fargo's advice and withheld payments;

E.  Failing to disclose to Mayotte that Wells Fargo's loss mitigation efforts routinely harmed, not helped, borrowers;

F.  Dual tracking;

G.  Initiating foreclosure when Wells Fargo did not have a good faith belief it had a legal right to foreclose;

H.  Failing to provide a single point of contact, and instead requiring Mayotte to talk with in excess of 70 separate individuals in an effort to modify her loan;

I.  Violating written promises to work with Mayotte to resolve disputes;

J.  Violating written promises to modify Mayotte's loan.

158.    Wells Fargo's actions, described herein, occurred in trade or commerce.

159.    Wells Fargo's actions impacted the public, as described in this complaint.

160.    Regarding public impact, Wells Fargo is a national servicer with national servicing guidelines. The practices described in this complaint applied to millions of homeowners, including at a minimum hundreds of thousands who sought modifications.

161.    Wells Fargo's actions during the same time it was dealing with Mayotte led to hundreds of lawsuits that made similar allegations.

162.    This complaint specifically identifies at least three other named individuals who suffered similar unfair and deceptive practices.

163.    Wells Fargo entered into a consent judgment to remedy the behaviors described herein. It failed to do so as late as 2015, meaning that Wells Fargo's actions harmed the public in the past and will continue to harm the public in the future.

164.     Wells Fargo's behavior led to lawsuits by dozens of attorney generals and audits and claims by the federal government, suggesting Wells Fargo's behaviors harmed the public.

165.     The acts of Wells Fargo caused harm to Mayotte's business, her property, and to her.

WHEREFORE Plaintiff prays this Court enter an order awarding: 1) actual damages, 2) treble damages, 3) attorney fees, 4) costs, and such other and further relief this Court deems appropriate.


## CLAIM IV
### Fraudulent Misrepresentation and Material Omissions against Wells Fargo

166.     Excluding the claims in Count I-III, Plaintiff incorporates all preceding allegations by reference as if fully set forth herein.

167.     Wells Fargo made a number of fraudulent misrepresentations, as described in this complaint, including but not limited to:

A.  Asserting through various customer service representatives beginning in 2007 and continuing through at least 2014 that loss mitigation efforts would benefit Mayotte;

B.  Stating in 2007 through customer service representatives that Mayotte would benefit from withholding three payments;

C.  Failing to disclose to Mayotte, despite actual knowledge of the same, that Wells Fargo's loss mitigation efforts were more likely than not going to cause harm to Mayotte;

D.  Stating repeatedly to Mayotte that making three trial period payments would qualify her for a permanent modification;

E.  Telling Mayotte that she did not have a permanent modification when in fact she did;

F.  Telling Mayotte as late as 2014 that Wells Fargo was working on the modification or otherwise seeking to avoid foreclosure, when in fact Wells Fargo was not.

168.     The statements above were made with knowledge of their falsity.

169.     The statements above were made with the intent that Mayotte rely on them.

170.     Mayotte reasonably relied on the statements, as she had no reason to believe, at the time the statements were made and she relied, that they were false.

171.     The statements above caused significant physical, emotional, and financial harm.

172.     The statements above were made intentionally.

WHEREFORE Mayotte seeks compensatory damages, punitive damages, and such other and further relief this Court deems appropriate.

### CLAIM V
**Negligent Misrepresentation**

173.     Excluding the claims in Count I-IV, Plaintiff incorporates all preceding allegations by reference as if fully set forth herein.

174.     Wells Fargo had a duty to be ordinarily careful in providing information to Mayotte.

175.     Wells Fargo made several negligent misrepresentations, as described in this complaint, including but not limited to:

A.  Asserting through various customer service representatives beginning in 2007 and continuing through at least 2014 that loss mitigation efforts would benefit Mayotte;

B.  Stating in 2007 through customer service representatives that Mayotte would benefit from withholding three payments;

C.  Failing to disclose to Mayotte, despite actual knowledge of the same, that Wells Fargo's loss mitigation efforts were more likely than not going to cause harm to Mayotte;

D.  Stating repeatedly to Mayotte that making three trial period payments would qualify her for a permanent modification;

E.  Telling Mayotte that she did not have a permanent modification when in fact she did;

F.  Telling Mayotte as late as 2014 that Wells Fargo was working on the modification or otherwise seeking to avoid foreclosure, when in fact Wells Fargo was not.

176.      The statements above were made negligently.

177.      Mayotte reasonably relied on the statements, as she had no reason to believe, at the time the statements were made and she relied, that they were false.

178.      The statements above caused significant physical, emotional, and financial harm.

179.      The statements above were made with reckless disregard to the well-being of Mayotte.

WHEREFORE Mayotte seeks compensatory damages, punitive damages, and such other and further relief this Court deems appropriate.

## CLAIM VI
### Breach of Contract against Wells Fargo and US Bank

180.      Excluding the claims in Count I-V, Plaintiff incorporates all preceding allegations by reference as if fully set forth herein.

181.     Wells Fargo acted on behalf of US Bank and had the authority to bind US Bank to contractual modifications.

182.     In 2007, Wells Fargo affirmatively stated to Mayotte that if she missed three payments and then made three payments, she would receive a permanent modification.

183.     Mayotte satisfied these conditions by missing three payments and then making three under a Home Affordable Modification Agreement.

184.     Again in 2010, Mayotte made seven payments when only three were required.

185.     And again in 2011, Mayotte made three payments as required.

186.     Each and every time that Wells Fargo told Mayotte to miss or make a payment, she did. Yet, Wells Fargo asserts now that Mayotte is in default.

187.     Mayotte had no change in her qualification for the permanent modification during the time she made trial period payments.

188.     Wells Fargo did not reject the payments or indicate that Mayotte failed to meet the requirements of the trial period plan.

189.     Wells Fargo's retention of the subject property at this time constitutes a material breach of its agreement with Mayotte.

190.     Wells Fargo's offer to modify the loan on multiple occasions, if Mayotte missed three payments, and made three payments, was accepted by Mayotte by complying with the terms.

191.     Wells Fargo further ratified the permanent modification by payments after the trial period payment.

192.     Acceptance of the modified payment amount, well past any trial period, was affirmative evidence of the contract.

193.    The agreement did not need to be in writing, as the behavior by both parties meets exceptions to the statute of frauds, including detrimental reliance, promissory estoppel, and avoiding allowing the statute of frauds to work an unjust result.

194.    Wells Fargo's final breach of the contract occurred when it foreclosed on Mayotte's home.

195.    The contract between Mayotte and the lender contained an implied duty of good faith and fair dealing.

196.    Wells Fargo repeatedly breached the duty.  Even now, as it is informed of the behavior of its employees, and even though Wells Fargo knows that it has engaged in similar issues in the past and even though it was found in 2015 to continue to have servicing issues, it continues to attempt to throw Mayotte's claim out and take her home.

197.    And throughout its interactions with Mayotte, it has failed to act in good faith.  It repeatedly refused to acknowledge Mayotte's documentation, it provided inaccurate information, it failed to respond to requests for information, it told Mayotte it was working to help her while it simultaneously moved her loan towards foreclosure, and it failed to provide a single point of contact, instead requiring Mayotte to speak to roughly 70 different people who provided wildly inconsistent information.

WHEREFORE Mayotte seeks compensatory damages, punitive damages, specific performance, and such other and further relief this Court deems appropriate.

## CLAIM VII
### Violations of the Fair Debt Collection Practices Act (FDCPA) against Wells Fargo

198.    Excluding the claims in Count I-VI, Plaintiff incorporates all preceding allegations by reference as if fully set forth herein.

199.    Mayotte is a consumer as defined under 15 U.S.C. § 1692a.

200.    Wells Fargo is a debt collector as defined under 15 U.S.C. § 1692a in that regularly collects the debts of another and was doing so in this case.

201.    Wells Fargo collected and continues to collect a debt as defined under 15 U.S.C. § 1692a.

202.    In violation of 15 U.S.C. § 1692e, Wells Fargo repeatedly used misleading means to attempt to collect the alleged debt owed by Mayotte.  These acts continue today. They include but are not limited to stating Mayotte was in default when she was not and withhold payment at Wells Fargo's instruction, using the threat of foreclosure to attempt to extort late fees and penalties that were not owed, and continuing to attempt to foreclose despite evidence that Wells Fargo caused the alleged default in this case.

203.    Wells Fargo attempted to collect the total amount allegedly owed as late as 2015.

204.    In violation of 15 U.S.C. § 1692g, Wells Fargo repeatedly failed to provide the amount of the debt owed and to whom it was owed. This occurred even when Mayotte sent a written request that required response under federal law.

205.    In addition, in violation of 15 U.S.C. § 1692g, Wells Fargo did not provide a fixed amount of the debt, instead the amount changed constantly and letters often indicated Mayotte had to contact Wells Fargo for the actual amount owed.

206.    The violations described above caused significant physical, emotional and financial harm to Mayotte.

WHEREFORE Mayotte seeks actual damages, statutory damages, attorney fees, costs, punitive damages, and such other and further relief this Court deems appropriate.

## CLAIM VIII
### Violations of the Fair Credit Reporting Act (FCRA) against Wells Fargo

207.　　Excluding the claims in Count I-VII, Plaintiff incorporates all preceding allegations by reference as if fully set forth herein.

208.　　Wells Fargo is a furnisher of credit information.

209.　　Wells Fargo violated 15 U.S.C.A. § 1681s-2 by providing and continuing to provide information that it knew or should have known is inaccurate.

210.　　Specifically, it reported and continues to report that Mayotte is in default, despite the fact that it induced the initial alleged default and then breached a new modified contract.

211.　　At present, Wells Fargo also reports the foreclosure inaccurately and illegally.

212.　　The reporting of false information to the major three credit reporting agencies damaged and continues to damage Mayotte's credit, which in turn damages her emotionally and financially.

WHEREFORE Mayotte seeks actual damages, statutory damages, attorney fees, costs, and such other and further relief this Court deems appropriate.

## CLAIM IX
### Declaratory Judgment

213.　　A real and present controversy exists between Mayotte, Wells Fargo, and US Bank.

214.　　Mayotte asserts that US Bank and Wells Fargo, for the reasons described in this Complaint, had no legal right to foreclose, and that the foreclosure that occurred is void, or in the alternative, voidable.

33

215.    US Bank and Wells Fargo assert that foreclosure was valid and that Mayotte is no longer the owner of the subject property.

216.    The issue is ripe and requires judicial determination.

217.    The Rule 120 hearing did not conclusively determine the legal status of any party.

218.    The foreclosure that occurred is non-judicial. There has been no judicial determination of the rights of the parties or review of the complex facts alleged in this complaint.

219.    The ultimate right to foreclose, the amount owed by Mayotte, whether a contract existed that was breached, and whether the entities that foreclosed had a legal right to foreclose have never been adjudicated.

220.    Mayotte affirmatively asks this Court to declare the rights of the parties, including a declaration that the foreclosure was void because Mayotte was not in default at the time of foreclosure, and for the court to determine who is secured regarding the subject property, how much is owed, and to whom Mayotte owes any remaining amounts.

## CLAIM X
### Unjust Enrichment against Wells Fargo and U.S. Bank

221.    With the exception of the claims for relief, Mayotte incorporates by reference all the allegations in this complaint.

222.    Wells Fargo and U.S. Bank received a benefit from Mayotte, including payments that were not credited and the equity in Mayotte's home that U.S. Bank now purports to own.

223.     Wells Fargo and U.S. Bank knew and know that it is unfair and unjust to retain the benefit.

224.     It is in fact unfair and unjust for Wells Fargo and U.S. Bank to retain the benefits described.

WHEREFORE Mayotte asks this Court to order that Wells Fargo and U.S. Bank disgorge all unjust benefits conferred by Mayotte to Wells Fargo or U.S. Bank.

## CLAIM XI
### Accounting

225.     Mayotte seeks an accounting of any amounts owed to any party in this case.

226.     As described herein, there is significant controversy regarding how much is owed, how Mayotte's payments were credited, and who has a right to any payments.   Because an action in accounting is equitable and flexible, Mayotte requests an accounting to resolve any remaining questions regarding payment in this matter.

## JURY TRIAL DEMAND

227.     Plaintiff demands a trial by jury on all issues so triable.

**Respectfully Submitted: April 13, 2018**

**Campbell Law LLC**

/s/ John Campbell
John Campbell
3407 S. Jefferson Street
St. Louis, MO 63118
john@campbelllawllc.com
314-249-2500

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 13, 2018, a true and accurate copy of this document was filed

electronically, to be distributed to all parties of record via the Court's electronic filing system.

John Campbell