IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLORADO

| | |
|---|---|
| MARY MAYOTTE, | |
| Plaintiff, | Civil Action No: 14-cv-3092-RBJ-CBS |
| v. | |
| US BANK N.A., | |
| & | |
| WELLS FARGO BANK N.A., | |
| Defendants. | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AGAINST WELLS FARGO**

*"It looks to me like Wells made some big mistakes. They incentivized the wrong behavior. I've seen that in a lot of places. When you find a problem, you have to do something about it."*
-Warren Buffett-

**I. Introduction**

After a decade of suggesting that Mary Mayotte was unwilling to pay and was a deadbeat homeowner, Wells Fargo has finally had to produce discovery. That discovery reveals that for the last ten years, Wells Fargo asserted Mayotte was in default, when in reality, Wells Fargo rejected her attempt to pay, promised modified loan terms, and then reneged on its promise. Wells Fargo's own call notes support Mayotte's assertion that she attempted to pay, was told to withhold payment, and then was put in foreclosure for following Wells Fargo's advice. And discovery also reveals that Wells Fargo misrepresented this fact to this Court, the state court (in four separate actions) and in

1

response to a formal inquiry by Senator Bennet. Discovery also shows a host of other illegal acts, including dual tracking (promising to modify a loan while simultaneously attempting to foreclose), stating Mayotte had not provided information for a modification when in reality it was in Wells Fargo's possession, mailing requests for information to the wrong person (in the wrong state) then asserting Mayotte failed to respond, and relying on a note that is endorsed in blank without a date, which Wells Fargo now admits might have been fraudulently endorsed.

Given all of this undisputed, written evidence, there is no need for a jury trial on liability. It is disappointing that Wells Fargo still has not acknowledged its misrepresentations, but they occurred, they are undisputed, and they are illegal.

As such, Plaintiff asks this Court to grant summary judgment in her favor and for a summary judgment order from this Court holding:

1) Wells Fargo fraudulently concealed its knowledge of the truth and veracity of Ms. Mayotte's claim that Wells Fargo had instructed her to withhold payment;

2) Wells Fargo continued pursuing foreclosure and eviction against Ms. Mayotte without ever revealing the fact that the default it was pursuing was caused by Wells Fargo;

3) Wells Fargo withheld information about its systemic failures as a servicer, which are now documented by the United States government;

4) Wells Fargo was negligent in its servicing of Ms. Mayotte's loan, and this negligence caused Ms. Mayotte harm;

5) Wells Fargo has violated multiple provisions of the Colorado Consumer Protection Act; and

6) Wells Fargo negligently misrepresented that withholding 3 payments would benefit Ms. Mayotte in her loan, which is the start of this dispute.

## II. Statement of Undisputed Material Facts

### A) Wells Fargo Has Been Concealing the Evidence of its Own Malfeasance.

1) On September 2, 2008, Wells Fargo told Ms. Mayotte to withhold payment on her Note in order to use the funds for an initial down payment for a modification. *Exhibit E*, 1711.

```
COL    09/02/08   MV6         BORROWER TO GATHER FINACIALS AND GIVE US A CALL BAC
                              K WANTS TO MAKE A PYMT ADVISED TO HOLD ON TO IT AND
                              USE AS INTIAL DOWN PYMT.
```

2) Ms. Mayotte withheld payment because Wells Fargo told her to. *Exhibit LL*, WF1336, *Exhibit N*, WF813, *Exhibit O*, WF815, *Exhibit KK*, WF1082-1083.

3) By September 28, 2008, Wells Fargo put her into foreclosure. *Exhibit E*, 1711.

4) A Rule 120 was filed in Colorado and it was suspended for parties to work out a modification. *Exhibit B*, WF2969 and WF3151.

5) Wells Fargo did not disclose the call note and waiver of payment in the Rule 120 hearings, but indicated the default was due to non-payment by Ms. Mayotte. *Exhibit B*, WF3147.

*6)* Wells Fargo did not disclose the call note and waiver of payment to any court of law. *Exhibit D.*

7) Wells Fargo opposed any discovery in the eviction proceedings concerning Ms. Mayotte in order to continue to conceal the call note and waiver of payment. *Exhibit D,* 26-29.

8) Wells Fargo did not disclose the call note and waiver of payment to Senator Bennet's office during his investigation of the matter, and despite the fact that Ms. Mayotte made that the basis for her inquiry. *Exhibit B*, WF2969.

9) Ms. Mayotte indicated to Wells Fargo throughout her interactions that Wells Fargo instructed her to withhold payment, highlighting this issue further. *Exhibit LL*, WF1336, *Exhibit N*, WF813, *Exhibit O*, WF815, *Exhibit KK*, WF1082-1083.

### B) Ms. Mayotte Makes Payments and Does What Wells Fargo Tells Her.

10) Ms. Mayotte has been consistent in stating that Wells Fargo told her she had to miss 3 payments in order to be considered for a loan modification. *Exhibit LL*, WF1336, *Exhibit N*, WF813, *Exhibit O*, WF815, *Exhibit KK*, WF1082-1083.

11) Ms. Mayotte missed July and August 2008 payments and called in September 2008, to make payment in exchange for a loan modification; at that time, she was told to hold on to her payment for an initial down payment. *Exhibit B*, WF2986, *Exhibit E*, 1711, *Exhibit LL*, WF1336, *Exhibit N*, WF813, *Exhibit O*, WF815, *Exhibit KK*, WF1082-1083.

12) It wasn't until August 23, 2009, and after attempted foreclosure proceedings, that Wells Fargo mailed out two letters regarding the governmental Home Affordable Modification Program ("HAMP"). *Exhibit A*.

13) One letter indicated that all Ms. Mayotte had to do was fill out the hardship affidavit and then make 3 Trial Period Payments ("TPP") of $2931.08 in October, November, and December 2009. *Exhibit A*, WF1054-1062.

14) The other letter sent by Wells Fargo on August 23, 2009, stated: "You did it! By entering into a Home Affordable Modification Trial Period Plan you have taken the first step toward making your payment more affordable." *Exhibit A*, WF1063.

15) That letter also included a "Pass" form showing the workout of the modification and demonstrated how Ms. Mayotte qualified. *Exhibit A*, WF1064.

16) Ms. Mayotte made all three payments timely. *Exhibit B*, WF 2988-2989.

17) Ms. Mayotte signed and returned the HAMP modification agreement, but Wells Fargo maintained no copy of it in its records. *Exhibit P*.

18) The TPP was to become permanent at the end of December 2009. *Exhibit A.*

19) Wells Fargo admits that Ms. Mayotte submitted all required documentation for the HAMP modification. *Exhibit F*, Page 174, Lines 13-19.

20) In fact, Wells Fargo had all of the necessary documentation from Ms. Mayotte in January 2010; however, Wells Fargo did not process her HAMP modification until March 2010, three months after the expiration of the TPP. *Exhibit K*, 2913 and *Exhibit KK*, WF002-003.

21) During that time, Wells Fargo also sent notices regarding the documentation that it needed for the HAMP modification, but these letters were sent to David Blaustein in Florida. *Exhibit KK,* WF1077-1078.

22) Despite the expiration of the TPP, Wells Fargo continued to collect payments from Ms. Mayotte in the amount of $2931.08, but without ever disclosing that Wells Fargo, was treating each of those payments as insufficient payments, and was also charging her fees for failing to make the original mortgage payment amount. *Exhibit B*, WF 2988-2989 and *Exhibit F*, Page 194, Lines 6-19.

23) Ms. Mayotte made the TPP payment in January 2010 and February 2010, past the TPP deadline. *Exhibit B*, WF 2988-2989.

24) In March 2010, Ms. Mayotte withheld payment of the TPP because no one from Wells Fargo would call her back or answer any of her questions about the modification. *Exhibit KK*, WF1082-1083.

25) However ultimately, Wells Fargo then denied Ms. Mayotte's HAMP modification in March 2010. *Exhibit B*, WF2970.

26) In March 2010, Ms. Mayotte became aware that she did not "qualify" for a HAMP modification. *Exhibit B*, WF2970.

27) No modification was given to Ms. Mayotte in 2009. *Exhibit B*, WF2970.

28) In late March 2010, Ms. Mayotte was then given a forbearance agreement. Under its terms, her monthly payments were the same amount as the TPP. *Exhibit KK*, WF1086-0001.

29) Ms. Mayotte paid Wells Fargo in April 2010, May 2010, June 2010, July 2010, August 2010, September 2010, and October 2010. *Exhibit B*, WF 2988-2989.

30) In November 2010, Wells Fargo sent Ms. Mayotte another forbearance agreement that slightly decreased the monthly payments. *Exhibit KK*, WF1131-1133.

31) In the meantime, Wells Fargo began another modification review. *Exihibit KK*, WF1099-1120.

32) Ms. Mayotte paid Wells Fargo in November 2010 and December 2010. *Exhibit B*, WF 2988-2989.

In December 2010, Ms. Mayotte was denied another loan modification, as a result of a denial by the pooling and servicing insurance carrier. *Exhibit C*, WF2935.

33) The reasoning given by the insurance carrier was:

> PMI acknowledges the request for a Loan Modification in connection with the above referenced Loan.
> After careful consideration, PMI is denying the request for the following reason(s):
> 1. Insufficient Information
> 2. Proposed terms of loan mod do not create pymt affordability

*Exhibit C*, WF2935.

34) In 2010, Ms. Mayotte was not provided a loan modification. *Exhibit KK*, WF1096-1097 and *Exhibit KK,* WF1145-1150.

### C) Wells Fargo Is a Negligent Servicer.

#### 1) Wells Fargo Owes Duties as Servicer.

35) Wells Fargo admitted that a Servicer owes a duty to keep accurate records and that all records that made it into our system are made on the standard -- at or near the time of business by the person with the most knowledge. *Exhibit F*, Page 14, Lines 15-19.

36) Wells Fargo admitted that its duty is to initiate and carry out foreclosure when it's appropriate, making sure to comply with all laws and having the accurate and complete documentation to proceed with a foreclosure.  *Exhibit F*, Page 21, Lines 4-9.

37) Wells Fargo admitted that a Wells Fargo employee should notate an event or call in the system right after the event has occurred. *Exhibit F*, Page 124:23-125:3.

38) Ms. Mayotte's expert Jim McNulty, who is the only expert in this case, stated that servicers, like Wells Fargo, owe borrowers the following duties:

   a. Keep accurate records;

   b. Maintain access to and knowledge of all essential documents, including the promissory note and the deed;

   c. Provide accurate, timely information to borrowers in a way that borrowers can understand;

   d. Communicate directly with the borrower via a person who is qualified to consider borrower questions, concerns, and requests;

   e. Accept and review modification requests in a timely, efficient manner; Receive and maintain copies of documents from borrowers;

      f. Provide clear decisions on requested loan modifications;

      g. Provide clear accounting to a borrower of how payments were applied and the current outstanding amounts; and

      h. Initiate and carry out foreclosure when appropriate, complying with all laws and relying upon accurate information and the required documentation.

*Exhibit G*, 6-7.

39) The risk of harm by Wells Fargo's practices put people at risk in that "in some parts of the bank short-term profits are more important than the welfare of the communities WF serves. It should be obvious to virtually any educated person that communities are damaged significantly by high levels of foreclosures." *Exhibit G*, 8.

40) Wells Fargo has signed consent orders indicating that their practices were negligent in that Wells Fargo was:

      a. Initiating and litigating non-judicial foreclosure proceedings without ensuring that promissory notes and mortgage documents were properly assigned and in the possession of the appropriate party at the appropriate time;

      b. Failing to devote sufficient financial, staffing and managerial resources to ensure proper administration of foreclosure processes;

      c. Failing to devote adequate resources, internal controls, policies and procedures, compliance risk management, internal audit, third-party management and training to foreclosure processes;

*Exhibit G*, 9.

### *2) Wells Fargo Failed to Perform These Duties*

41) All Wells Fargo Home Mortgage employees have access to the MSP system which houses the loan information, including call notes. *Exhibit F*, Page 45, Lines 5-14.

42) There are different departments at Wells Fargo, but the office of the president does not involve the president in any way but is only a title for the department. *Exhibit F*, Page 109:1-110:13.

43) America Servicing Company is on many documents in this file but is still Wells Fargo; American Servicing Company is essentially a d/b/a that Wells Fargo uses for certain investors that didn't want the name Wells Fargo associated with their loans. *Exhibit F*, Page 169, Lines 4-10.

44) The original note boarded by Wells Fargo was unendorsed, but Wells Fargo continued to service without evidence of a right to. *Exhibit H.*

45) The first endorsed note does not appear in the file until September 18, 2008 and is a stamped endorsement in blank; Wells Fargo has testified that it can not be certain that it did not stamp the Note itself. *Exhibit I* and *Exhibit F*, Page 96, Lines 5-18.

46) Wells Fargo sent numerous letters with inaccuracies. For example, in November 2010, Wells Fargo sent a letter to Ms. Mayotte indicating that they had received no payments since December 1, 2008, despite the fact that Ms. Mayotte had been paying what Wells Fargo told her since September 2009, and had not credited her in any way for the waiver of payments in 2008.  *Exhibit KK*, WF002-003.

47) Another example is that on December 27, 2010, Wells Fargo sent Ms. Mayotte a letter indicating that she did not qualify for a loan modification because:

> Unfortunately, after carefully reviewing the information you've provided, we are unable to adjust the terms of your mortgage.
>   This decision was made because you did not meet certain requirements and we were unable to get you to a modified payment amount that you could afford. For those reasons, you have not been approved for a mortgage loan modification.

*Exhibit KK,* WF1145-1147.

48) Another example is that on December 30, 2010, Ms. Mayotte received a letter from Wells Fargo which stated that:

> **Here's what we found**
> We carefully reviewed the information you sent us and explored a number of mortgage assistance options. At this time, you are not eligible because:
>
> You have not been approved for a mortgage loan modification because we were unable to get you to a modified payment amount that you could afford per the investor guidelines on your mortgage.

*Exhibit KK*, WF1148-1150.

49) On December 27, 2010, the investor gave the following reason for denying the loan modification, which are different from the reasons provided to Ms. Mayotte in its denial letters:

> PMI acknowledges the request for a Loan Modification in connection with the above referenced Loan.
> After careful consideration, PMI is denying the request for the following reason(s):
>   1. Insufficient Information
>   2. Proposed terms of loan mod do not create pymt affordability

*Exhibit C*, WF2935.

50) However, the letters of December 27, 2010, or December 30, 2010, the reasons from the investors are not in line with what the investor said – namely, that there was insufficient information provided to the investor; moreover, it is not clear why there are 2 different letters being mailed out regarding the loan modification. *Exhibit KK,* WF1145-1150, and *Exhibit C*, WF2935.

10

51) Wells Fargo also engaged in dual tracking – meaning that Wells Fargo was ostensibly working with Ms. Mayotte on "work out" options on her Note, while simultaneously putting her in foreclosure. *Exhibit B*, WF2968.

52) After receiving an inquiry from Senator Michael Bennet, which included Ms. Mayotte's rendition of facts, where she also explains that she was told to default by Wells Fargo, Wells Fargo seemingly conducted an investigation into the situation. *Exhibit B*.

53) However, even in the investigative file used to construct the response to Senator Bennet, a note for a borrower in New York was included as proof that Ms. Mayotte was indebted on the obligation; none of Ms. Mayotte's notes were included in the investigative file. *Exhibit B*, WF3154-3156.

54) Moreover, Wells Fargo received a copy of Ms. Mayotte's response to a Rule 120 hearing wherein Ms. Mayotte again states that Wells Fargo told her not to pay in order to get a loan modification. *Exhibit B*, WF2957-2958.

55) In reviewing the Senator Bennet inquiry, Wells Fargo sought 3 extensions and then finally sent a letter recounting the situation. *Exhibit B*, WF2959-2967, 2968-2973.

56) That letter to Senator Bennet recounts the loan history and includes reference to the foreclosure proceedings being started on September 28, 2008, but does **NOT** mention the waiver call note where Ms. Mayotte was told not to pay, even though that documentation was in the investigative file. *Exhibit B*, WF2969 and WF3037.

57) Ms. Mayotte has inexplicably been mailed correspondence and the Note of Marie Ireland from Wells Fargo despite Wells Fargo having a duty to keep accurate records. . *Exhibit J*.

58) Ms Mayotte has inexplicably been sent correspondence meant for Jeffrey Dessum from Wells Fargo despite Wells Fargo having a duty to keep accurate records. *Exhibit JJ.*

59) Wells Fargo has been sued and has entered into consent decrees for its bad behavior as a servicer. *Exhibit G*, Appendix.

### *C) Ms. Mayotte Has Been Damaged.*

60) Ms. Mayotte has suffered injury. *Exhibit D*, 15-16.

### III.  Argument

#### A)-*The standard of review applied to motions for summary judgment.*

As the moving party, Ms. Mayotte has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once that burden has been met, the nonmoving party, Wells Fargo, must come forward and establish specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). "Although a party moving for summary judgment has the burden of demonstrating the absence of any genuine issue of material fact, a nonmoving party may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Rose-Matson v. NME Hospitals, Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998).

#### B) - *Wells Fargo Has Engaged in a Pattern and Practice of Fraudulent Concealment of the Facts of this Case.*

##### *1) – Wells Fargo Has Been Hiding Evidence of Ms. Mayotte's Story.*

In discovery in this case, Plaintiff has uncovered the call note which confirms what Ms. Mayotte has been saying – that Wells Fargo instructed her to withhold payment in exchange for a modification – and that Ms. Mayotte was told by Wells Fargo in September 3, 2008, to not pay her mortgage.

```
COL   09/02/08   MV6         BORROWER TO GATHER FINACIALS AND GIVE US A CALL BAC
                             K WANTS TO MAKE A PYMT ADVISED TO HOLD ON TO IT AND
                             USE AS INTIAL DOWN PYMT.
```

Despite this waiver, by September 28, 2008, Wells Fargo had put Ms. Mayotte in foreclosure. *Exhibit E,* 1711.

By early 2009, Ms. Mayotte found herself at a Rule 120 hearing, where Wells Fargo represented to a Colorado county court, that Ms. Mayotte was in default. *Exhibit B*, WF2969 and WF3151. At no time, did Wells Fargo offer information regarding the fact that it had waived payment. It never disclosed this call note to Ms. Mayotte or to the Court. In fact, Wells Fargo has not disclosed this proof of waiver to anyone, including a congressional inquiry from Senator Bennet's office. *Exhibit B*, WF2969 and WF3037.  It has simply proceeded to foreclose and evict Ms. Mayotte by claiming that default was her problem alone.

But this fact has been open and obvious to Wells Fargo since September 2008. Wells Fargo has admitted that call notes are to be entered in the system as soon as they occur. *Exhibit F*, Page 14, Lines 15-19 and *Exhibit F*, Page 124:23-125:3. Wells Fargo has also admitted that these records can be reviewed at any time by any Wells Fargo Home Mortgage employee. *Exhibit F*, Page 45, Lines 5-14.  There is no explanation that makes clear why this call note was never disclosed or why Ms. Mayotte was constantly accused of being in default, despite evidence in Wells Fargo's possession that demonstrated the opposite. *Exhibit LL*, WF1336, *Exhibit N*, WF813, *Exhibit O*, WF815, *Exhibit KK*, WF1082-1083.

As a result of this concealment, Ms. Mayotte has suffered damages for which she seeks redress, including the illegal foreclosure of and eviction from her home based on known mistruths by Wells Fargo. *Exhibit D*.

### C) - *Wells Fargo Is a Negligent Servicer.*

Colorado has specified that the elements of a negligence claim are: "…a duty owed by the defendant to the plaintiff, a breach of that duty, injury to the plaintiff, and a proximate cause relationship between the breach and the injury. The standard of care that must be met in order to satisfy a recognized duty and thereby avoid breach is that of reasonable care in light of the apparent risk." *Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo. 1992)(internal citations omitted).

When a court is determining whether a duty exists, a court must consider many factors, including "the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden upon the actor. The foregoing list of factors is not exclusive, no single factor controls, and the question of whether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards—whether reasonable persons would recognize a duty and agree that it exists." *Id.* Moreover, "[w]here damage is to be foreseen, there is a duty to act so as to avoid it. *Metro. Gas Repair Serv., Inc. v. Kulik*, 621 P.2d 313, 317–18 (Colo. 1980). "However, the issue of negligence presents a question of law in only the clearest of cases and should normally be reserved for the jury unless the facts are undisputed, and it is plain that reasonable persons can draw but one inference from them." *Id.* (internal citations and quotations omitted).

It is clear that Wells Fargo had a legal duty to Mary Mayotte under the law. To start, Wells Fargo has admitted it had duties to Mayotte under the law. Specifically, Wells Fargo has admitted that a Servicer owes a duty to keep accurate records and that all records that made it into our system are made on the standard -- at or near the time of business by the person with the most knowledge. *Exhibit F*, Page 14, Lines 15-19. Wells Fargo has admitted that its duty is to initiate and carry out foreclosure when it's appropriate, making sure to comply with all laws and having the accurate and complete documentation to proceed with a foreclosure.   *Exhibit F*, Page 21, Lines 4-9. And Wells Fargo has admitted that a Wells Fargo employee should notate an event or call in the system right after the event has occurred. *Exhibit F*, Page 124:23-125:3.

Additionally, Ms. Mayotte's expert has indicated that Wells Fargo owed duties as well. He listed in his report, the duties that Wells Fargo owed in this case; Keep accurate records which include: a) process payments accurately and quickly; b)keep an accurate total of the amount paid and the amount owed; c) maintain access to and knowledge of all essential documents, including the promissory note and the deed; d) provide accurate, timely information to borrowers in a way that borrowers can understand; e) communicate directly with the borrower via a person who is qualified to consider borrower questions, concerns, and requests; f) accept and review modification requests in a timely, efficient manner; g) receive and maintain copies of documents from borrowers; h)provide clear decisions on requested loan modifications;  i) provide clear accounting to a borrower of how payments were applied and the current outstanding amounts; and j) initiate and carry out foreclosure when appropriate, complying with all laws and relying upon accurate information and the required documentation. *Exhibit G*, 6-7.

15

Unsurprisingly, the duties to which Wells Fargo admits, are duties that are included in Mr. McNulty's opinions and in his list of duties for Wells Fargo as a servicer. Certainly, this not only gives credence to Mr. McNulty, but highlights that in terms of a negligence analysis, the duty prong has been met.

Moreover, in contemplating the factors that this Court is to consider, with an eye towards fairness, it is clear and recognizable duty exists at law. The risk in this situation is great; namely the loss of a home illegally due to the bad acts of a servicer. Given that a woman's home is her castle, the law contemplates that a servicer would act appropriately prior to foreclosing on it, especially if a servicer like Wells Fargo has information in its possession that states that the default is a creation of its own making. It is not a difficult task for Wells Fargo to ensure that any step towards foreclosure against another's home is based on an actual default, rather than a bait and switch scheme.

Wells Fargo has breached these duties. Wells Fargo has failed to exercise reasonable care in failing to admit it waived payment, to genuinely consider her for a loan modification or provide her one after indicating it would, communicate with her about her modifications while simultaneously having her home in foreclosure (dual tracking)( *Exhibit B*, WF2968), send letters with conflicting and/or wrong information (*Exhibit KK*, WF002-003), take too long for evaluation of her TPP plan in order to deny her and force her to start over (*Exhibit K*, 2913), honestly inform Senator Bennet's office about the details of Ms. Mayotte's loan (*Exhibit B*, WF2969), and accurately represent her debt to courts (*Exhibit D)*.

Not only do these actions reflect a breach of duty to Ms. Mayotte, the Tenth Circuit has also commented that this type of behavior is in fact, negligent. In *Clark v. Green Tree Servicing LLC*, the Tenth Circuit engaged in an analysis of fraudulent misrepresentation, as

16

it related to a servicer's actions with regards to a Trial Period Payment under HAMP, which is the situation here. In its opinion, the Court stated:

> In this case, plaintiff's allegations do not rise above the level of negligence. Plaintiff alleges that defendant "failed to exercise reasonable care or competence," "failed to adequately obtain the borrowers' loan files," "failed to adequately review and communicate the information contained" in those loan files, and "failed to exercise reasonable care in determining whether the borrowers had already been approved for TPPs." *Id.* These allegations evoke the standard for negligence. *See Ebrahimi,* 794 P.2d at 1017 (discussing the tort of negligent misrepresentation). They do not plausibly allege that defendant acted with reckless disregard or conscious indifference to plaintiff's HAMP status. *Clark v. Green Tree Servicing LLC*, 69 F. Supp. 3d 1203, 1223–24 (D. Colo. 2014)(internal citations omitted).

What is clear from the facts of this case is that Wells Fargo has engaged in the behavior that the *Clark* Court indicated unequivocally was negligent.

As if that wasn't enough, Colorado has also recognized that a negligence claim exists when only representations that are negligent. The Colorado Court of Appeals indicated that, "[t]his court first recognized the tort of negligent misrepresentation in *First National Bank v. Collins,* 44 Colo. App. 228, 616 P.2d 154 (1980), and adopted the description of that tort set forth in Restatement (Second) of Torts § 552. That Restatement provision states:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. *Ebrahimi v. E.F. Hutton & Co.*, 794 P.2d 1015, 1017 (Colo. App. 1989).

Further, "[t]he defendant's state of mind is irrelevant to a claim for negligent misrepresentation, except to the extent that it must be shown that the defendant failed to act reasonably in ascertaining the accuracy of the information supplied or in communicating that information. Thus, in such a case, the defendant may have had an

17

honest intention, but simply failed to exercise reasonable care." *Ebrahimi v. E.F. Hutton & Co.*, 794 P.2d 1015, 1017 (Colo. App. 1989).

In this matter, Wells Fargo misrepresented to Ms. Mayotte that missing payments would result in a loan modification. Not only do we have Ms. Mayotte's behavior – i.e., missing July, and August, 2008 payments based on representations that being in default would result in a modification – but we also have Ms. Mayotte calling in to Wells Fargo to get that modification and being told to not pay so that the initial down payment for a modification could be had. Given the totality of this file, with Wells Fargo's many misrepresentations and missteps, it is impossible to understand how Wells Fargo has any credibility at all.

### *D)- Wells Fargo's Actions As Servicer Violate the Colorado Consumer Protection Act.*

"A primary purpose of the CCPA is to deter and punish deceptive trade practices. *Hall v. Walter*, 969 P.2d 224, 231–32 (Colo. 1998)(internal citations and quotations omitted). In fact, private action is an important function of "police power" and this "police power" relates to "public Financial safety". *People ex rel. Dunbar v. Gym of Am., Inc.*, 177 Colo. 97, 112, 493 P.2d 660, 667 (1972)(internal citations and quotations omitted). In fact, the CCPA works "to protect the public from financial loss, and to abate evils which are deemed to arise from the pursuit of business." *Id*. Additionally, "[t]he Tenth Circuit has held that 'false representation' within the context of the CCPA must either induce a party to act, refrain from acting, or have the capacity or tendency to attract consumers." *HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.*, 805 F. Supp. 2d 1115, 1120 (D. Colo. 2011)(internal quotations omitted).

In order to prove a cause of action under the CCPA, a plaintiff must show: "(1) the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered the injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury. All elements of a CCPA claim must be met; otherwise, the claim fails as a matter of law. If a plaintiff can prove each of the elements, the remedies available include injunctive relief, civil penalties including treble damages, and attorney fees." *Id*

Here, Wells Fargo has acted deceptively and unfairly in its role as servicer. It has failed to admit that it waived payment on the loan for the last ten years. Wells Fargo has also been deceptive in its representations to Senator Michael Bennet and courts of law (*Exhibits B & D*). Wells Fargo has been unfair to Ms. Mayotte, continuously providing wrong information and wrong documents (*Exhibit KK*, WF002-003 and *Exhibit K*, 2913), while holding foreclosure and subsequently, eviction over her head (*Exhibit D*). As a result of these actions, Ms. Mayotte has been injured.

Moreover, Ms. Mayotte is not the first borrower to suggest that Wells Fargo is deceptive and unfair. Ms. Mayotte points to the consent decrees between Wells Fargo and the government for its actions as a servicer, as well as references through her expert, hundreds of lawsuits, wherein Wells Fargo is being sued for similar deceptive servicing behavior. Given these sources, the public impact prong is met. To be clear, in Colorado, lawsuits filed against Wells Fargo, and governmental action against Wells Fargo is

19

sufficient in demonstrating public impact. *McNees v. Ocwen Loan Servicing, LLC*, WL 1762947, at 6 (D. Colo. Apr. 22, 2019).

As such, Plaintiff has demonstrated that with evidence, there is no genuine dispute of fact with regards to the CCPA. Accordingly, summary judgment should be granted on this point.

### *IV. Conclusion*

For the reasons stated above, Ms. Mayotte requests this Court grant summary judgment, and schedule trial only for the damages in this case.

Respectfully Submitted,

*CAMPBELL LAW LLC*

*/s/ Alicia Campbell*
Alicia Campbell   MO 59586
3407 Jefferson Avenue
St. Louis, MO 63118
P: 888.588.5043   F: 314.588.9188
alicia@campbelllawllc.com

**CERTIFICATE OF SERVICE**

This is to certify that on June 17, 2019, a true and correct copy of the above and foregoing document has been served the on counsel for Defendant via the EM/ECF filing system.

*/s/ Alicia Campbell*