IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 1:14-cv-03092-RBJ

MARY M. MAYOTTE,

      Plaintiff,

v.

US BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR STRUCTURED ASSET
INVESTMENT LOAN TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES
2006-4; and WELLS FARGO BANK N.A.,

      Defendants.

---

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

---

This matter is before the Court on plaintiff's motion for summary judgment against Wells
Fargo Bank, N.A. ("Wells Fargo") [ECF No. 134]; plaintiff's motion for summary judgment
against U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust
Mortgage Pass Through Certificates, Series 2006-4 ("U.S. Bank") [ECF No. 138]; and
defendants' joint motion for summary judgment against plaintiff [ECF No. 136]. For the reasons
stated herein, plaintiff's motion for summary judgment against Wells Fargo is denied, plaintiff's
motion for summary judgment against U.S. Bank is denied, and defendants' motion for summary
judgment is granted.

## I. BACKGROUND

The heart of this case is plaintiff Mary Mayotte's allegation that Wells Fargo, as an agent
of U.S. Bank, promised modified loan terms, rejected Ms. Mayotte's attempts to pay her existing
loan, and then reneged on its promise and foreclosed on her home. This series of unfortunate
events began over a decade ago and has been in and out of litigation for five years, including a

1

recent trip to the Tenth Circuit. *See Mayotte v. U.S. Bank Nat'l Ass'n for Structured Asset Inv. Loan Tr. Mortg. Pass-Through Certificates, Series 2006-4*, 880 F.3d 1169, 1170 (10th Cir. 2018).

The Facts

On February 13, 2006, Ms. Mayotte took out a $481,650 loan with New Century Mortgage Corp. *See* ECF No. 136 ¶ 1. Her obligation to repay the loan was documented in a promissory note and secured by a deed of trust on the property. *See* ECF No. 114 ¶¶ 21–22. New Century Mortgage Corp. subsequently assigned the loan to U.S. Bank. *See* ECF No. 136 ¶ 1. Wells Fargo began servicing the loan on June 1, 2006, doing business as America's Servicing Company ("ASC"). *See* ECF No. 136 ¶ 2.

In the summer of 2007, believing that the terms of the note she signed differed from what she had been told, Ms. Mayotte contacted Wells Fargo and informed a customer representative of her desire to modify the terms of the loan. *See* ECF No. 114 ¶¶ 22–25. The customer service representative told her that she had to miss three loan payments in order to qualify for a loan modification. *See id.* ¶ 25. The representative also told Ms. Mayotte that Wells Fargo "can't really work with [her] on any options unless [she is] in arrears on payments for three months," and that she "would be considered for a modification" if she missed the payments. *See* ECF No. 136 ¶¶ 3–4.

For a time she continued to make her payments, but by the summer of 2008 she had decided to follow Wells Fargo's advice and withhold the three payments. *See* ECF No. 114 ¶ 29. Thus, Ms. Mayotte purposefully missed both her July 2008 and August 2008 monthly loan payments. *See* ECF No. 134 ¶ 11. After missing these two payments, Ms. Mayotte called Wells Fargo on September 2, 2008 to discuss modification. *See id.* ¶ 8. Wells Fargo again advised her

"don't make the [September] payment" because "they would apply it as a down payment on a new loan." *See id.* In discovery, Wells Fargo produced a call note that a customer service representative created subsequent to this September 2, 2008 phone call. The call note acknowledged that Ms. Mayotte wanted to make a payment, but that the representative told her "to hold on to [sic] it and use as in[i]tial down [payment]." *Id.* at 2 n.1; ECF No. 136-6. Ms. Mayotte does not recall how long she was "supposed to hold onto the payment." ECF No. 136 ¶ 8. This call note was first disclosed during discovery in the instant case; it was not disclosed in the state court proceedings discussed below. *See* ECF No. 134 ¶ 6; ECF No. 142 ¶¶ 5–6.

On October 8, 2008 U.S. Bank's foreclosure lawyers advised Ms. Mayotte that they were retained to initiate foreclosure proceedings. *See* ECF No. 136 ¶ 9. Wells Fargo filed a Rule 120 proceeding in the District Court for Denver County, Colorado. *See* ECF No. 134 ¶ 4. Pursuant to the Colorado Rules of Civil Procedure, a Rule 120 proceeding requires creditors pursuing nonjudicial foreclosure to first obtain a ruling by a Colorado trial court that there is a reasonable probability that a default exists. C.R.C.P. 120. On October 29, 2008 Ms. Mayotte requested a loan modification by submitting a financial worksheet. *See* ECF No. 136 ¶ 10. Subsequently, on March 7, 2009 "ASC postponed the foreclosure sale . . . to assist Ms. Mayotte while working with [their] offices in an effort to obtain approval for a loan modification." *See* ECF No. 142 ¶ 4. Wells Fargo ultimately declined this modification request in April 2009. *See id.* ¶ 11.

On August 23, 2009 Wells Fargo mailed two letters to Ms. Mayotte noting that she was "eligible" for a loan modification through a trial payment plan ("TPP") under the Home Affordable Loan Program ("HAMP"). *See* ECF No. 134 ¶ 12. Wells Fargo had prequalified Ms. Mayotte for this TPP in August 2009 based on verbal financial information provided to Wells Fargo on October 2, 2008, which estimated Mayotte's income at $12,000 per month. *See* ECF

No. 136 ¶ 14. One of the HAMP letters provided five action items that Ms. Mayotte needed to complete in order to "accept this offer, and see if [she] qualif[ies] for a Home Affordable Modification." ECF No. 134-1 at WF001055. One of the action items was that Ms. Mayotte sign and return the attached TPP form, which states, "I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of the Modification Agreement, and (iii) the Modification Effective Date has passed." *See id.* at WF001054, WF001067.

Ms. Mayotte timely paid the first two TPP payments and made her third TPP payment one day late. *See* ECF No. 134 ¶ 16; ECF No. 142 ¶ 16; ECF No. 136-1 at WF001054. Ms. Mayotte also signed and returned all required HAMP documents, including the TPP form. *See* ECF No. 134 ¶¶ 17, 19. However, in their final review, Wells Fargo found that Mayotte's submitted documentation reflected income substantially less than the $12,000 per month upon which the TPP was offered, and her income did not support modifications that Wells Fargo was authorized to offer. *See* ECF No. 136 ¶ 15. Wells Fargo ultimately declined to permanently modify Ms. Mayotte's loan via the TPP in March 2010. *See id.* ¶ 12.

Before being informed that her modification was denied, Ms. Mayotte made two TPP payments in January 2010 and February 2010. *See* ECF No. 134 ¶¶ 22–23. Wells Fargo did not tell Ms. Mayotte that because her modification had not yet been accepted, she was still required to make the full monthly payment on her original loan rather than the reduced TPP payment. *See id.* Wells Fargo instead applied these two payments to Ms. Mayotte's original loan and charged her late fees for not paying the full amount. *See id.*; see ECF No. 136-5 at 194:6–19.

4

On March 25, 2010 Wells Fargo and Ms. Mayotte entered into the first of two separate Special Forbearance Agreements. *See* ECF No. 136 ¶ 17. This first agreement allowed Ms. Mayotte to make reduced payments between May 15, 2010 and July 15, 2010. *See id.* The agreement states that it "is an agreement to temporarily accept reduced payments," that "upon completion of this plan, the loan must be brought current," and "[a]ll of the provisions of the note and security instrument, except as herein provided, shall remain in full force and effect." *Id.* ¶ 18. Ms. Mayotte did not make the July 15, 2010 payment. *See id.* ¶ 19.

Ms. Mayotte submitted a third request for loan modification on September 30, 2010. *See id.* ¶ 20; ECF No. 136-1 at 102:19–103:21. Sometime in November 2010, Ms. Mayotte testified that Wells Fargo advised her on the phone that if she paid her Homeowners Association lien and made another payment on her original loan, then Wells Fargo would modify her loan. *See* ECF No. 134 ¶ 23. However, on December 30, 2010 Wells Fargo denied this final request for a modification. *See id.* ¶ 25; ECF No. 136-1 at 101:6–17.

Meanwhile, on November 2, 2010—before Wells Fargo denied Ms. Mayotte's third modification request—Wells Fargo and Ms. Mayotte entered into a second Special Forbearance Agreement. *See* ECF No. 136 ¶ 21. This agreement similarly allowed Mayotte to make one reduced payment on December 1, 2010. *See id.* ¶ 22. This agreement similarly states that it is an agreement to "temporarily accept[] reduced installments," that the "lender is under no obligation to enter into any further agreement," and that "[a]ll provisions of the Note and Security Instrument, except as herein provided, shall remain in full force and effect." *Id.* Ms. Mayotte made a payment on December 8, 2010 pursuant to the second Special Forbearance Agreement but made no further payments on the loan. *See id.* ¶ 24. As noted above, Wells Fargo denied her

third loan modification request later that month on December 30, 2010.  *See id.* ¶ 25; ECF No. 136-1 at 101:6–17.

In May 2011, Ms. Mayotte filed for bankruptcy.  *See* ECF No. 136 ¶ 27.

On August 13, 2013 U.S. Bank's foreclosure lawyers informed Ms. Mayotte that if she failed to cure her default by September 12, 2013, they would accelerate the loan and proceed with foreclosure.  *See id.* ¶ 30.  Ms. Mayotte did not make any additional payments.  *See id.* ¶ 24. Accordingly, on November 6, 2014 the District Court for Denver County, Colorado held a Rule 120 hearing.  *See id.* ¶ 31.  Wells Fargo objected to discovery in this hearing based on the hearing's narrow scope and limited purpose.  *See* ECF No. 142 ¶ 7.  The state court agreed.  As such, the September 2, 2008 call note was not part of the record.  *See* ECF No. 134 ¶ 5.  The state court ultimately entered an Order Authorizing Sale of Property on November 12, 2014.  *See* ECF No. 136 ¶ 31.

The following day on November 13, 2014, while state court proceedings were ongoing, Ms. Mayotte filed the instant suit in federal court.  *See id.* ¶ 32.  She proceeded pro se.  *See Mayotte*, 880 F.3d at 1171.

In December 2014 U.S. Bank foreclosed on the property.  *See id.* ¶ 34.  Pursuant to the foreclosure, U.S. Bank initiated a forcible entry and detainer action in the District Court for Denver County, Colorado in August 2016 (the "FED Action").  *See id.* ¶ 35.  In that FED Action, Ms. Mayotte asserted counterclaims and third-party claims against U.S. Bank and Wells Fargo for: (1) abuse of process; (2) declaratory judgment; (3) violations of the Colorado Consumer Protection Act; and (4) fraudulent misrepresentation.  *See id.* ¶ 36.  The state court granted U.S. Bank and Wells Fargo's joint motion to dismiss all four of Ms. Mayotte's claims with prejudice on May 30, 2017.  *See id*.

Trial in the FED Action proceeded on September 13, 2017. *See id.* ¶ 38. Following that trial, the state court entered its Order and Judgment for Possession ("Possession Order") finding that U.S. Bank had established ownership of the subject property and entering judgment against Ms. Mayotte. *See id.* Ms. Mayotte appealed both the May 30th dismissal of her claims and the September 13th Possession Order. *See id.* ¶ 39. The Colorado Court of Appeals affirmed both of the trial court's decisions in an opinion dated February 7, 2019. *See id.* ¶ 40. The Court of Appeals subsequently issued its mandate on May 30, 2019. *See id.* ¶ 40. Ms. Mayotte petitioned for certiorari review, but the Colorado Supreme Court denied her petition on May 28, 2019. *See Mayotte v. U.S. Bank Nat'l Ass'n as Tr. for Structured Asset Inv. Loan Tr. Mortg. Pass-Through Certificates, Series 2006-4*, No. 19SC208, 2019 WL 2266491, at *1 (Colo. May 28, 2019).

<u>Procedural History</u>

As noted above, Ms. Mayotte filed her federal complaint on November 13, 2014 while state court proceedings were ongoing. *See* ECF No. 136 ¶ 32; ECF No. 1. Still proceeding pro se, she amended her complaint, *see* ECF No. 12, and later she filed a second amended complaint, *see* ECF No. 31. The second amended complaint alleged seven claims premised on U.S. Bank's and Wells Fargo's alleged misrepresentations and improper foreclosure, the exact parameters of which are not relevant here. *See* ECF No. 31.

In March 2016, this Court dismissed six of Ms. Mayotte's claims from her second amended complaint without prejudice, and one claim with prejudice.[1] *See Mayotte v. US Bank Nat'l Ass'n*, No. 14-CV-3092-RBJ-CBS, 2016 WL 943781, at *1 (D. Colo. Mar. 14, 2016). This Court found that Ms. Mayotte's claims "effectively ask[ed] the Court to unwind the results of the

---

[1] This Court dismissed with prejudice Ms. Mayotte's claim under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605 *et seq.*, for failure to state a claim. *See Mayotte v. US Bank Nat'l Ass'n*, No. 14-CV-3092-RBJ-CBS, 2016 WL 943781, at *1 (D. Colo. Mar. 14, 2016).

Rule 120 proceedings" contrary to the *Rooker-Feldman* doctrine, which forbids lower federal courts from reviewing state-court civil judgments. *See id.* at *4 (citing *Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923)); *see generally* Andrea Bloom, *Foreclosure by Private Trustee: Now Is the Time for Colorado*, 65 Denv. U. L. Rev. 41, 51, 56 (1988).

Ms. Mayotte obtained counsel and appealed the dismissal. *See* ECF No. 66; ECF No. 71. On January 23, 2018, the Tenth Circuit reversed this Court's holding in part.[2] *See Mayotte*, 880 F.3d at 1171. The Tenth Circuit determined that the *Rooker-Feldman* doctrine does not bar Ms. Mayotte's federal suit because none of her claims (at least the ones pursued on appeal) challenge the Rule 120 proceedings or seek to set aside the Rule 120 ruling.[3] *See id.* Having so held, the Tenth Circuit remanded back to this Court "to consider what effect, if any, the Rule 120 ruling may have on this case under state-law doctrines of claim and issue preclusion." *See id.*

Following the remand, Ms. Mayotte filed a third amended complaint, *see* ECF No. 89, and finally a fourth amended complaint, *see* ECF No. 114. Her fourth amended complaint asserts four claims: (1) negligence against both defendants; (2) negligent supervision and hiring against U.S. Bank; (3) violations of the Colorado Consumer Protection Act ("CCPA"), West's C.R.S.A. § 6–1–101 *et seq.*, against both defendants; and (4) declaratory judgment against both defendants. *See* ECF No. 114 ¶¶ 133–184.

Currently pending before this Court are three motions for summary judgment on Ms. Mayotte's fourth amended complaint. Ms. Mayotte herself filed two separate motions for summary judgment, one against each defendant. *See* ECF No. 134; ECF No. 138. In her motion

---

[2] The Tenth Circuit affirmed this Court's dismissal of Ms. Mayotte's RESPA claim for failure to state a claim. *See Mayotte v. U.S. Bank Nat'l Ass'n for Structured Asset Inv. Loan Tr. Mortg. Pass-Through Certificates, Series 2006-4*, 880 F.3d 1169, 1171 (10th Cir. 2018).

[3] The court expressly refrained from deciding whether the *Rooker-Feldman* doctrine bars a federal court from reviewing a Rule 120 proceeding or ruling. *See id.*

for summary judgment against Wells Fargo, Ms. Mayotte asserts that (1) Wells Fargo is a negligent servicer and (2) Wells Fargo's actions violate the CCPA. *See* ECF No. 134 at 7, 18. In her motion for summary judgment against U.S. Bank, Ms. Mayotte asserts that (1) U.S. Bank is liable for Wells Fargo's illegal acts as its principal, (2) U.S. Bank is liable for the negligent supervision and ongoing retention of Wells Fargo, (3) U.S. Bank is independently liable for negligence, and (4) U.S. Bank is independently liable under the CCPA. *See* ECF No. 138.

Defendants' joint motion for summary judgment asserts seven defenses. Defendants argue that Ms. Mayotte's claims are barred by (1) claim preclusion, (2) the applicable statutes of limitations, (3) the Colorado Credit Agreement Statute of Frauds ("CCASF"), C.R.S. 38–24–124, (4) novation, and (5) the economic loss doctrine. *See* ECF No. 136. Defendants also assert that (6) there is no evidence to support any of Ms. Mayotte's claims and (7) she lacks evidence of compensable damages. *See id*.

## II.  STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id*. at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court will examine the factual record and make reasonable inferences therefrom in the light

most favorable to the party opposing summary judgment. *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## III.  ANALYSIS

### A.  <u>Claim Preclusion</u>

Defendants first argue that claim preclusion bars Ms. Mayotte's claims. *See* ECF No. 136 at 8. Claim preclusion prevents "relitigation of matters that have already been decided as well as matters that could have been raised in a prior proceeding but were not." *Lobato v. Taylor,* 70 P.3d 1152, 1165 (Colo. 2003). In determining whether to give preclusive effect to state-court judgments, federal courts apply the preclusion law of the state from which the judgment emerged. *See Allen v. McCurry*, 449 U.S. 90, 96 (1980) (citing 28 U.S.C. § 1738 (1976)).

Under Colorado law, a claim in a second judicial proceeding is precluded by a previous judgment when there exists: "(1) finality of the first judgment, (2) identity of subject matter, (3) identity of claims for relief, and (4) identity or privity between parties to the actions." *Argus Real Estate, Inc. v. E-470 Pub. Highway Auth.*, 109 P.3d 604, 608 (Colo. 2005) (citations and quotations omitted). An exception to claim preclusion applies where the plaintiff was not afforded a full and fair opportunity to litigate the issue in the first proceeding. *See Byrd v. People*, 58 P.3d 50 (Colo. 2002). However, this exception bars claim preclusion only where there was a denial of due process. *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1243 (10th Cir. 2017). Notably, claim preclusion does not require actual litigation. *See S.O.V. v. People in Interest of M.C.,* 914 P.2d 355, 358–59 (Colo. 1996).

Here, defendants assert that the prior FED Action in Colorado state court, specifically Ms. Mayotte's counterclaims in that case, precludes Ms. Mayotte's instant claims. *See* ECF No.

136 at 8. Ms. Mayotte does not dispute any of the four elements of claim preclusion. Instead, she argues that claim preclusion cannot apply here because she did not have a full and fair opportunity to litigate her claims in the FED Action. *See* ECF No. 144 at 3–4.

Although Ms. Mayotte does not dispute any of the elements of claim preclusion, I briefly consider each one. First, the FED Action was final. The state court granted U.S. Bank and Wells Fargo's joint motion to dismiss all of Ms. Mayotte's claims with prejudice. *See* ECF No. 136 ¶ 37l; *see also O'Done v. Shulman*, 238 P.2d 1117, 1118 (Colo. 1951) (finding that a dismissal with prejudice is a final adjudication on the merits for the purpose of claim preclusion). Ms. Mayotte appealed, and the Colorado Court of Appeals affirmed the dismissal of her claims. *See* ECF No. 136-11; *see also Mayotte*, 880 F.3d at 1171. Ms. Mayotte's subsequent petition for certiorari to the Colorado Supreme Court was denied. *See Mayotte*, 2019 WL 2266491, at *1.

Second, the subject matter of the claims is identical. Both the FED Action and the instant case involve "the same parcel of land and the same agreement," namely the house and the loan. *Argus Real Estate, Inc.*, 109 P.3d at 608.

Third, the claims are identical. The inquiry regarding identity of claims "does not focus on the specific claim asserted or the name given to the claim," but rather whether the claims are "bounded by the injury for which relief is demanded." *Id.* at 608–09. In the instant case, Ms. Mayotte brings claims for negligence, negligent supervision and hiring, violations of the CCPA, and declaratory judgment. *See* ECF No. 136 ¶ 41. In the FED Action, Ms. Mayotte brought counterclaims for fraudulent misrepresentation, violations of the CCPA, and declaratory judgment. *See* ECF No. 136-9 at 3. Some of these claims are the same specific claims, but more to the point, all of the claims focus on the same allegations and injury: that defendants instructed Ms. Mayotte to withhold payments on her loan while promising a loan modification, that

defendants denied Ms. Mayotte a loan modification, and that the defendants subsequently illegally foreclosed on Ms. Mayotte's home.

Fourth and finally, the claims involve the same parties: Ms. Mayotte, U.S. Bank, and Wells Fargo.

Having established that the four elements of claim preclusion are met, I consider whether Ms. Mayotte was nevertheless not afforded a full and fair opportunity to litigate her claims in the FED Action. Ms. Mayotte makes two arguments on this point. First, she claims that the state court expressly held that it would not litigate the claims, instead relying on the Rule 120 hearing that held that Ms. Mayotte was in default. Ms. Mayotte cites language from the Possession Order stating: "[I]t is not the proper purview of this Court to unwind the consequences of the Rule 120 action in 2013CV35162, and to litigate the purported malfeasance of Wells Fargo Bank and its role, if any, in the subsequent foreclosure action." ECF No. 136-10 at 4. Although Ms. Mayotte does not provide argument in her response as to why such reliance on the Rule 120 action would be inappropriate, her fourth amended complaint asserts that the Rule 120 hearing was a non-judicial proceeding that "did not conclusively establish the legal status of any party." ECF No. 114 ¶¶ 180–183. As such, she argues, "[t]he ultimate right to foreclose, the amount owed by Ms. Mayotte, whether a contract existed that was breached, and whether the entities that foreclosed had a legal right to foreclose have never been adjudicated."[4] *Id.* ¶ 183.

---

[4] This argument might have been better couched under the third element of claim preclusion—identity of claims—rather than under the full and fair opportunity to litigate exception. The full and fair opportunity to litigate exception is a due process rule. *See Lenox MacLaren Surgical Corp.*, 847 F.3d at 1243. Yet Ms. Mayotte does not appear to argue that the state court denied her due process in the FED Action when it refused to "unwind the consequences of the Rule 120 action." ECF No. 136-10 at 4. Ms. Mayotte's argument instead appears to be that the state court simply did not litigate the claims that she brings in the instant case. Further, if Ms. Mayotte were to argue that she was denied due process in the FED Action, her claims might fall awry of both the *Rooker-Feldman* doctrine and the Tenth Circuit's express finding that the *Rooker-Feldman* doctrine did not apply to Ms. Mayotte's claims because none of her claims challenge a state-court proceeding. *See Mayotte*, 880 F.3d at 1171. That said, Ms. Mayotte's argument

This argument fails because Ms. Mayotte misrepresents the state court's holding in the Possession Order and ignores the state court's prior order. The state court did not consider Ms. Mayotte's claims in the Possession Order because the state court had already dismissed her claims with prejudice in its May 30, 2017 order. *See* ECF No. 136-9. That May 30th order evinces Ms. Mayotte's full and fair opportunity to litigate her claims before the state court. Although I do not purport to review the adequacy of that state-court order, it is worth noting that the order provided a robust analysis of why all three of Ms. Mayotte's claims were barred by statute of frauds, specifically, the CCASF.[5] Ms. Mayotte had further opportunity to litigate her claims in her appeal to the Colorado Court of Appeals and again in her petition for certiorari to the Colorado Supreme Court.[6] Yet Ms. Mayotte does not mention this May 30th order or her subsequent appeals anywhere in her instant response to defendants' motion, instead referring solely to the much narrower Possession Order.

---

about the Possession Order fails on its face for ignoring the May 30th order, and I base my decision primarily on this.

[5] The state court noted Ms. Mayotte's various defenses to the CCASF and explained why they each failed. Ms. Mayotte argued, first, that the CCASF did not apply because U.S. Bank and Wells Fargo are not "creditors" under the statute. *See* ECF No. 136-9 at 3–4. Specifically, she noted that the party that extended the credit for the loan was New Century Mortgage, a now-bankrupt lender who had assigned the note to a trust. *See id*. That trust is represented by U.S. Bank, and U.S. Bank is the principal of Wells Fargo. *See id*. Yet after analyzing Colorado case law, the state court held that U.S. Bank and Wells Fargo should receive the same protections under the CCASF that New Century Mortgage would receive. *See id.* at 4. Second, Ms. Mayotte argued that the CCASF did not apply because her claim did not rest "upon a broken contractual promise or some credit agreement," but rather on a broken oral representation. *See id*. The state court disagreed, finding that the statute should be—and had been—broadly interpreted to include oral representations. *See id.* at 4–5.

[6] In Ms. Mayotte's appeal to the Colorado Court of Appeals, Ms. Mayotte claimed (1) that U.S. Bank and Wells Fargo were not creditors under the CCASF and (2) that the CCASF cannot be used to shield a fraud. *See* ECF No. 136-9 at 4. The Court of Appeals reviewed these arguments de novo. *See id*. at 4, 6–9. It first affirmed that assignees of mortgages "stand[] in the shoes of" the assignor and thus qualify as creditors under the CASF. *See id*. at 7. It also held that regarding her argument that the CCASF cannot be used to shield a fraud, Ms. Mayotte had neither cited any case law nor raised the argument below. Regardless, the court held that the language of the statute creates no exceptions.

Second, Ms. Mayotte also claims that she was denied a full and fair opportunity to litigate her claim because Wells Fargo fraudulently concealed the September 2, 2008 call note in the FED Action, not producing it until discovery in the instant case. *See* ECF No. 144 at 5. The discovery of new evidence which was fraudulently concealed or could not have been discovered with due diligence can bar the application of claim preclusion to a new claim if "the plaintiff did not know the full dimensions of the claim at the time of the first action." *Lenox MacLaren Surgical Corp.*, 847 F.3d at 1243–44 (noting that "under certain circumstances, the later filing of a new claim arising from the same transaction at issue in a prior action may . . . be excused because the plaintiff did not know the full dimensions of the claim at the time of the first action," including where "evidence was either fraudulently concealed or . . . could not have been discovered with due diligence"). Ms. Mayotte argues that although this call note does not change the contours of her underlying claims, it does change her response to defendants' assertion of the CCASF. Specifically, she argues that she never had the opportunity to litigate the issue of whether the call note constitutes a "writing" under the CCASF.[7] *See* ECF No. 144 at 10.

Defendants note, however, that Ms. Mayotte did assert this argument in the FED Action. *See* ECF No. 147 at 2 n.1. In her March 21, 2019 petition for certiorari to the Colorado Supreme Court, Ms. Mayotte argued that she had newly "discovered smoking gun documents," including the call note. ECF No. 147-1 at 4–5. She argued that this evidence "defeat[s] any argument that

---

[7] Ms. Mayotte's brief on this issue is ambiguous. In her argument section on claim preclusion she notes only that this call note was "in Wells Fargo's own writing." ECF No. 144 at 5. However, she also argues later in her response that the CCASF does not apply here because the call note constitutes a "writing" within the meaning of the statute. *See id.* at 10. She then clarified at the trial preparation conference that this is indeed her argument. *See* ECF No. 166 at 13:22–14:7.

the [CCASF] bars Mayotte's claims or defenses." *Id.* at 5–6. In response, the Colorado Supreme Court denied Ms. Mayotte's petition. *See Mayotte*, 2019 WL 2266491, at *1.

That said, Ms. Mayotte's claim raises three questions: (1) whether the call note was fraudulently concealed or could not have been discovered with due diligence; (2) whether the discovery of the call note altered the dimensions of Ms. Mayotte's claim, and (3) whether a denied petition for certiorari that has timely raised newly discovered evidence constitutes a full and fair opportunity to litigate an issue. *See Lenox MacLaren Surgical Corp.*, 847 F.3d at 1243–44.

First, I find that Ms. Mayotte could not have discovered the call note with due diligence. The call note was in Wells Fargo's possession, and the state court denied general discovery "due to the narrow scope of the FED hearing." *See* ECF No. 144-1 at 6–8. Ms. Mayotte had access to general discovery only during the instant case. *See* ECF No. 144 at 5.

Second, I find that the discovery of the call note alters the dimensions of Ms. Mayotte's claims. Ms. Mayotte argues that the call note constitutes a writing that precludes application of the CCASF. The state court's dismissal of Ms. Mayotte's claims in the FED Action turned entirely on the CCASF. Thus, the discovery of a writing alters Ms. Mayotte's arguments on whether the CCASF bars her four instant claims.

Third, I agree with Ms. Mayotte that a denied petition for certiorari does not constitute a full and fair opportunity to litigate an issue. That is not to say that the Colorado Supreme Court was wrong to deny certiorari or that the Colorado Supreme Court denied Mayotte due process in so doing. The Colorado Supreme Court has discretion in accepting petitions for certiorari, and it usually does not do so simply to correct an erroneous decision that will affect only the parties to that case. *See* C.A.R. 49–50. It grants petitions "only where there are special and important

reasons." C.A.R. 49.  The Colorado Supreme Court's denial of Ms. Mayotte's petition let stand the Court of Appeals' decision dismissing Ms. Mayotte's claims, but it made no ruling as to Ms. Mayotte's newly discovered and newly presented evidence.  Although it is true that a full and fair opportunity to litigate does not require a trial on the merits, it does require an opportunity to litigate.  *Cf. Ellis v. Brown*, No. CIV-06-1156-R, 2007 WL 28273, at *1 (W.D. Okla. Jan. 3, 2007), *aff'd,* 237 F. App'x 327 (10th Cir. 2007) (finding that a denial of certiorari did not constitute a denial of a full and fair opportunity to litigate where plaintiff was able to present the same arguments in state trial court and state appellate court).  Because granting a petition for certiorari to consider the Court of Appeal's finding is discretionary, Ms. Mayotte never had the opportunity to litigate the issue of whether the call note constitutes a writing under the CCASF.

Accordingly, Ms. Mayotte's four claims are not barred by claim preclusion to the extent that she presents claims that she did not have a full and fair opportunity to litigate.  *See infra* note 8.  Ms. Mayotte did not have a full and fair opportunity to litigate any of her four claims because she did not have a full and fair opportunity to litigate whether the call note constitutes a writing under the CCASF.  I therefore address Ms. Mayotte's argument that the call note constitutes a writing under the CCASF.

### B.  The Colorado Credit Agreement Statute of Frauds

Colorado law prohibits any claim founded upon unwritten changes to a credit agreement.  *See* C.R.S. § 38-10-124(2) (2017) ("Notwithstanding any statutory or case law to the contrary . . . no debtor or creditor may file or maintain an action or a claim relating to a credit agreement involving a principal amount in excess of twenty-five thousand dollars unless the credit agreement is in writing and is signed by the party against whom enforcement is sought.").

Defendants assert that because Ms. Mayotte's suit is premised upon an alleged oral promise of modification to her loan, the CCASF bars her suit. *See* ECF No. 136 at 11.

Ms. Mayotte asserts that the call note constitutes a "writing" sufficient to survive the CCASF.[8] *See* ECF No. 144 at 10. She asserts without authority that "[a]ny writing by a defendant removes any doubt that the claim can be proved with paper." *Id*. She argues that it does not matter that the call note is not a "signed" writing, citing case law recognizing that bilateral emails can be sufficient. *See* ECF No. 144 at 10; *PayoutOne v. Coral Mortg. Bankers*, 602 F. Supp. 2d 1219, 1222, 1226 (D. Colo. 2009) (finding that bilateral emails between the parties constituted a signed writing to support an agreement to refinance a third party's loan where defendant "expressly promised to refinance [the third party's] Property debt after [the third party] acquired the Property").

Yet Ms. Mayotte's argument on what constitutes a "signed" writing under the CCASF misses the point. The call note is insufficient under the CCASF, not because it is not signed, but because it does not indicate that there was any meeting of the minds between Ms. Mayotte and Wells Fargo about granting her a loan modification. The call note is two lines in a customer service representative's call log noting that Ms. Mayotte "want[ed] to make a [payment]" but was "advised to hold on to [sic] it and use as in[i]tial down [payment]." ECF No. 136-6. Even construing this call note in the light most favorable to Ms. Mayotte, the call note merely confirms what is not disputed in the instant litigation: that in September 2008 Wells Fargo told Ms. Mayotte that she needed to be three months behind on her loan payments before they could

---

[8] Only one of Ms. Mayotte's arguments about the CCASF survives claim preclusion. Ms. Mayotte was denied a full and fair to litigate only one of these arguments because only one is new pursuant to the discovery of the call note. Claim preclusion bars Mayotte's other two arguments that (1) the CCASF does not apply because defendants waived payment based on their representations to Mayotte and (2) the CCASF does not apply to fraud. *See* ECF No. 144 at 10–11.

consider her for a loan modification, and that they "advised" her not to pay until they ruled on her request for a loan modification. It is true that defendants initiated foreclosure proceedings in approximately October 2008 after Ms. Mayotte purposefully missed three payments pursuant to this advice. *See* ECF No. 136 ¶ 9. However, when Ms. Mayotte officially requested a loan modification on October 29, 2008, defendants stayed foreclosure proceedings so as to work with her on loan modification options. *See* ECF No. 136 ¶ 10; ECF No. 142 ¶ 4. Defendants subsequently considered (and rejected) Ms. Mayotte's requests for a loan modification three times. *See* ECF No. 136 ¶¶ 10–12, 25.

The call note does not indicate that Wells Fargo promised that they would modify Ms. Mayotte's loan. It does not indicate that Wells Fargo promised not to foreclose on Ms. Mayotte if she ultimately failed to cure her default. It does not indicate that Wells Fargo promised Ms. Mayotte anything except that they would consider her for a loan modification—which they did, three times. The fact that they subsequently denied those loan modification requests does not contradict the call note. The call note therefore does not count as a "signed writing" that proves that Wells Fargo promised to modify Ms. Mayotte's loan.

Because Ms. Mayotte premises all four of her claims on an alleged oral promise to modify her loan, and because she has not presented a signed writing to prove that oral promise, the CCASF bars each of her claims. Accordingly, defendants' joint motion for summary judgment is granted and all four of Ms. Mayotte's claims are dismissed.

### C. Economic Loss Doctrine

In the interest of finality, I also address defendants' argument that Ms. Mayotte's claims are barred by the economic loss doctrine. *See id.* at 13. Under Colorado law, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a

tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma v. AZCO Const., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000). A duty of care is considered independent of a contractual duty when it: (1) "arise[s] from a source other than the relevant contract" and (2) is not "a duty also imposed by the contract." *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.,* 573 F.3d 947, 962 (10th Cir. 2009) (citing *Town of Alma*, 10 P.3d at 1263).

The economic loss doctrine can also apply to statutory claims such as the CCPA. *See Electrology Labs., Inc. v. Kunze*, 169 F. Supp. 3d 1119, 1152 (D. Colo. 2016) (applying Colorado law and holding that "[a]lthough stated to preclude 'tort' actions, depending on the facts and circumstances of a case, the economic loss rule may be applied to bar statutory claims as well"); *see also Nero v. Am. Family Mut. Ins. Co.*, No. 11-CV-02717-PAB-MJW, 2013 WL5323147, at *6 (D. Colo. Sept. 23, 2013) (finding that plaintiff's CCPA claim is barred by economic loss doctrine); *but see Christenson v. CitiMortgage, Inc.*, No. 12-cv-02600-CMA-KLM, 2015 WL 1757076, at *5 (D. Colo. April 14, 2015) (finding that plaintiff's CCPA claim is not barred by economic loss doctrine). In response, Ms. Mayotte argues that her claims arise independently in tort law, not in contract law.[9]

I find that all four of Ms. Mayotte's claims are barred by the economic loss doctrine. Ms. Mayotte has failed to identify any independent duty of care under tort law to support her claims. Ms. Mayotte proffers a litany of allegedly independent duties that Wells Fargo owes to Ms. Mayotte, including:

> a) keeping accurate records; b) processing payments accurately and quickly; c) keeping an accurate total of the amount paid and the amount owed; d) maintaining access to and knowledge of all essential documents, including the promissory note and the deed; e) providing accurate, timely information to borrowers in a way that borrowers can understand; f) communicating directly with the borrower via a

---

[9] Preliminarily I note the irony of this assertion. Ms. Mayotte's suit survived claim preclusion only because she was denied a full and fair opportunity to litigate the CCASF issue—which is, of course, a statute sounding in contract law.

person who is qualified to consider borrower questions, concerns, and requests; g) accepting and reviewing modification requests in a timely, efficient manner; h) receiving and maintaining copies of documents from borrowers; i) providing clear decisions on requested loan modifications; j) providing clear accounting to a borrower of how payments were applied and the current outstanding amounts; and k) initiating and carrying out foreclosure when appropriate.

*See* ECF No. 144 at 12–13. Yet Ms. Mayotte's argument ends there; she does not explain how any of the proffered duties are independent of the underlying loan agreement. Indeed, I find that none of these duties "arise from a source other than the relevant contract," and that rather all of them are "dut[ies] also imposed by the contract." *Haynes Trane Serv. Agency, Inc.*, 573 F.3d at 962. The loan agreement itself imposes a duty of care on defendants in the servicing of that loan. All of Ms. Mayotte's proffered duties arise out of defendants' role as servicers of Ms. Mayotte's loan. Ms. Mayotte even expressly frames many of these duties with reference to "the borrower" and "the promissory note and the deed."

Because she cannot identify an independent duty, the economic loss doctrine applies facially to Ms. Mayotte's tort claims for negligence and negligent supervision. I find that it also applies to her CCPA claim and her declaratory judgment claim. *See Electrology Lab., Inc. v. Kunze*, 169 F. Supp. 3d 1119, 1152–53 (D. Colo. 2016) (noting that "an independent evaluation of the reach of the [economic loss] rule is necessary as to any given claim"). Ms. Mayotte bases her CCPA claim on Wells Fargo's alleged "fail[ure] to admit that it waived payment on the loan for the last ten years" and its provision of "wrong information and wrong documents." *See* ECF No. 134 at 19. These allegations are contractual in nature and "arise[s] out of duties imposed by the [loan] contract." *Nero*, 2013 WL5323147, at *6 (finding that the economic loss doctrine bars plaintiff's CCPA claim because the relevant duty "to comply with its contracts" and "to pay [insurance] claims in a timely fashion" arises out of the contract); *cf. Christenson*, 2015 WL 1757076, at *5 (finding that the economic loss doctrine did not bar plaintiff's CCPA claim

because the relevant duty to evaluate and implement loss mitigation options arises not out of the relevant contract but out of Department of Housing and Urban Development regulations).

The declaratory judgment claim is also contractual in nature. It seeks to assign contractual rights under the loan agreement, including whether Ms. Mayotte was in default at the time of foreclosure, "who is secured regarding the subject property, how much is owed, and to whom [Ms.] Mayotte owes any remaining amounts." ECF No. 144 ¶ 184. Like Ms. Mayotte's other claims, this claim improperly seeks to replace what is properly a contract law claim.

Accordingly, the economic loss doctrine bars all four of Ms. Mayotte's claims.

### D. Novation

In the interest of finality I will also consider Ms. Mayotte's claims to the extent that they arise in contract law. I have already addressed the application of the CCASF to Ms. Mayotte's claims. I now address defendants' argument that the two Special Forbearance Agreements supersede any alleged prior agreement for modification. *See* ECF No. 136 at 12.

Novation is "[t]he extinguishment of an old contract by the substitution of a new contract." *Moffat Cty. State Bank v. Told*, 800 P.2d 1320, 1323 (Colo. 1990). Under Colorado law, a contract of novation has four prerequisites: (1) a previous valid obligation, (2) an agreement between the parties to abide by the new contract, (3) a valid new contract, and (4) the extinguishment of the old obligation by the substitution of the new one. *See id.* "[I]f the essential elements or terms of the contract have been transformed, a new contract will be deemed to supersede the old." *Phoenix Power Partners, L.P. v. Colorado Pub. Utilities Comm'n*, 952 P.2d 359, 364–65 (Colo. 1998). Ms. Mayotte does not respond to defendants' novation argument except to state that her claims arise in tort rather than contract. *See* ECF No. 144 at 12.

Ms. Mayotte alleges that Wells Fargo promised her a loan modification in September 2008. *See* ECF No. 134 ¶ 1. It is undisputed that Ms. Mayotte thereafter signed two separate Special Forbearance Agreements in March 2010 and November 2010. *See* ECF No. 136 ¶¶ 17, 21. Both of these agreements expressly held that the "indebtedness of the referenced loan is in default," that the respective Special Forbearance Agreement "is an agreement to temporarily accept reduced payments," that "upon completion of this plan, the loan must be brought current," and that "[a]ll of the provisions of the note and security instrument, except as herein provided, shall remain in full force and effect." ECF No. 136 ¶¶ 18, 22.

Even assuming that Wells Fargo's alleged promise to modify Ms. Mayotte's loan is valid, the Special Forbearance Agreements extinguish that promise. The Special Forbearance Agreements are valid contracts by which both Ms. Mayotte and Wells Fargo agreed to abide. Defendants did not foreclose on Ms. Mayotte until after she entered the Special Forbearance Agreements. The Special Forbearance Agreements supersede any alleged promise to modify Ms. Mayotte's loan by expressly reaffirming Ms. Mayotte's obligations under the original loan.

Accordingly, novation bars all of Ms. Mayotte's claims to the extent that she premises them on an alleged contractual promise to modify her loan.

### E. Compensable Damages

Finally, again in the interest of finality, I address defendants' argument that Ms. Mayotte has failed to show compensable damages. *See* ECF No. 136 at 19. Ms. Mayotte's complaint alleges that she lost equity in her home, attorney's fees, reputational harm and emotional distress, credit injury, and diminished business opportunities. *See* ECF No. 114 ¶¶ 128–131.

Yet Ms. Mayotte has not provided any evidence that her damages outweigh the benefit that she has derived. Ms. Mayotte made her last loan payment in December 2010. *See* ECF No.

136 ¶ 24.  She lived in the house for over ten years without payment.[10]  Using the $2,500 per month fair-market rent that Ms. Mayotte herself asserted in the FED Action, defendants estimate that Ms. Mayotte derived approximately $310,000 from her continued occupancy of the property without payment.  *See* ECF No. 136 at 20.  Ms. Mayotte has offered no evidence as to what her property was worth at the time of foreclosure.  *See id.* at 19–20.

Accordingly, Ms. Mayotte has not presented a genuine dispute of material fact as to damages and I find that she has failed to allege compensable damages as a matter of law.

## ORDER

1.  Plaintiff's motion to supplement, ECF No. 141, is GRANTED.

2.  Plaintiff's motion for summary judgment against Wells Fargo, ECF No. 134, is DENIED.

3.  Plaintiff's motion for summary judgment against U.S. Bank, ECF No. 138, is DENIED.

4.  Defendants' motion for summary judgment, ECF No. 136, is GRANTED.  Plaintiff's claims are dismissed with prejudice.  As the prevailing party, defendants are awarded reasonable costs to be taxed by the Clerk pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

DATED this 29th day of November, 2019.

BY THE COURT:

---

[10] Defendants did not foreclose on the property until December 2014, four years after Ms. Mayotte's last payment.  *See* ECF No. 136 ¶ 34.  Defendants then took a forcible entry and detainer action two years later, in August 2016, to finally evict Ms. Mayotte from the property, which she appealed through May 2019.  *See id.* ¶¶ 35, 40; *Mayotte*, 2019 WL 2266491, at *1.  It is unclear exactly when Ms. Mayotte vacated the property, but defendants' profit estimate indicates that she lived at the property without payment for ten years and four months.  *See* ECF No. 136 at 20.  Ms. Mayotte does not dispute this.

R. Brooke Jackson
United States District Judge